# EXHIBIT B

LEXSEE 2007 US DIST LEXIS 84588

FRANKLIN ELECTRIC CO., INC., Plaintiff, v. DOVER CORPORATION, d/b/a
OPW FUELING COMPONENTS, Defendant.

05-C-598-S

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
WISCONSIN

*2007 U.S. Dist. LEXIS 84588*

**November 15, 2007, Entered**

**PRIOR HISTORY:** *Franklin Elec. Co. v. Dover Corp., 2006 U.S. Dist. LEXIS 47722 (W.D. Wis., July 11, 2006)*

**COUNSEL:** **[\*1]** For FRANKLIN ELECTRIC CO., INC., Plaintiff: CHRISTOPHER DARROW, YOUNG & BASILE PC, TROY, MI; Thomas Ross, Marshall Gerstein & Borun LLP, Chicago, IL; Timothy Edwards, Axley Brynelson Llp, Madison, WI.

For INC. OPW, DOVER CORPORATION, Defendants: James R. Troupis, Michael Best & Friedrich LLP, Madison, WI.

**JUDGES:** JOHN C. SHABAZ, District Judge.

**OPINION BY:** JOHN C. SHABAZ

**OPINION**

MEMORANDUM AND ORDER

Plaintiff Franklin Electric Co., Inc. commenced this patent infringement action alleging that defendant Dover Corporation manufactures and sells underground fuel storage tank ("UST") components which infringe its *United States Patents Nos. 5,085,257 ('257 patent)* and *6,840,549 B1 ('549 patent)*. On May 4, 2006, the Court entered summary judgment of non-infringement as to both patents. Plaintiff appealed from the judgment of non-infringement of the *'257 patent* and on March 1, 2007 the Federal Circuit Court of Appeals reversed that portion of the judgment and remanded for further proceedings The matter is presently before the Court on defendant's second motion for summary judgment of non-infringement and invalidity of the *'257 patent*. Defendant also moves for alternative determinations that even if the *'257* is found valid **[\*2]** and infringed, the facts are insufficient as a matter of law to establish willful infringement or damages for lost profits. The following is a summary of relevant undisputed facts.

FACTS

The *'257 patent* relates to UST components installed above underground tanks to facilitate filling the tanks while protecting against spills and water infiltration. The *'257 patent* claims a containment assembly which attaches to the top of a containment sump surrounding the riser pipes and protects against spills during the filling process and water infiltration into the system. Defendant manufactures and sells UST components which perform functions similar to those of the patented devices. Following is a more detailed discussion of the patents in suit and the accused devices.

The *'257 patent* claims a sump cover containment assembly which protects surrounding soil from contamination during the filling and evacuating of underground petroleum storage tanks and prevents water from entering to avoid contamination of the tank contents. Claim 1 is the only independent claim:

> **1.** A sump cover containment assembly for use with a containment sump which has a top end with a hole therein, comprising:
>
> a substantially **[\*3]** hollow frame having an open top end and an open bottom end sized, shaped and oriented so

that said bottom end fits around said top end of said containment sump;

a sump cover positionable over said top end of said frame, having at least one downward extension and at least one access hole extending through said at least one downward extension, said at least one access hole being of proper size, shape and orientation to facilitate positioning of a spill collector therein;

a lid for covering each of said at least one access holes in said sump cover;

first sealing means for sealing said lid to said sump cover;

second sealing means for sealing said sump cover to said frame to minimize intrusion of surface water into said substantially hollow frame; and

a sump shield substantially covering said top end of said containment sump, having a downward lip which extends downward about said containment sump between said frame and said containment sump, and an upward extension having a hole therein sized, shaped and oriented to mate with said at least one downward extension of said sump cover and to facilitate positioning of said spill collector therein.

Figure 7 of the *'257 patent* depicts a preferred embodiment [*4] of the invention.

[SEE [FIG. 7] IN ORIGINAL]

The patent application which ultimately led to the issuance of the *'257 patent* was initially rejected in its entirety by the examiner as obvious. To overcome the rejection certain amendments were made to claim 1 including the addition of the phrase "to facilitate positioning of a spill collector therein" in two places. The remarks accompanying the amendment included the following:

Claim 1 has been amended to include further clarifying and limiting language which clearly distinguishes claim 1 as amended from the prior art of record. More specifically, claim 1 now includes clarification of the sump cover as accepting a spill collector in one of its downward extensions, as well as clarification of the sump shield as substantially covering the top end of the containment sump while accepting a spill collector in one of its upward extensions.... Thus, the containment assembly of amended claim 1 is capable of much more than is the prior art of record. It acts as a housing for containing and supporting a spill collector, as well as acting as a secondary containment system which facilitates access for maintaining a spill collector utilized therewith. [*5] Thus, the spill collector no longer needs to be concreted into the ground as was previously required.

In its March 1, 2007 order, at page 15, the Federal Circuit announced the following interpretation of the claim 1 requirement that the extensions "facilitate position" of the spill collector:

Therefore, we hold that the extensions need not assist with, or even be capable of assisting with, the act of positioning the spill collector. Instead, we agree with Franklin that the upward and downward extensions need only "allow" the spill collector to be positioned in the hole.

*Defendant's Containment Assembly*

Defendant manufactures and sells a containment system which attaches to the top of a sump above a UST. The system includes a composite or metal tray which is attached to an adapter on the riser. A metal ring attaches a bellows-like spill container made of molded plastic to the tray. The spill container extends upward and connects to a second metal ring which is attached to the sump cover. A second, optional, soft pliable bellows-like boot called the water shroud boot can be placed over the spill container. It is attached at the top to the same metal ring

used to attach the spill container [*6] and at the bottom to a cover that is placed over the sump. Both the spill container and the water shroud boot are flexible bellows so that they can move both vertically and laterally without breaking their respective seals. The diagram below depicts the defendant's accused containment assembly:

[SEE [OPW MULTI-PORT (MPWS)] IN ORIGINAL]

*Relevant Prior Art*

U.S. Patent No. 5,058,633 to Sharp ("Sharp") and U.S. Patent No. 4,615,362 to Hartman ("Hartman") are prior art to the *'257 patent*. Sharp claims a UST assembly which includes a secondary containment chamber. Sharp's figure 11 depicts a preferred embodiment:

[SEE [FIG. 11] IN ORIGINAL]

As evident from an examination of the preferred embodiment, Sharp does not disclose a cover over its containment sump.

Hartman describes an environmentally safe protection device to contain fuel fill hose spillage. Hartman's figure 2. depicts a preferred, embodiment of the invention:

[SEE [FIG. 2] IN ORIGINAL]

Hartman describes the use of a screen (labeled "150" in figure 2) which filters debris from spilled fuel before it enters a containment sump.

Plaintiff manufactures and sells UST watertight sump containment assemblies. The assemblies do not incorporate all [*7] elements of the *'257 patent*, however they are protected by other patents owned by plaintiff. In 2003, defendant began selling the OPW multiport system with water shroud boot. Prior to developing the OPW multiport, defendant tried unsuccessfully to license the '257 technology. Both plaintiff's and defendant's products are used with containment sumps. Plaintiff's products are substantially more expensive than defendant's competitive products. In 2006 defendant began selling a non-infringing alternative product.

Other available systems for filling tanks do not employ sumps but directly bury pipe components. Other systems with a sump include components for enhanced vapor recovery but to not prevent water from entering the sump. During the relevant period Fibrelite Composites, Ltd. sold a UST fiberglass secondary containment system including a sump. Fibrelite's products included a seal between the manhole cover frame and the top of the sump to prevent water infiltration.

The prevention of water infiltration into the containment sump was a desirable characteristic of the products and was required by California regulation AB2481 for all new sump containment systems on new construction after [*8] July 1, 2003. Customers were seeking water tight UST systems in 2003.

MEMORANDUM

Defendant's present motion for summary judgment seeks a determination of non-infringement based on four separate elements of claim one of the *'257 patent*. Defendant also seeks a determination that all claims of the *'257 patent* are invalid as obvious in light of the Sharp and Hartman patents. Additionally, defendant seeks summary judgment that plaintiff's claims for lost profits and willful infringement fail as a matter of law.

Summary judgment is appropriate when, after both parties have the opportunity to submit evidence in support of their respective positions and the Court has reviewed such evidence in the light most favorable to the nonmovant, there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Rule 56(c), Fed. R. Civ. P.* A fact is material only if it might affect the outcome of the suit under the governing law. Disputes over unnecessary or irrelevant facts will not preclude summary judgment. A factual issue is genuine only if the evidence is such that a reasonable factfinder, applying the appropriate evidentiary standard of proof, could return [*9] a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. Under *Rule 56(e)* it is the obligation of the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.

*Infringement*

Patent infringement analysis consists of two steps. First, the patent claims must be interpreted or construed to determine their meaning and scope. Second, the properly construed claims are compared to the process or product accused of infringing. *Markman v. Westview*

*Instruments, Inc.,* 52 F.3d 967, 976 (Fed. Cir. 1995). The first step of this analysis, claim construction, is a matter of law exclusively for the court. *Id. at 970-71*. To establish infringement plaintiff must prove that each claim element is present in the accused product, either literally or by equivalence. *Dawn Equipment Co. v. Kentucky Farms Inc.,* 140 F.3d 1009, 1015 (Fed. Cir. 1998). Conversely, defendant can prevail by demonstrating that at least one element of the asserted claim is absent in their product or process.

The well established process for claim construction begins with examination of the claims language. The language is given its ordinary meaning as it would be understood [*10] by one of ordinary skill in the relevant art, given its context and the other patent claims. *Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336, 1342 (Fed. Cir. 2001). This initial construction is then considered in light of the specification to determine whether the inventor expressed a different meaning for the language, whether the preferred embodiment is consistent with the initial interpretation and whether the inventor specifically disclaimed certain subject matter. *Id. at 1342-43*. The specification takes on a more important role if the claims language is particularly ambiguous, *id.,* or if the inventor invoked the means plus function language of *35 U.S.C. § 112,* P 6 thereby incorporating the specification's embodiment into the claims by reference. Finally, the interpretation is examined for consistency with the patent's prosecution history and any disclaimers made therein. *Id. at 1343*.

Assuming one or more elements is literally absent from the accused device, it must be determined whether the device infringes under the doctrine of equivalents. The Supreme Court offered the following guidance for assessing whether an element is present by equivalents:

> Does the accused product or process [*11] contain elements identical or equivalent to each claimed element of the patented invention? ... A focus on individual elements and a special vigilance against allowing the concept of equivalence to eliminate completely any such elements should reduce considerably the imprecision of whatever language is used. An analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element.

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 40, 117 S. Ct. 1040, 137 L. Ed. 2d 146 (1997).

Defendant contends that as a matter of law the frame of its device does not include a bottom end which "fits around" the top end of the containment sump or a sump shield having a downward lip "between" the frame and the containment sump. Both contentions are based on the factual premise that in its accused device the lower portion of the frame does not extend down to vertically overlap the top of the sump. Resolution of the argument therefore requires both construction of the terms "fits around" [*12] and "between" and a factual determination concerning the spatial relationships of the components in defendant's device.

The phrase "fits around" in the context of the patent claim ordinarily means to encircle or surround. To encircle or surround requires that the encircling item is in the same plane as the item encircled. This definition is reinforced by the preceding language requiring that the bottom end of the frame be "sized, shaped and oriented" to fit around the top of the sump. The use of the word "oriented" in modification surely implies that the bottom of the frame must be situated relative to the top of the sump to encircle it. This definition is further confirmed by the col. 5, lines 30-34 of the specification which discusses positioning of the components:

> Such positioning allows frame 18 to overlap extension 17 of the containment sump 11 and facilitates proper positioning of sump shield 16 to effectively eliminate water intrusion into containment sump 11.

Additionally, the specification discloses an optional seal 110 between the frame and the downward lip of the sump shield (see col. 5, lines 1-3), a seal which is only possible if the frame surrounds and encircles the top [*13] of the sump.

A similarly compelling analysis leaves no doubt that the downward lip of the sump shield lies "between" the

frame and the containment sump only if the top portion of the sump and the bottom portion of the frame overlap. In this context the common meaning of between is in the space separating two things. Thus, for the downward lip of the sump shield to lie "between" the bottom portion of the frame and the top portion of the sump, the two must overlap. The specification confirms this in for the same reason it confirms common definition of "fits around."

The second step in the analysis is to determine whether the frame of defendant's accused device overlaps the top of the sump. In the previously stipulated depiction of the device it appears that there is overlap so that the frame is oriented to fit around the top of the sump and the downward lip of the sump shield is between the two. In support of this motion, however, defendant has submitted by affidavit a revised drawing, purporting to more precisely represent the relationship of the components of its device which indicates a space of 3.688 inches between the top of the sump and the bottom of the frame. Notwithstanding the **[*14]** newly presented diagram the Court cannot accept the fact of a space as undisputed. First, it contradicts previously stipulated evidence. Second, the representation that the distance between the components can be measured to within a one thousandth of an inch is entirely contrary to the undisputed fact that the flexible nature of both the spill container and the water shroud boot permit significant vertical and horizontal variance in the orientation of the manhole components of the system relative to the riser pipes and the sump. An issue of fact exists concerning the orientation of these components as they are used and therefore an issue of fact remains on the issue literal infringement.

Furthermore, even if it could be determined that there was no literal infringement because the bottom of the frame is inches above the top of the sump, the issue of infringement by equivalents remains. The relevant element in the patent claims, a cylindrical frame which extends downward overlapping the top of the sump, is replaced in the accused device by a cylindrical frame which extends downward and stops inches short of overlapping the sump top. The issue is whether the shortened frame matches the **[*15]** function, way, and result of the overlapping frame, or plays a role substantially different from the claimed element. That issue presents a question of fact not subject to resolution on summary judgment.

In another non-infringement argument, defendant asserts that the sump cover of its device lacks a "downward extension" that "mates" with an "upward extension" of the sump shield. There is no dispute that the sump shield of defendant's device includes an upward extension that mates with the bottom of the water shroud boot. The issue is whether the water shroud boot is properly characterized as a "downward extension" of the sump cover. More specifically, the issue of construction is whether the "downward extension" must be an integral part of the cover. The term "extension" does not suggest that a component be an integral part of that which it extends. In fact, the term is not only consistent with but even implies the attachment of an additional component. To overcome this common meaning of the term defendant argues that the claim requires a cover "having" an extension and that the verb "have" implies that the cover and the extension are integral. The argument is unpersuasive. Devices **[*16]** (e.g., vacuum cleaners) are often described as "having" extensions, even though the extensions are not unitary parts of the device. Without improperly importing the preferred embodiment into the claim, there is no basis to conclude that the downward extension must be a unitary part of the cover.

In its final non-infringement position, defendant argues that the "size, shape and orientation" of its water shroud boot does not "allow positioning" of the spill container. This argument is nearly the same as the argument accepted by this Court in granting defendant summary judgment on its first motion. Unfortunately for defendant, the Federal Circuit disagreed. In light of the claim construction presently governing the case, the argument has no merit. Defendant argues that the water shroud boot does not allow positioning because it is installed over the spill collector and is in such close proximity that the spill collector cannot be manipulated once the boot is in place. The reasoning of the Court of Appeals forecloses this argument:

> It does not matter *when* a space is created to house the spill collector; a structure can still infringe claim 1 if the space only exists after the full device **[*17]** is constructed.
>
> . . .
>
> [W]e agree with Franklin that the upward and downward extensions need

only "allow" the spill collector to be positioned in the hole.

March 1, 2007 decision at 14-15. There is no question that the size shape and orientation of the water shroud boot allows the spill collector to be positioned in the hole it creates. The order of assembly and the ability or inability to manipulate the components after assembly is irrelevant. Under the Federal Circuit analysis, the element is literally present in the accused device.

*Obviousness*

A claim is obvious under *35 U.S.C. § 103* when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time of the invention to a person having ordinary skill in the art." The ultimate issue of obviousness has been termed an issue of law. However, its determination is dependent on a series of factual issues as set forth in *Graham v. John Deere Co., 383 U.S. 1, 86 S. Ct. 684, 15 L. Ed. 2d 545 (1966)*. Those inquiries are as follows: (1) determining the scope and content of prior art; (2) comparing the differences between the prior art and the claims at issue; (3) determining the [*18] level of ordinary skill in the art; and (4) considering objective evidence of obviousness or nonobviousness. *Id. at 15-16*.

The principal issue presented by this motion is whether it would have been obvious to one of ordinary skill in the art to combine the components of Sharp with the screen covering of Hartman to produce the sump shield in the *'257 patent*. Longstanding patent law requires that when a defendant argues that a combination of prior art references renders the patented invention obvious, the defendant has the burden to establish some motivation in the prior art for one of ordinary skill in the art to make the combination. *In re Rouffet, 149 F.3d 1350, 1357 (Fed. Cir. 1998)*. Defendant argues that recent analysis of *KSR Intern. Co. v. Teleflex, Inc., 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007)* alters this standard in a way that compels a finding of obviousness as a matter of law.

*KSR* affirmed the idea that

> it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine elements in the way the claimed new invention does. This is so because inventions in most, is not all, instances rely upon building blocks long since uncovered, and claimed [*19] discoveries almost of necessity will be combinations of what, in some sense, is already known.

*Id. at 1741*. However, it rejected a rigid and formalistic approach to proving a teaching, suggestion or motivation to perform the combination in favor of broader, more common sense approach to the issue. *Id. at 1740-42*. Under the correct analysis, any need or problem, known in the field of endeavor at the time of the invention and addressed by the patent can provide a reason for combining the elements in the claimed manner. *Id. at 1742*.

Applying this standard for obviousness, fact issues preclude a determination of obviousness or non-obviousness on summary judgment. Sharp does not disclose a sump shield. Hartman discloses a filter or screen over the top of the sump to filter out solid debris from entering the sump which could be described as a sump shield. However, there would be no reason to incorporate the sieve-like cover of Hartman over the Sharp sump because the configuration of Sharp, which seals out debris from entry either from the top or sides would not permit debris to reach such a screen. Although the problem of water infiltration into the sump was known in the field of endeavor [*20] at the time of the invention, the Hartman screen would be of no use to solve that problem. Accordingly, whether one of ordinary skill in the art was motivated by the desire to filter debris or to seal out moisture, it seems doubtful that combining Hartman and Sharp would have provided an obvious solution.

Neither does the testimony of the '257 inventor Smith prove obviousness sufficiently to warrant summary judgment. Smith testified that preventing water from entering the sump was a problem well known in the field and that he solved the problem with a sump shield that was like a lid which was put on the sump which was like a jar. It is true that putting a lid on a jar is an old concept, but it is not necessarily true that the concept was obvious to apply to a containment sump. At most, the testimony implies that the solution was obvious to Smith, but the fact that the solution became obvious to the inventor does not establish that it would have been obvious to the hypothetical person of ordinary skill in the art. *KSR, 127*

*S. Ct. at 1742* (The question is not whether the combination was obvious to the patentee.)

Because the facts do not establish that incorporation of a sump shield element [*21] into the prior art was obvious as a matter of law, it follows that none of the dependent claims were obvious as a matter of law. The Court does not address whether adding other elements to the prior art would have been obvious.

*Willfulness*

To establish willful infringement plaintiff must demonstrate "objective recklessness" by clear and convincing evidence. *In re Seagate Technology, LLC, 497 F.3d 1360, 1371 (Fed. Cir. 2007)*. "Objective recklessness" means that "the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Id.* Additionally, plaintiff must show that this objectively defined risk was known or should have been known by the infringer. *Id.* The accused infringer's actual state of mind is irrelevant for purposes of the analysis. *Id.* While a pre-infringement opinion of counsel is relevant to defeat a claim of willfulness, an accused infringer has no affirmative obligation to obtain one. *Id. Seagate* expressly deferred further development on how to apply the standard to future cases. *Id.*

Defendant points primarily to this Court's first summary judgment decision as conclusively establishing that there was not an objectively [*22] high likelihood of infringement. Plaintiff points to defendant's failure to seek advice of counsel prior to selling the accused devices, defendant's efforts to obtain a license from plaintiff's predecessor, customer demand for a waterproof system and letters from the patentee accusing defendant of infringement. Plaintiff argues that this evidence establishes willfulness.

All of the evidence advanced by plaintiff goes to the second component of the *Seagate* test -- what defendant knew or should have known with respect to the likelihood of infringement. That plaintiff accused defendant of infringement or defendant sought a license has no bearing on whether there was an objectively high likelihood that its product infringed. It goes to the defendant's knowledge and state of mind, which *Seagate* holds irrelevant to the objective inquiry. The infringement analysis in the first summary judgment decision goes to the objective inquiry of the likelihood of infringement. Regardless of the contrary decision of the Appeals Court, the analysis establishes defendants' conduct in selling its product was not reckless in the sense that there was an "objectively high likelihood" that its actions were infringement. [*23] Given the significant support in the language of the patent, the specification and prosecution history for defendant's non-infringement position, plaintiff cannot meet its burden to prove objective recklessness by clear and convincing evidence.

*Lost Profits*

To recover lost profits a patent owner must prove that but for the infringement, it would have made some or all of the infringer's sales. *Bic Leisure Products, Inc. v. Windsurfing Intern., Inc., 1 F.3d 1214, 1218 (Fed. Cir. 1993)*. One way to prove that infringement caused lost sales is to establish the four *Panduit* factors: (1) a demand for the patented product, (2) the absence of acceptable non-infringing substitutes, (3) plaintiff's capacity to exploit the demand, (4) the profits lost due to the infringement. *Id.* (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1156 (6th Cir. 1978))*. The patentee's burden is to show a reasonable probability that it would have made the sales. *Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1545*. Once it does so the burden shifts to the infringer to prove that it is unreasonable to infer that the patentee would have made some or all of the sales.

Initially, defendant argues [*24] that plaintiff's concession that its products do not employ all elements of the *'257 patent* precludes recovery of lost profit damages. This argument was thoroughly considered and rejected by *Rite-Hite, 56 F.3d at 1546-48*. Assuming plaintiff can demonstrate that it would have sold its competing products but for defendant's infringement, the fact that it is not practicing the '257 teachings is not a policy bar to recovery. Furthermore, it has no effect on the application of the second *Panduit* factor.

Viewing the evidence in a light most favorable to plaintiff, a fact issue remains concerning the availability of lost profit damages. There is ample evidence to support a finding of demand for a product, like the patented device, which protects from water infiltration. Inventor Smith testified of the long felt need for a system that protected against water infiltration. The demand for such systems is further confirmed by California's regulatory requirement (AB 2481) that new installations protect against water infiltration. Finally, evidence of

demand is found in defendant's efforts to license the patented technology and to promptly develop a product to meet customer demand for water exclusion.

There **[*25]** is substantial dispute concerning the availability of acceptable non-infringing substitutes. Depending on the particular application, direct bury products and products which have EVR technology but are not water tight, are substitutes for the watertight products of the parties. However, in light of the higher cost of plaintiff's product and the additional cost of defendant's separately sold water shroud boot, it can be presumed that defendant's purchasers were purchasing only in the water tight, sump containment systems market to which plaintiff's lost profit claims are directed. This is at least one reasonable inference.

In that market, only the Fibrelite sump product appears to be a potentially acceptable non-infringing substitute. The Fibrelite product apparently differs from the parties' products in that it does not use a sump shield to preclude the entry of water by condensation or by surface runoff through the manhole cover, but precludes infiltration of outside water through the ground by sealing the frame to the top of the sump. Whether and to what extent purchases would see these products as acceptable substitutes remains an issue of fact. Furthermore, even to the extent the **[*26]** Fibrelite product competes in the same market, it continues to appear likely that a percentage of the infringing sales would have been made by plaintiff, but for defendant's infringing sales.

On the issue of the third *Panduit* factor, the evidence tends to show that plaintiff had the capacity to manufacture and sell many, if not all of the additional units. Plaintiff was manufacturing only in a single shift and could have immediately doubled capacity simply by operating a second shift. A factual issue remains concerning whether the ability to expand capacity was less than the total available additional sales.

The issues and arguments raised may be persuasive in reducing the total sales which plaintiff would have made but for infringement. They do not, however, establish as a matter of law that plaintiff will be unable to prove that it would have captured some portion of defendant's infringing sales had defendant not been competing in the market with an infringing product.

ORDER

IT IS ORDERED that defendant's motion for summary judgment is GRANTED on the issue of willfulness and is in all other respects DENIED.

Entered this 15th day of November, 2007.

BY THE COURT:

JOHN C. SHABAZ

District Judge