# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

HYPERPHRASE TECHNOLOGIES, LLC and
HYPERPHRASE INC.,

        Plaintiffs,

    v.

GOOGLE INC.,

        Defendant.

Civil Action No. 06 C 0199 S

---

**MEMORANDUM IN SUPPORT OF GOOGLE'S MOTION
FOR SUMMARY JUDGMENT OF NONINFRINGEMENT
OF U.S. PATENT NOS. 5,903,889 AND 6,516,321**

---

Dockets.Justia.com

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................1

II.  OPERATION OF AUTOLINK ...........................................................................2

III.  LEGAL STANDARDS ........................................................................................4

    A.  To Successfully Oppose Summary Judgment, HyperPhrase Must Set Forth Specific Facts that Show There Is a Genuine Issue for Trial...............................................................................................4

        1.  Summary Judgment of Noninfringement Should Be Granted Where, As Here, the Properly Construed Claims Do Not Cover Google's Technology. .........................................4

            a.  Claims should be given a meaning consistent with the intrinsic record. ...............................................5

            b.  Claim preambles can be limitations.................................6

        2.  A Claim is Not Infringed Where a Single Limitation is Lacking. ...............................................................................6

IV.  ARGUMENT ........................................................................................................8

    A.  AutoLink Does Not Infringe the '889 Patent........................................8

        1.  AutoLink does not have a "standardized format for addressing."..............................................................................8

            a.  "Standardized format for addressing" means exactly what it says. ............................................8

            b.  Application of the "standardized format for addressing" construction to AutoLink. ..........................9

        2.  AutoLink Does Not Modify the First Data Record to Create an Address of the Referenced Record. .........................10

            a.  Claim element 1(e) requires "modifying said reference to said second data record to create an address," and that address must be "the address of the referenced record." ...........................................11

            b.  Application of the "address" construction to AutoLink. ...............................................................12

         3.  AutoLink Does Not Modify the First Data Record At All. .........................................................................................12

i

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   OPERATION OF AUTOLINK ............................................................................2

III.  LEGAL STANDARDS ..........................................................................................4

    A.   To Successfully Oppose Summary Judgment, HyperPhrase
        Must Set Forth Specific Facts that Show There Is a Genuine
        Issue for Trial..............................................................................................4

        1.   Summary Judgment of Noninfringement Should Be
            Granted Where, As Here, the Properly Construed Claims
            Do Not Cover Google's Technology. ..........................................4

            a.   Claims should be given a meaning consistent
                with the intrinsic record. ...................................................5

            b.   Claim preambles can be limitations................................6

        2.   A Claim is Not Infringed Where a Single Limitation is
            Lacking. .......................................................................................6

IV.   ARGUMENT ..........................................................................................................8

    A.   AutoLink Does Not Infringe the '889 Patent..........................................8

        1.   AutoLink does not have a "standardized format for
            addressing."..................................................................................8

            a.   "Standardized format for addressing" means
                exactly what it says. ..........................................................8

            b.   Application of the "standardized format for
                addressing" construction to AutoLink. ...........................9

        2.   AutoLink Does Not Modify the First Data Record to
            Create an Address of the Referenced Record. ...........................10

            a.   Claim element 1(e) requires "modifying said
                reference to said second data record to create an
                address," and that address must be "the address
                of the referenced record." ..............................................11

            b.   Application of the "address" construction to
                AutoLink.........................................................................12

        3.   AutoLink Does Not Modify the First Data Record At
            All. .............................................................................................12

i

a.    The "first data record" refers to one of the plurality of data records stored in the plurality of databases, it does not mean some other data record. ...................................................................12

b.    Application of the "modification of the first data record" limitation to AutoLink. .................................15

B.    AutoLink Does Not Infringe the '321 Patent...........................................15

1.    Claim 1 is not infringed by AutoLink.....................................................15

a.    AutoLink does not satisfy the "modifier reference" limitation. ...................................................16

i.    The term "modifier reference" means "a word or phrase that further specifies a specific record or record segment." ..............................17

ii.    Application of the "modifier reference" limitation to AutoLink. ...................................18

b.    AutoLink does not satisfy the "when" or "real-time" limitation. ...................................................18

i.    The '461 Patent. ..............................................19

ii.    The '171 Patent ..............................................21

iii.    The '321 Patent ..............................................22

iv.    Application of the "when" or "real-time" requirement to AutoLink...................................24

2.    Claim 27 is not infringed by AutoLink....................................................24

a.    AutoLink does not satisfy the "when" or "real-time" limitation. ...................................................24

b.    AutoLink does not have a plurality of subject matter specific tag pairs, one for each information type...............................................25

i.    A "subject matter specific tag pair" means "two matching tags, each identifying a specific subject matter." ...........................25

ii.    Application of the "subject matter specific tag pair" limitations to AutoLink. ......................26

a.   The "first data record" refers to one of the plurality of data records stored in the plurality of databases, it does not mean some other data record. ................................................................12

b.   Application of the "modification of the first data record" limitation to AutoLink. ..................................15

B.   AutoLink Does Not Infringe the '321 Patent. ........................................15

1.   Claim 1 is not infringed by AutoLink. ..................................15

a.   AutoLink does not satisfy the "modifier reference" limitation. ................................................16

i.   The term "modifier reference" means "a word or phrase that further specifies a specific record or record segment." ................................17

ii.   Application of the "modifier reference" limitation to AutoLink. ................................................18

b.   AutoLink does not satisfy the "when" or "real-time" limitation. ................................................18

i.   The '461 Patent. ................................................19

ii.   The '171 Patent ................................................21

iii.   The '321 Patent ................................................22

iv.   Application of the "when" or "real-time" requirement to AutoLink. ................................24

2.   Claim 27 is not infringed by AutoLink. ................................24

a.   AutoLink does not satisfy the "when" or "real-time" limitation. ................................................24

b.   AutoLink does not have a plurality of subject matter specific tag pairs, one for each information type. ................................25

i.   A "subject matter specific tag pair" means "two matching tags, each identifying a specific subject matter." ................................25

ii.   Application of the "subject matter specific tag pair" limitations to AutoLink. ................................26

3.   Claim 86 is not infringed by AutoLink.........................................................27

a.   "Specifying reference" means (1) a combination of a first DR, a second DR, and a MR, or (2) it is a combination of a DR, a first MR, and second MR. ........................................................................27

b.   Application of the "specifying reference" limitation to AutoLink. ..........................................................28

c.   The alleged AutoLink SRs are not "seemingly general" and they do not become "relatively specific." ................................................................................28

C.   There Is No Liability For Licensed Microsoft Software Users, Because Microsoft Software Users are Licensed to Use the '889 and '321 Patents.........................................................................29

V.   CONCLUSION.............................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bayer AG v. Elan Pharm. Research Corp.,*
212 F.3d 1241 (Fed. Cir. 2000) ........................................................................... 7

*Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.,*
55 F.3d 615 (Fed. Cir. 1995) ............................................................................ 6, 9

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ............................................................................................ 4

*Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.,*
291 F.3d 1317 (Fed. Cir. 2002) ............................................................... 7, 10, 28

*Dolly, Inc. v. Spalding & Evenflo Cos.,*
16 F.3d 394 (Fed. Cir. 1994) ............................................................................... 7

*Eaton Corp. v. Rockwell Int'l Corp.,*
323 F.3d 1332 (Fed. Cir. 2003) ........................................................................... 6

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,*
535 U.S. 722 (2002) ..................................................................... 7, 12, 15, 24, 27

*Fin Control Sys. Pty., Ltd. v. OAM, Inc.,*
265 F.3d 1311 (Fed. Cir. 2001) ........................................................................... 7

*General Mills, Inc. v. Hunt-Wesson, Inc.,*
103 F.3d 978 (Fed. Cir. 1997) ............................................................................. 4

*HyperPhrase Technologies LLC v. Google Inc.,* ___ F.3d ____,
2007 WL 4509047 (Fed. Cir. Dec. 26, 2007) (*slip. op.*) ............................ 1, 10, 11, 12

*Intel Corp. v. ULSI Sys. Tech., Inc.,*
995 F.2d 1566 (Fed. Cir. 1993) ......................................................................... 29

*Johnston v. IVAC Corp.,*
885 F.2d 1574 (Fed. Cir. 1989) ........................................................................... 6

*Kahn v. General Motors Corp.,*
135 F.3d 1472 (Fed. Cir. 1998) ....................................................................... 6, 7

*Kurek v. Pleasure Driveway and Park Dist. of Peoria, Ill.,*
557 F.2d 580 (7th Cir.1977) ............................................................................. 18

*LG Electronics, Inc. v. Bizcom Electronics, Inc.,*
453 F.3d 1364 (Fed. Cir. 2006) .................................................................... 29, 32

*Mark I Mktg. Corp. v. R.R. Donnelley & Sons Co.,*
66 F.3d 285 (Fed. Cir. 1995) ............................................................................... 7

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995)................................................................................4, 5

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..............................................................................................4

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
    357 F.3d 1340 (Fed. Cir. 2004)..............................................................................6

*Network Commerce, Inc. v. Microsoft Corp.*,
    422 F.3d 1353 (Fed. Cir. 2005)............................................................................29

*NTP, Inc. v. Research in Motion, Ltd.*,
    418 F.3d 1282 (Fed. Cir. 2005)....................................................................6, 9, 25

*PC Connector Solutions LLC v. SmartDisk Corp.*,
    406 F.3d 1359 (Fed. Cir. 2005)............................................................................28

*Pharmacia & UpJohn Co. v. Mylan Pharmaceuticals, Inc.*,
    170 F.3d 1373 (Fed. Cir. 1999)............................................................................18

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)...........................................................................5, 6

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999)..............................................................................6

*Quanta Computer, Inc. v. LG Electronics, Inc.*,
    _____ U.S. _____, 128 S.Ct. 28, 168 L.Ed.2d 805 (2007)...................................29

*Renishaw PLC v. Marposs Societa' per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998)..............................................................................5

*Sage Prods, Inc. v. Devon Indus., Inc.*,
    126 F.3d 1420 (Fed. Cir. 1997)..............................................................................7

*Seachange Int'l, Inc. v. C-COR, Inc.*,
    413 F.3d 1361 (Fed. Cir. 2005)..............................................................................6

*SRI Int'l v. Matsushita Elec. Corp.*,
    775 F.2d 1107 (Fed. Cir. 1985)..............................................................................4

*TechSearch,  LLC v. Intel Corp.*,
    286 F.3d 1360 (Fed. Cir. 2002)..............................................................................5

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)................................................................................5

*Warner-Jenkinson Co. Inc. v. Hilton-Davis Chem. Co.*,
    520 U.S. 17 (1997)................................................................................................7

*Wolverine World Wide, Inc. v. Nike, Inc.*,
    38 F.3d 1192 (Fed. Cir. 1994)................................................................................7

**Statutes and Rules**

35 U.S.C. § 112 ¶ 2 ................................................................................................. 13

Fed. R. Civ. P. 56(c) ................................................................................................. 4

## I.    INTRODUCTION

In 2006, HyperPhrase sued Google, alleging infringement of five different patents by four different Google technologies.  In the series of filings and opinions since that time, this case has been narrowed to one technology (AutoLink) and six claims from two patents:  claims 1 and 7 of the '889 patent and claims 1, 24, 27, and 86 of the '321 patent.[1]

As the Court may recall, the '889 and '321 patents generally concern various methods pertaining to the storage, retrieval and addressing of records.  The claims that remain relate to the address specification aspects of the purported invention, particularly as used for automatic hyperlink generation for linking records.  While the accused technology, like many of the prior art references, also relates generally to automatic hyperlink generation, it is fundamentally different.  It does not automatically generate hyperlinks in the manner the claims require, nor does it generate the type of hyperlinks or tags the claims specify.  In fact, AutoLink does not infringe at least five of the six remaining (claims 1 and 7 of the '889 patent and claims 1, 24, and 86 of the '321 patent) for the same reasons both this Court and the Federal Circuit previously noted in agreeing that the "links" created by the AutoLink client point to a process on an intermediate computer, not to any record, and the ultimate record links do not share a common address format:

> AutoLink clearly operates the same way the disclosed prior art system does.  After identifying tokens, the processing device (i.e., the user's computer) does not convert them into the same address format as that used by the database holding the contextually related record (e.g., UPS's database). Instead AutoLink sends the token to Google's servers, which like the intermediate computers of the prior art systems, conduct the necessary translation into the address format used by each database.

*HyperPhrase Technologies LLC v. Google Inc.*, ___ F.3d ____, 2007 WL 4509047 at 7 (Fed. Cir. Dec. 26, 2007) (*slip. op.*).

There are other reasons the remaining claims are not infringed as well.  For the '889 patent, the "first data record" is not modified by AutoLink as the claims require, because the

---

[1] The '889 patent is found at Dkt. No. 26 (Woodford Decl.), Ex. A and the '321 patent is found at Dkt. No. 26, Ex. E.  For simplicity, we will refer to them as just the '889 patent and the '321 patent.

hyperlinks are created in a file separate from the web page itself. Additional reasons the '321 patent is not infringed are:

- While the patent's "modifier reference" (claims 1 and 86) exists to choose between multiple records of potential interest, AutoLink triggers do not, and instead are used to determine whether a token should be linked at all

- The "when" or "real time" limitation (claims 1 and 27) is not satisfied because the browser user must manually intervene in the AutoLink process

- There is no "subject matter specific tag pair" (claim 27) because AutoLink employs only a single tag (the anchor tag), which does not identify the subject matter

- There is no "seemingly general" SR that becomes "relatively specific" (claim 86).

This motion turns almost entirely on claim construction. We have omitted a detailed discussion of the patents-in-suit, which can be found in Google's earlier summary judgment filings and the Court's subsequent opinion and order. (*See* Dkt. Nos. 17 and 64.) Those facts material to this motion are either not genuinely disputed or are the law of the case, so summary judgment is appropriate.

Finally, apart from all the other failings in HyperPhrase's case, most of its case also fails because of a license HyperPhrase granted to Microsoft and its users, which are admittedly responsible for several of the alleged infringing systems and steps in well-over 90% of the infringements for which HyperPhrase seeks damages. Licensed uses are of course not infringing ones.

## II.    OPERATION OF AUTOLINK

The Google Toolbar, which includes the accused AutoLink feature, is software that can optionally be installed on a computer with a Web browser, such as Microsoft Internet Explorer. The Toolbar requires a Web browser to operate. (Google's Proposed Finding of Fact and Conclusions of Law In Support of Its Motions for Summary Judgment Regarding U.S. Patent Nos. 5,903,889 and 6,516,321 ("PFOF"), No. 50.) The AutoLink feature has two components, a client component, which is located with the browser on a user computer, and a server component which is located on at least one computer at Google. (PFOF 51.)

2

The AutoLink client can recognizes certain types of information from a web page, such as ISBNs, VINs, package tracking numbers, or postal addresses, from a Web page by matching text strings to patterns of particular types.  Strings that match of one of the predetermined patterns are assumed to in fact be information of a particular type and, on that basis, are called "tokens."  (PFOF 52.)  The AutoLink client also recognizes certain words called "triggers," such as "book," "car," and "fedex."  (PFOF 53.)  The absence of an appropriate accompanying trigger indicates that certain tokens are false positives even though the tokens otherwise match a pattern of interest; conversely, if the trigger is present with a proper token, the AutoLink button becomes enabled, to indicate to the user the potential availability of other information of interest to the user.  (*Id.*)

If the enabled AutoLink button is then manually selected by the browser user, the AutoLink client can create an anchor tag to identify the token obtained from the browser, which includes a first URL that points to a process on the AutoLink server.  (PFOF 54.)  However, AutoLink inserts the anchor tag into what is called a "document object model" or "DOM" representation of the web page created by the browser, not into the web page itself stored locally on the user computer, and certainly not the web page located on any third party server.  (PFOF 55.)  If the browser user does not select the AutoLink button, then nothing further happens and neither a first URL nor an anchor tag is created.  (PFOF 56.)

Assuming the user has manually selected the AutoLink button and an anchor tag (together with a first URL) was created, if the user then further clicks on that anchor tag, then the browser sends the first URL to the AutoLink server.  (PFOF 57.)  The AutoLink server processes the first URL by running a "redir" command contained in the first URL, which causes the server to select one of over twenty different URL formats to return to the browser as a second URL.  (PFOF 58.)  There are no records located in the AutoLink server, and therefore the AutoLink server does not return any records to the user.  (PFOF 59.)  Instead, upon receipt of the second URL by the browser, the browser can forward that second URL as an HTTP request to yet

3

another server (typically a third party server), which will process the second URL and which may ultimately return information of interest to the user.  (PFOF 60.)

The Google Toolbar is used with Microsoft systems and software, by Microsoft users, to function, such use includes the operation of AutoLink feature.  (PFOF 61.)  Microsoft's products, systems, users, and licensed third parties are licensees of the '889 and '321 patents.  (PFOF 62.)

## III.   LEGAL STANDARDS

### A.   To Successfully Oppose Summary Judgment, HyperPhrase Must Set Forth Specific Facts that Show There Is a Genuine Issue for Trial.

Summary judgment is appropriate where, as here, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The burden of demonstrating the absence of any genuine dispute as to material facts rests with the moving party.  *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985).  To defeat a well-founded summary judgment motion, the nonmoving part must do "more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*."  *Id.* at 587.  The question of infringement is particularly amenable to summary judgment where, as here, there can be no material dispute over the relevant facts regarding the accused technology.  *General Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 980-81 (Fed. Cir. 1997).

### 1.   Summary Judgment of Noninfringement Should Be Granted Where, As Here, the Properly Construed Claims Do Not Cover Google's Technology.

Determining whether an accused product or method infringes a patent claim is a two-step process.  First, the Court construes the asserted claims to determine their scope and meaning.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).  Second, the properly construed claims are compared to the allegedly infringing products and methods.  *Id.*  As the patentee, HyperPhrase bears the burden of proving infringement.

4

*TechSearch, LLC v. Intel Corp.*, 286 F.3d 1360, 1371 (Fed. Cir. 2002). General assertions of fact and conclusory statements are insufficient to satisfy this burden. *Id.* at 1371-72.

      **a.**     **Claims should be given a meaning consistent with the intrinsic record.**

Claim construction is a question of law. *Markman*, 52 F.3d at 983-84. The first step in the claim construction process is to analyze the language of the claims themselves. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Id.* In some cases claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. This is true for several terms at issue in the instant motion.

The claims must always be read in view of the patent specification. *Id.* at 1315. "Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

After reviewing the claims and the patent specification, the Court should also consider the final piece of the intrinsic record—the prosecution history. *Phillips,* 415 F.3d at 1317. The prosecution history includes the complete record of proceedings before the patent office and the prior art cited during the examination of the patent. *Id.* "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* The prosecution histories of related applications are also part of the intrinsic record, and may also be used to construe and limit the

claims. *See, e.g., Microsoft Corp. v. Multi-Tech Sys., Inc*., 357 F.3d 1340, 1349-50 (Fed. Cir. 2004) (the prosecution history of one patent is relevant to an understanding of the scope of a common term in a related patent).

Although the intrinsic record is the most important evidence in claim construction, courts may also look to extrinsic evidence, but this evidence is only reliable when considered in the context of the intrinsic evidence. *Phillips*, 415 F.3d at 1317-19. For example, dictionaries and treatises can be useful tools in claim construction to help the court better understand the technology at issue and the way in which one of skill in the art may use the claim terms. *Id.* at 1318. Expert testimony may also be useful to provide background on the technology at issue, but should be rejected when it is at odds with the intrinsic record. *Id.* at 1318.

### b. Claim preambles can be limitations.

Courts must construe claim preambles according to the general principles of claim construction. *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995). A preamble that merely states an intended purpose or use of the invention is not limiting, but if language in the preamble is necessary to give meaning to the claim, the preamble must be read as a limitation on the claim. *Id*. at 620-21. When a preamble provides antecedent basis for terms in the body of the claim, courts have consistently found the preamble to be limiting because the term in the body cannot be properly understood without reference to its antecedent in the preamble. *See NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1305-06 (Fed. Cir. 2005); *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1376 (Fed. Cir. 2005); *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003); *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305-06 (Fed. Cir. 1999).

### 2. A Claim is Not Infringed Where a Single Limitation is Lacking.

An accused product or process must meet every limitation of a patent claim, exactly, in order to literally infringe a patent claim. *Kahn v. General Motors Corp.*, 135 F.3d 1472, 1476 (Fed. Cir. 1998); *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1580 (Fed. Cir. 1989). "If any claim

6

limitation is absent from the accused device, there is not literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

A product or process that does not literally infringe may nonetheless infringe under the doctrine of equivalents if the accused device contains an equivalent to every limitation that is not literally met. *Warner-Jenkinson Co. Inc. v. Hilton-Davis Chem. Co.*, 520 U.S. 17, 24 (1997). If an accused product or process does not satisfy each and every limitation of a claim either literally or under the doctrine of equivalents, then the claim is not infringed. *Kahn*, 135 F.3d at 1481. However, the patent holder cannot automatically seek a finding of infringement under the doctrine of equivalents, however, because there are several legal limitations to the application of the doctrine: (1) vitiation, (2) disavowal, and (3) prosecution claim amendment.

First, if a patentee's theory of equivalents would "vitiate a particular claim element, [then] partial or complete summary judgment [of non-infringement] should be rendered by the court." *Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.*, 291 F.3d 1317, 1322 (Fed. Cir. 2002); *Fin Control Sys. Pty., Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1320-21 (Fed. Cir. 2001) (allowing "front" or "back" to be the equivalent of "lateral" would cause a vitiation of the claim limitation); *Sage Prods, Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1425-26 (Fed. Cir. 1997); *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 400 (Fed. Cir. 1994) ("[T]he concept of equivalency cannot embrace a structure that is specifically excluded from the scope of the claims"). Second, a patentee may not claim equivalents for subject matter it disavowed during prosecution. *Mark I Mktg. Corp. v. R.R. Donnelley & Sons Co.*, 66 F.3d 285, 291 (Fed. Cir. 1995). Third, where a patentee narrows a claim by amendment while prosecuting the patent, any narrowed limitation is presumed to have no equivalents at all. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 739-40 (2002).

Where an independent claim asserted in the patent is not infringed, it follows as a matter of law that any claims depending from that independent claim are also not infringed. *Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed. Cir. 1994).

## IV.    ARGUMENT

Four independent claims remain in this case, one from the '889 patent and three from the

'321 patent.  Two dependent claims also remain, but since the independent claims are not

infringed, the dependent claims are also not infringed and therefore need not be separately

discussed.

### A.    AutoLink Does Not Infringe the '889 Patent.

AutoLink does not employ a "standardized format for addressing," does not create an

address to the referenced record, and does not modify the "first data record" at all.  Independent

claim 1 (and thus dependent claim 7) requires:

> 1. A computer system with a plurality of data records on a plurality of databases, and a **standardized format for addressing said data records**, said computer system comprising:
> (a) a user interface having an interactive display program for requesting one of said data records and displaying a plurality of interface supported data formats;
> (b) means for receiving a reference to a first data record from said interactive display program;
> (c) means for retrieving said first data record;
> (d) means for parsing said first data record to identify a reference to a second data record;
> (e) **means for modifying said reference to said second data record to create an address, said address being operable to retrieve said second data record**; and
> (f) means for sending said modified first data record to said interactive display program.

### 1.    AutoLink does not have a "standardized format for addressing."

The Federal Circuit found that AutoLink did not infringe the '567 patent because it does

not employ a common address format as between the various systems alleged to be part of the

infringement.  This holding dispositive of claims 1 and 7 of the '889 patent.

#### a.    "Standardized format for addressing" means exactly what it says.

The term "standardized format for addressing" is found in the preamble.  As the plain

language of the claim suggests, the claim concerns a computer system with a number of records,

on a number of databases, and a standard way to format the addresses of those records in the databases.

The preamble is a limitation here because (1) the body of claim 1 relies upon the preamble for antecedent basis for the term "data records," (2) the limitation specifies a characteristic of how the addresses of those data records in the plurality of databases are to be specified, and (3) the body of the claim requires a means for creating these addresses. *Bell Commc'ns Research, Inc*., 55 F.3d at 620-621; *see also NTP, Inc*., 418 F.3d at 1305-06. The preamble therefore clearly breathes life and meaning into the claim and is thus a limitation. HyperPhrase's own validity expert, Dr. Sergei Nirenburg, apparently agrees, because he used the preamble to allegedly distinguish claim 1 from the Anthony prior art submitted with Google's previous motion for summary judgment of invalidity. (Dkt. No. 45 (HyperPhrase Decl. of Nirenburg ISO Opp to Google's MSJ of Invalidity) at 12 ("The preamble of Claim 1 of the '889 patent states that there must be a plurality of databases as follows...").) Furthermore, the Summary of the Invention states that the '889 patent is concerned with standardizing, among other things, the way in which data records are to be accessed:

> It is the object of this invention to provide a means of processing and converting existing data records formatted, structured, and accessed according to a multitude of disparate standards to common standards by which they may be accessed, controlled, and/or displayed though a single interactive display program.

('889 patent at 2:65-3:3.) This further shows that standardized addressing is an important feature of the invention and not merely an intended purpose or use.

**b.    Application of the "standardized format for addressing" construction to AutoLink.**

In its discussion regarding AutoLink and the '567 patent, the Federal Circuit held that AutoLink did not employ a common address format and moreover that it operated precisely the way the prior art distinguished in the patent operated. Specifically, the Federal Circuit found:

> AutoLink clearly operates the same way the disclosed prior art system does. After identifying tokens, the processing device (i.e., the user's computer) does not convert them into the same address format as that used by the database holding the contextually related record (e.g., UPS's database). Instead AutoLink sends the token to Google's servers which, like the intermediate computers of the prior art systems, conduct the necessary translation into the address format used by each database. As the district court astutely noted, this translation is necessary because Google does not control the databases and thus cannot dictate (to UPS or CarFax.com, for example) what address formats they must use.

*HyperPhrase*, 2007 WL 4509047 at 7.

Thus, AutoLink does not employ a standardized format for addressing records in the alleged plurality of databases. (*Id.*) Instead, the alleged plurality of databases supposedly used by AutoLink each use a different addressing scheme. (*Id.*; PFOF 59.) Indeed, HyperPhrase itself pointed to over twenty different URL templates in the AutoLink server code to somehow prove AutoLink infringes other patent claims in earlier briefing to this Court. (Dkt. No. 37 (11/21/06 HyperPhrase Opp'n to Google's MSJ of Noninfringement) at 15.) The fact that there are over twenty different possible URL templates, each having a different putative address format and each pointing to a different (mostly third party) putative database, shows that there is no standardized format for addressing all of, or even some of, the alleged infringing data records in the *plurality* of databases.

AutoLink also does not infringe under the doctrine of equivalents, either, because the alleged infringing system operates in exactly the opposite way of the claim – not using standard address formats at all. *See, e.g., Cooper Cameron Corp.*, 291 F.3d at 1322.

### 2.     AutoLink Does Not Modify the First Data Record to Create an Address of the Referenced Record.

Not only is there no standardized format for addressing in AutoLink, but it is undisputed that the first URL created by the AutoLink client points to a process on the Google AutoLink server and not to some data record. (PFOF 54 and 59.) The Federal Circuit noted this too,

stating "AutoLink practices the prior art as described by the '567 patent," because just like the

prior art AutoLink employs an "intermediate computer" to translate between the various

databases because "each database requires different record formats and address formats."

*HyperPhrase*, 2007 WL 4509047 at 7.  This is an independent reason AutoLink does not infringe

the '889 patent.

> **a.    Claim element 1(e) requires "modifying said reference to said second data record to create an address," and that address must be "the address of the referenced record."**

Claim element 1(e) requires "modifying said reference to said second data record to

create an address."  During prosecution, HyperPhrase repeatedly argued this limitation to

distinguish the Meske prior art, asserting the address created by Meske was different than

HyperPhrase's invention because Meske did not "modif[y] the first data record <u>to create an

address of the referenced record</u>."  (Dkt. No. 26 (Woodford Decl.), Exhibit B ('889 patent file

history) at GOOG056999-57000 (10/6/98 Response A  at pp. 3-4) (emphasis added).)

HyperPhrase's complete response is shown below:

> Parsing for references (keywords, hyperlinks and the like) and modifying the parsed reference to create an address of the referenced data record is not taught by the cited references. In Meske, HTML versions of articles (files, or data records) are parsed for the presence of specified search terms.  This parsing, however, only leads to the creation of additional files such as a brief file describing the contents of the article, a profile list, and story files; there is no modification of the parsed file to refer to another file by its address. <u>See</u> Col. 5, line 60, through col. 6, line 14; col. 6, lines 38 through col. 9, line 48.  There is simply no teaching of linking records by <u>modifying</u> the parsed record to create an address of the referenced record.

(*Id.*)

HyperPhrase thus confirmed during prosecution the natural reading of claim 1 – the

"address" required by the claim is the "address <u>of the referenced record</u>."  In fact, so important

was this characteristic of the invention to HyperPhrase that it made this same argument three

times in the same paragraph: "to create an address <u>of the referenced record</u>," "to refer to another file <u>by its address</u>," and "to create an address <u>of the referenced record</u>." *Id.* (emphasis added).

### b.    Application of the "address" construction to AutoLink.

The URL created by the AutoLink client plainly is not "the address of the referenced record." (PFOF 54.) In fact, it is not the address of any record. (PFOF 59.) It is, as the Federal Circuit held, a URL to an intermediate computer. *HyperPhrase*, 2007 WL 4509047 at 7. The intermediate computer, Google's AutoLink server, has no data records at all. (PFOF 59.) Thus, AutoLink does not satisfy the "address" requirement of claims 1 and 7 of the '889 patent and does not literally infringe. Furthermore, because this limitation was argued during prosecution to overcome the prior art, the doctrine of equivalents is not available. *See Festo Corp.*, 535 U.S. at 739-40.

### 3.    AutoLink Does Not Modify the First Data Record At All.

AutoLink does not satisfy the further requirement of claim element 1(e) that the "first data record" in the plurality of databases, specifically the reference to the second data record contained in the first data record, be modified to form the required address. AutoLink does not modify the first data record in any of the alleged plurality of databases, nor has HyperPhrase offered evidence that it does.

### a.    The "first data record" refers to one of the plurality of data records stored in the plurality of databases, it does not mean some other data record.

The "first data record" required by claim 1 is one of the plurality of records in the plurality of databases referred to earlier in the claim, and is the thing operated upon by the various "means" of the claim. Claim 1 requires:

> 1. A computer system with **a plurality of data records on a plurality of databases**, and a standardized format for addressing **said data records**, said computer system comprising:
>
> (a) a user interface having an interactive display program for requesting one **of said data records** and displaying a plurality of interface supported data formats;
>
> (b) means for receiving a reference to **a first data record** from said interactive display program;
>
> (c) means for retrieving said **first data record**;
>
> (d) means for parsing said **first data record to identify a reference** to a second data record;
>
> (e) means for modifying **said reference** to said second data record to create an address, said address being operable to retrieve said second data record; and
>
> (f) means for sending said **modified first data record** to said interactive display program.

The plain language of the claim shows that (1) the "plurality of data records" and "said data records" in the preamble include the first and second records; (2) the "first data record" in element (b) is "one of said data records" referenced in element (a); (3) element (d) requires parsing the first data record for a reference; (4) element (e) requires modifying the reference parsed from the first data record; and (5) element (f) requires sending the modified first data record. The term "said modified first data record" has no antecedent basis, which raises indefinite issues under 35 U.S.C. § 112 ¶ 2, but the claim can be construed in a way that preserves its validity and in a way that makes sense of the claim overall, if the "modified first data reference" is understood to refer to modifying the reference parsed from the first data record, and thus, modifying the first data record in the database as is stated in the preamble.

The prosecution history confirms this view. During prosecution, HyperPhrase expressly clarified that the self-same record is operated on in all steps of claim 1. HyperPhrase made this clarification after the patent examiner rejected claim 1 in view of the Meske patent. Specifically, the patent examiner found that Meske made claim 1 unpatentable:

> identify a reference to a second data record. On the other hand, Meske, Jr. et al. disclosed a
> computer system for retrieving information including a means for parsing a first data record to
> identify a reference to a second data record including a hypertext link (see abstract; col.2, line 21-
> col. 3, line 9). Therefore, it would have been obvious to one of ordinary skill in the art at the time

(Dkt. No. 26 (Woodford Decl.), Exhibit B ('889 patent file history) at GOOG056991 (7/30/98

Office Action at p. 4).)

HyperPhrase argued in response that Meske did not modify the first data record (the

"parsed record"), but rather modified **additional files** created from the first data record:

> Parsing for references (keywords, hyperlinks and the like) and modifying the
> parsed reference to create an address of the referenced data record is not taught by the
> cited references. In Meske, HTML versions of articles (files, or data records) are parsed
> for the presence of specified search terms. This parsing, however, only leads to the
> creation of additional files such as a brief file describing the contents of the article, a
> profile list, and story files; there is no modification of the parsed file to refer to another
> file by its address. See Col. 5, line 60, through col. 6, line 14; col. 6, lines 38 through
> col. 9, line 48. There is simply no teaching of linking records by modifying the parsed
> record to create an address of the referenced record.

(*Id*. at GOOG056999-57000 (10/6/98 Response A at pp. 3-4).)  These remarks leave no doubt

that Google's proposed reading of the claim is correct.

Finally, Google's view is further supported by HyperPhrase's validity expert, Dr.

Nirenburg, who interpreted the claim the same way, concluding that Google's prior art failed to

anticipate the claim because "the source documents are never modified (or, for that matter,

modified in the document itself).  Again, claim limitation 1(e) requires 'modifying' the reference

itself."  (Dkt. No. 45 (Decl. of Nirenburg ISO HyperPhrase Opp'n to Google's MSJ of

Invalidity) at 17.)

14

**b.    Application of the "modification of the first data record" limitation to AutoLink.**

AutoLink does not modify the first data record in any database.  In fact, we further note, as the AutoLink creator has testified, AutoLink does not even modify the web page retrieved by the browser, instead it modifies the DOM representation of the web page that is constructed by the browser.  (PFOF 55.)  In this respect, AutoLink operates just like the Meske patent HyperPhrase distinguished to get its claims allowed.  Since AutoLink does not modify the first data record (claim element 1(e)), it cannot infringe for the same reasons Meske does not invalidate claim 1 of the '889 patent.  Moreover, AutoLink cannot infringe under the doctrine of equivalents because HyperPhrase surrendered the claim scope when it argued this limitation to overcome the rejection of claim 1 in view of Meske.  *See Festo Corp*., 535 U.S. at 739-40.

Each of the above grounds stands on its own as a reason why AutoLink does not infringe claim 1 of the '889 patent.  Because asserted claim 7 depends upon claim 1, it is not infringed either.

**B.    AutoLink Does Not Infringe the '321 Patent.**

Claims 1, 27, and 86 of the '321 patent are also not infringed by AutoLink.  Google presents four claim terms for construction here: "modifier reference" (claims 1 and 86), "when" (claims 1 and 27), "subject matter specific tag pair" (claim 27), and "specifying reference" (claim 86).  Because the claims of the '321 patent differ in their use of certain terms, different terms affect different claims.  We address each claim in its numerical order.

**1.    Claim 1 is not infringed by AutoLink.**

Claim 1 requires a "modifier reference" that further specifies a particular record or record segment.  It also requires performance of the steps linked with the "when" term automatically in real-time.  Claim 1 reads:

1. A method for identifying a referenced record referenced in a referencing record wherein the referenced record is referenced in the referencing record by at least a combination including a data reference (DR) and **a modifier reference (MR)**, the method comprising the steps of:

(i) receiving the referencing record;

(ii) analyzing the referencing record to identify a DR, **when a DR is identified**:

(a) identifying an MR rule set (MRRS) specifying the relationship between an MR and the DR;

(b) **analyzing the referencing record in accordance with the MRRS to identify the existence of the MR and, when the MR is identified**;

(c) **identifying the referenced record associated with the DR/MR combination.**

      a.        **AutoLink does not satisfy the "modifier reference" limitation.**

Under the proper construction of the term "modifier reference," AutoLink does not infringe claim 1 of the '321 patent. The point of the modifier reference according to the '321 patent was to assist in situations where the data reference failed to point to something specific enough. For example, a doctor may ask a nurse to bring up the ECG, but the nurse may need to ask "which ECG?" *See* '321 patent at 3:50-67. In this instance, the term "ECG" is a data reference, but it might refer to more than one ECG, so the modifier reference is used to point specifically to *one of* those ECGs, for example the "admission" or "post-op" "ECG." It is, then, the point of the modifier reference to further specify a specific record or record segment that cannot adequately identified by a data reference alone.

AutoLink does not do this. HyperPhrase asserts that an AutoLink token, such as an ISBN, is a data reference, and that the AutoLink trigger, a term such as "book" is a modifier reference. But the ISBN is already as specific as possible. It describes, at most, one book. AutoLink triggers are not used to make the ISBN point to something more specific. Instead, the trigger is used to confirm that a number that looks like it might be an ISBN is one. That is, while the patent contemplates a data reference that refers to an "X" and a modifier reference answers the question "which X?," AutoLink triggers answer a completely different question: "is the token possibly an X?" The AutoLink trigger is not used as specified by the claim because it simply throws out candidate tokens which may not be tokens at all – it does not modify the token

16

as HyperPhrase asserts.  (PFOF 53.)  Thus, AutoLink does not satisfy the modifier reference

limitation of the claims.

> ### i.    The term "modifier reference" means "a word or phrase that further specifies a specific record or record segment."

The term "modifier reference" has no plain ordinary meaning.  Google's position is that

the term "modifier reference" means "a word or phrase that further specifies a specific record or

record segment identified by a data reference."  The last time HyperPhrase litigated this term was

in the Microsoft litigation before Judge Crabb in 2003.  There, HyperPhrase said the term meant

"a reference which, in combination with a DR, may be used to refer to a specific and distinct

record or record segment," adding further that "[t]he meaning of this term is clear from the

context of use in the specification of the '321 patent."  (Dkt. No. 35 (Woodford Decl. Exhs.),

Exhibit V (9/24/03 HyperPhrase Supp. Brief on Claim Constr) at p. 22.)

Turning to the specification, it states that a modifier reference further specifies a

particular record or record segment identified by a data reference, so it is used to precisely

pinpoint what was already referred to by the data reference:

> A wrinkle of complexity is added to the referencing scheme whereby modifier
> references (MRs) may be used to further specify a specific record or record
> segment when a DR is identified. In this case, when a DR is identified, the record
> is further examined to identify modifier references (MRs) which identify a
> specific segment of a record which is associated with the data reference. When an
> MR is located, additional information is sought within the record for building an
> address to the record or record segment referenced by the DR/MR combination.
> Once again, a link is created between the referencing record and the referenced
> record or record segment.

*See* '321 patent at 3:21-32 (emphasis added).[2]  As described in the patent, if just the term ECG

was identified as the DR, it might be unclear which ECG was meant to be referred to by the

record author, which is why the modifier reference "admission" narrows ECG to identify not one

of many ECG records, but a specific record or record segment.  *See, e.g.*, '321 patent at 11:65-

12:8.

_____

[2] This conclusion is also amply supported by the '321 patent, which makes repeated reference to the
importance of linking from one record to another, specific record.  *See, e.g.*, '321 patent at 2:22-25; 2:60-62; 3:8-10;
3:13-17; 3:30-32; 4:24-27; 5:5-8; and 5:47-50.

ii.    **Application of the "modifier reference" limitation to AutoLink.**

HyperPhrase asserts that the AutoLink trigger is the modifier reference. The AutoLink trigger includes text like "book" or "auto" or "fedex." (PFOF 53.) However, the AutoLink trigger does not make the token more specific, nor does it make the token refer to a specific record or record segment. This is because (1) the token alone was already determined to be, for example, a specific book ISBN, a vehicle VIN, or a FedEx shipping number (PFOF 52), and (2) even if the token and trigger are said to be used in "combination," they do not point to a specific record or record segment, but to a process on the AutoLink server (PFOF 54), which has no records at all (PFOF 59).

Thus, AutoLink does not satisfy the modifier reference limitation of claim 1 of the '321 patent. The AutoLink trigger is not equivalent to the modifier reference either because, as is mentioned above, it does not perform the same function (further specifying a particular data record), it does not do so the same way (combining the DR and the MR), and it does not achieve the same result (linking to a specific data record or record segment). Furthermore, since claim 1 is not infringed, claim 24, which depends from claim 1, is also not infringed.

b.    **AutoLink does not satisfy the "when" or "real-time" limitation.**

The "when" language found twice in claim 1 requires real-time processing and precludes user intervention. HyperPhrase simply ignores the "when" language in the claims in its analysis of infringement, but to do so erases it from the claims. The language quite plainly imparts a temporal element and a precise sequence in which the steps must be performed, which is automatically in real-time. (*See, e.g*., Declaration of Jason W. Wolff ISO Google's Motions for Summary Judgment Regarding U.S. Patent Nos. 5,903,889 and 6,516,321 ("Wolff Decl."), Exhibit E (Merriam Webster definition of "when").) This conclusion is buttressed by the fact that Judge Crabb reached the same conclusion in HyperPhrase's litigation with Microsoft. There, Judge Crabb found that the "as" and "when" language both required real-time processing of the steps and did not allow manual user intervention. (*See, e.g*., Dkt. No. 35 (Woodford Decl.

18

Exhs.), Exhibit S (6/18/03 Order re Constr Claims), at 14-15.)  HyperPhrase is collaterally
estopped from challenging this construction now.[3]  (Dkt. No. 35 (Woodford Decl. Exhs.),
Exhibit W (9/24/03 Order re Microsoft MSJ) at 24-26.)

The AutoLink process is fundamentally different than what is claimed because it requires
manual user intervention to perform the alleged infringing steps.  Below, Google marshals the
intrinsic record of the family of patent applications that led to the '321 patent to show why,
beyond just the plain language of the claim, the "when" term adds a "real-time" limitation to the
claims where it is used.

### i.       The '461 Patent.

U.S. Patent No. 5,895,461 (the "'461 patent"), which is a parent application to the '321
patent, issued from an application filed in 1996, based on a provisional application filed earlier
that same year.  As the background of the invention spells out in unusually clear terms, the
invention was designed to overcome two alleged problems with the straightforward use of
hyperlinks, of the type widely used on the internet, for linking one data record to another in a
data-intensive environment.  The alleged problems were (1) where and how should the records
be stored and (2) how to reduce the inefficiency and potential for error introduced when
individual users manually created the hyperlinks.  (Dkt. No. 27 (Woodford Decl. Exhs.), Exhibit
I ('461 patent) at 2:52-3:25.)

To solve the first problem, the inventors proposed a system in which the keyword phrase
portion of the hyperlink (i.e., the underlined or highlighted text the user sees on the screen)
would itself be used to construct the address at which the data record would be stored.  An

---

[3] HyperPhrase did file an appeal in this prior case, but that does not bar application of collateral estoppel.
*Kurek v. Pleasure Driveway and Park Dist. of Peoria, Ill.*, 557 F.2d 580, 595 (7th Cir.1977) *vacated and remanded
on other grounds by* 435 U.S. 992, 98 S.Ct. 1642 (1978) (the pendency of an appeal does not suspend the operation
of an otherwise final judgment as collateral estoppel, unless the appeal removes the entire case to the appellate court
and constitutes a proceeding de novo), *Pharmacia & UpJohn Co. v. Mylan Pharmaceuticals, Inc.*, 170 F.3d 1373,
1381 (Fed. Cir. 1999) (stating "[t]he law is well settled that the pendency of an appeal has no effect on the finality or
binding effect of a trial court's holding" and applying the rule in a patent invalidity setting).  Moreover,
HyperPhrase subsequently dismissed that appeal and did not seek vacatur of the underlying district court judgment.

example given in the patent is to use the "report type" keyword phrase, such as a hospital "discharge report", to construct the address at which the discharge report will be stored.  (*Id*. at 7:51-64.)

The inventors considered this first solution so important that all 42 claims in the original application were addressed to it.  (Dkt. No. 28 (Woodford Decl. Exhs.), Exhibit J ('461 patent file history) at GOOG074485-74896 ('461 patent original application at pp. 30-41.)  All of those claims required that the records be stored at "predetermined addresses" which were "defined" by keyword phrases.  After amendments not pertinent here, these original 42 claims became claims 1-47 of the issued '461 patent – none of which is asserted in this case.

It was the inventors' attempt to patent their solution to the second alleged problem that resulted in the asserted claims of the '461.  That solution was to have the system automatically generate hyperlinks when it recognized that the user had entered selected keywords or keyword phrases.  (*Id.,* Exhibit I ('461 patent) at 7:65-8:15.)  It was hoped that replacing manual creation of hyperlinks by the user with automatic creation by the system would reduce error and insure uniformity.  The inventors added new claims to their application (43-60) to explicitly cover this automatic hyperlink creation aspect of the alleged invention.  (*Id.*, Exhibit J ('461 patent file history) at GOOG074539-74543 (7/21/98 Response at pp. 1-5).)

The Patent Office rejected both sets of claims because of a prior art patent to Vasudevan. (*Id*. at. GOOG074527-74536 (4/21/98 Office Action) and GOOG074550-74552 (10/14/98 Office Action at pp. 2-4).)  In arguing against the first rejection, the applicants stressed that their invention "establishes a hyperlink . . . in real time" and Vasudevan did not.  (*Id*. at GOOG074544-74555 (7/21/98 Response A at pp. 6-7).)  But the examiner rejected all of the claims a second time, again based on Vasudevan, nonetheless.  (*Id.* at GOOG074552 (10/14/98 Office Action).)  The examiner observed that "Applicant admits that hypertext linking is a well-known system allowing the identifying [of] components/files over the Internet.  Therefore, it is the examiner's position Vasudevan discloses the claimed limitation."  (*Id.*)  However, the examiner agreed "that an 'on-the-fly' recognition of files named according to keywords as they

20

are entered by a user and using hypertext linking is novel and unobvious." (*Id.*)  The trouble, according to the examiner, was that the claims did not capture the patentable subject matter while avoiding the prior art.  (*Id.*)

After this second rejection, the applicants' attorney interviewed the examiner; it was agreed in that interview that the applicants would "submit a response presenting arguments as to how the claim language sets forth a 'real time' system." (*Id.* at GOOG074563 (11/18/98 Interview Summary).)  The next day, the applicants obliged by pointing out "[t]he claims recite that keywords and keyword phrases are recognized 'as' they are entered or 'when' they are entered by the user, i.e., they are recognized as soon as their entry by the user is complete." (*Id.* at GOOG074555 (11/19/98 Response B).)  The examiner then immediately allowed all claims. (*Id.* at GOOG074560-74562 (12/3/98 Notice of Allowance).)  The statement of reasons for allowance reads: "Applicant's arguments regarding the claim interpretation are considered persuasive.  Applicant has cited specific language and specific references in the specification that demonstrate that the claims set forth a 'real time' system for processing keywords and keyword phrases in creating a file name/reference.  The prior art of record merely discloses performing these operations only after the link or object is created and not in real time as the user enters the keywords.  Therefore, this feature renders the claims allowable over the prior art of record." (*Id.*)

Exactly the same language that the applicants pointed to in the '461 patent as requiring a real time system – linking "as" text is entered or "when" a record is created – appears in asserted independent claims 1, 27, and 86 of the '321 patent.

## ii.    The '171 Patent

U.S. Patent No. 6,308,171 (the "'171 patent") issued from a continuation-in-part ("CIP") of a continuation-in-part of the original application on which the '461 patent was based.  All 23 of the figures in the '171 patent are new, as are more than 10 columns of text.  While much of the added material is not directly relevant to this case (for example, there are many columns dealing with specific ways of constructing hyperlink addresses using recognized key words or

21

phrases), to the extent all the changes signal an attempt to change and broaden what the inventors initially regarded as their own, the changes are telling.

The story of the '171 patent prosecution history is simple: the applicants (1) took the real time language out of the independent claims (thus broadening those claims as compared to the '461), and (2) removed all mention of "hyperlinks" or "hypertext linking" (substituting the broader terms "associating" or "identifying" instead), while (3) failing to tell the examiner – who was different than the '461 examiner – about Vasudevan.

Perhaps not surprisingly, the result was a patent that issued with no substantive examination. The examiner merely issued a double patenting rejection based on the '461 patent because, of course, "[t]he subject matter claimed in the instant application is fully disclosed in the ['461] patent and is covered by the patent since the patent and the application are claiming common subject matter . . . ." (Wolff Decl., Exhibit F ('171 patent file history) at GOOG086791 (1/18/01 Office Action at p. 3).) Mr. De La Huerga duly filed a terminal disclaimer, and the '171 duly issued.

The result is a patent with a set of claims clearly designed to broaden the claims of the '461 patent in certain respects.

### iii.    The '321 Patent

The '321 patent is a CIP of a CIP of a CIP of the '461 patent. Like the '171 patent, all the figures (29 of them) are new. There are also approximately 28 columns of new text – so much new text, that it is fair to say the '321 patent has been completely re-written. Though filed before the application that issued as the '171 patent, the '321 issued years later, in February of 2003.

The reason for part of the delay is particularly relevant here: after pursuing claims to the basic idea of hyperlinking (albeit it in phraseology different from both the '461 and '171 patents), through a prosecution lasting almost 3 years and culminating in an initial notice of allowance in early 2002, the applicant requested continued examination rather than allowing the patent to issue. (Dkt. No. 27 (Woodford Decl. Exhs.), Exhibit F ('321 patent file history) at

GOOG053783-53856 (original application); GOOG053954 (5/7/02 Notice of Allowance); and GOOG053958 (7/3/02 Request for Continued Examination).)  The reason?  The "Applicant performed a supplemental prior art search to further ensure the novelty of the claimed invention" and discovered, to its alleged surprise, that the broadest claims had to be amended to add a real-time requirement in order to overcome the prior art.  (*Id*. at GOOG053967 (8/2/02 Response to Notice of Allowance at p. 8).)  And so, what had been dropped out of the broad independent claims of the '171 patent that are asserted here was put back into independent claims of the '321 patent.  (*Id*. at GOOG053969 (p. 10).)

    With the real-time language added where necessary, the examiner immediately re-allowed the claims.  (*Id*. at GOOG053974 (8/13/02 Notice of Allowance).)

    Like the claims of the '461 patent, numerous claims of the '321 patent, including claims 1, 27, and 86, use the terms "as" and/or "when" in the context of one or a series of steps.  Given the plain meaning of these terms, and the clear definitions established by the inventors during prosecution of the '461 patent, these terms, and particularly here the term "when," must be construed to mean that the steps recited in conjunction with the "when" term occur automatically in real time.

    Claim 1 includes the "when" term, stating in pertinent part:

> (ii) analyzing the referencing record to identify a DR, **when a DR is identified**:
>> (a) identifying an MR rule set (MRRS) specifying the relationship between an MR and the DR;
>> (b) analyzing the referencing record in accordance with the MRRS to identify the existence of the MR and, **when the MR is identified**;
>> (c) **identifying the referenced record associated with the DR/MR combination**.

Because the term "when a DR is identified" introduces steps (ii)(a), (b), and (c), and because the term "when" must be given a temporal (real-time) meaning, claim 1 must be construed to require those steps that follow to occur automatically in real-time upon the first identification of a DR or an MR.

### iv.   Application of the "when" or "real-time" requirement to AutoLink.

The AutoLink process does not happen in real-time.  Instead, the AutoLink client, the browser user must manually intervene in the AutoLink process.  As explained above, when an anchor tag is created by AutoLink, that tag points to a process on the AutoLink server.  (PFOF 54.)  It does not "identify the referenced record associated with the DR/MR combination."  Only after the browser user manually intervenes twice, first by selecting the AutoLink button and then by selecting hyperlink created by the AutoLink client, does anything more happen.  (PFOF 57.)  Thus, AutoLink does not perform step (c) in real-time and does not infringe.  Infringement under the doctrine of equivalents is also precluded because the "real-time" limitation arose from a limiting amendment.  *See Festo Corp*., 535 U.S. at 739-40.  In any event, the real-time processing required by the claims and the manual intervention employed by AutoLink are opposites, and thus not equivalent at all.  For the above reasons, claim 1 is not satisfied by AutoLink, either literally or under the doctrine of equivalents.

### 2.   Claim 27 is not infringed by AutoLink.

Claim 27 has both a "real-time" requirement (through the "when" language) and a requirement of "subject matter specific tag pairs."  Claim 27 reads:

> 27. A method to be used with a rule set including **subject matter specific tag pairs** and corresponding search rules, **a separate tag pair for each of a plurality of different information types** and a separate search rule for each pair, each pair including a begin tag and an end tag, the method comprising the steps of:
>     (a) receiving a record;
>     (b) examining the record according to the search rules to identify record segments including information of each of the information types;
>     (c) **when a record segment is identified which is of a particular information type:**
>         **accessing the tag pair associated with the information type; inserting the begin tag before the identified segment and inserting the end tag after the identified segment.**

### a.   AutoLink does not satisfy the "when" or "real-time" limitation.

Claim 27 has a "real-time" limitation by nature of the "when" language found in step (c), for the same reason this limitation is found in claim 1.  When AutoLink identifies a token, it is known to be a certain type of token.  (PFOF 54.)  However, AutoLink does not add an anchor tag

at the first instance "when" this token is recognized. (PFOF 52.) Rather, the anchor tag is not added until after the token is determined not to be a false positive and the AutoLink button is manually selected by the user. (PFOF 53 and 54.) Thus, AutoLink does not satisfy the real-time limitation of claim 27 either. As is noted above, AutoLink's process, requiring manual intervention by the browser user, is the opposite of a real-time process, so it is not equivalent either, and HyperPhrase argued this limitation for reasons of patentability, so the doctrine of equivalents is not available to it for that reason as well. *See Festo Corp.*, 535 U.S. at 739-40.

> **b.** **AutoLink does not have a plurality of subject matter specific tag pairs, one for each information type.**

Claim 27 requires "a separate tag pair for each of a plurality of different information types and a separate search rule for each pair, each pair including a begin tag and an end tag." Google employs just one tag, and that tag is not subject matter specific.

> **i.** **A "subject matter specific tag pair" means "two matching tags, each identifying a specific subject matter."**

Again, the preamble of claim 27 requires "a separate tag pair for each of a plurality of different information types and a separate search rule for each pair, each pair including a begin tag and an end tag." The body elements of claim 27, namely claim elements (b) and (c), rely upon the preamble for antecedent basis so the preamble is a limitation of the claim. *See NTP Inc.*, 418 F.3d at 1305-6. The term "subject matter specific tag pair" has no plain ordinary meaning and is used uniquely in the patent to describe the beginning and matching ending tag elements that delineate information by its type. For instance, the specification states:

> Recently another method and tool for accessing/manipulating data within a specific record has been developed which specifies universal "tags" which can be used within a record to earmark specific data types. An exemplary "tagging" language is the extensible markup language (XML). The tags are to be used by processor applications which are familiar with the tags to identify specific information types. Applications which are capable of recognizing tags are referred to hereinafter as "tag enabled" and records which include such tags are likewise referred to as tag enabled. Tags are typically paired including a "begin" tag and an "end" tag identifying the beginning and the end of a specific data type within a corresponding record. For example, in a patient record, a "<patient id>" tag may specify the beginning of a field including a patient ID and a corresponding "</patient id>" tag may specify the end of the patient ID field. Similarly, a "begin

25

image" tag may specify the beginning of an image field while an "end image" tag specifies the end of the image field.

(*See* '321 patent at 2:35-56.)  Thus the tags <patient id> and </patient id> are a subject matter specific tag pair for the patient ID information type, and the tags <heart rate> and </heart rate> are a separate subject matter specific tag pair for a heart rate information type.  (*See, e.g.*, '321 patent at 21:11-25.)  The point is that the beginning and ending tags (the "pair") match and each identifies the specific type of information that appears between them.

Furthermore, the specification also states that "[a]ccording to the present invention the concept of automatic linking is taken one step further and includes a system which automatically provides 'tags' within records which can be used by processing applications to distinguish different information types within the record."  (*See, e.g.*, '321 patent at 20:6-10.)  Since the prior art automatic tagging used anchor tags, a "subject matter specific tag pair" is obviously something more than an anchor tag.  (*See, e.g.,* Memorandum in Support of Google's Motion for Summary Judgment of Invalidity, filed concurrently herewith.)

### ii.    Application of the "subject matter specific tag pair" limitations to AutoLink.

AutoLink employs only one tag, which is the anchor tag (<a href=...> and </a>).  (PFOF 54.)  The anchor tag, however, is not a "tag pair" as used in the patents, and furthermore the anchor tag does not identify information by its type:  the end anchor tag (</a>), for instance, is the same regardless of the type of information that is to be linked and it is not subject matter specific.  Furthermore, since the same tag is used for all types of tokens with AutoLink, AutoLink fails to satisfy the requirement that "when a record segment is identified which is of a particular information type: accessing the tag pair associated with the information type," since this clearly requires the presence of more than one subject matter specific tag pair.

HyperPhrase's infringement expert, Dr. Thompson, has no substantive analysis of the required subject matter specific tag pairs in his recently served infringement charts.  He omits this requirement and speculated that Google might infringe:

26

> So far, as discussed above, I have been given no access to Google documents that would address the contention that Google AutoLink does not use subject matter specific tag pairs, then it is my view that Google AutoLink uses a substantially similar way to achieve the same functionality. For example, it might use subject matter specific offsets to achieve the same purpose. Even if these steps are different because they involve the use of a substantially similar technique, there would still be performed in the same logical sequencing.

(Wolff Decl., Exhibit N.)  Beyond the fact that AutoLink only uses the anchor tag for all putative information types, HyperPhrase cannot carry its burden of proving infringement if it cannot even identify the subject matter specific tag pairs alleged to be infringing or provide any substantive analysis on the subject.  Moreover, because the tag pair limitations were argued for reasons of patentability, HyperPhrase surrendered infringement under the doctrine of equivalents.  *See Festo Corp.*, 535 U.S. at 739-40.

For the above reasons, Google does not infringe claim 27 of the '321 patent.

### 3.    Claim 86 is not infringed by AutoLink.

Claim 86 requires a "specifying reference," for which the express definition requires a "modifier reference."  It also requires a "seemingly general SR," which is somehow modified by other information in the record to make the SR "relatively specific."  AutoLink does not satisfy any of these requirements.  Claim 86 reads:

> 86. A method for use with an application wherein specifying references (SRs) in one record to other records which are selectable to access the other records are visually distinguished from other record information so as to indicate selectability, the method also for use with a system which enables a user to designate and also select SRs where designation comprises pointing to an SR without selection and, wherein a seemingly general SR is modified by other record information which renders the SR relatively specific, the method for indicating the specific nature of an SR prior to selection and comprising the steps of:
>
> > when an SR is designated, indicating the specific nature of the SR.

#### a.    "Specifying reference" means (1) a combination of a first DR, a second DR, and a MR, or (2) it is a combination of a DR, a first MR, and second MR.

HyperPhrase added its special term "specifying reference" to claim 86.  This term, like several others in the claims, has no plain ordinary meaning.  In fact, HyperPhrase was its own lexicopher, defining the term prominently in its summary of the invention:

Hereinafter the term "specifying reference" (SR) will be used to refer generically to each of a DR and a DR/MR combination or a DR/MR/MR combination."

*See* '321 patent at 4:33-35.  Here, the SR is either (1) a combination of a first DR, a second DR, and a MR, or (2) it is a combination of a DR, a first MR, and second MR.  However the term is construed, it requires a combination, and that combination must include at least one data reference and at least one modifier reference.

### b.    Application of the "specifying reference" limitation to AutoLink.

As is discussed above with regard to claim 1, an AutoLink trigger is not a modifier reference because (1) it does not further specify a particular record or record segment (PFOF 53), and (2) the AutoLink client does not create a link to any records, but to a process on a server (PFOF 54), which has no records at all (PFOF 59).

In addition to the failure to meet these aspects of the modifier reference, the AutoLink client does not "visually distinguish" the SR "from other record information so as to indicate selectability," nor does the "system" "enable[] a user to designate and also select SRs where designation comprises pointing to an SR without selection," because AutoLink only creates a hyperlink around a token.  (PFOF 54.)  Furthermore, HyperPhrase cannot carry its burden to show that AutoLink is equivalent to claim 86 on any grounds because AutoLink does not have an SR at all, and to assume that something less than an SR is an SR is to vitiate the meaning of this expressly defined claim term.  *See Cooper Cameron Corp.*, 291 F.3d at 1322.

### c.    The alleged AutoLink SRs are not "seemingly general" and they do not become "relatively specific."

The language of claim 86 requires not just an SR, but an SR that is "seemingly general." The sole evidence pointed to by HyperPhrase that Google has SRs is HyperPhrase's allegation that a book ISBN, for example the text "40967812221" is an SR.  This is not an SR for the reasons stated above.  However, assuming for a moment that HyperPhrase is correct, a book ISBN is not "seemingly general."  It is a very specific 10 digit number.  Furthermore, the ISBN does not become "relatively specific" by somehow being "modified by other record

28

information." It is the same ISBN number, whether it occurs with a trigger or without, so it cannot be both seemingly general and relatively specific.

HyperPhrase offers no substantive analysis as to why AutoLink satisfies these claim limitations under the doctrine of equivalents, which is plainly insufficient to meet its burden to show particularlized testimony and linking argument. *See, e.g., PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005) ("[h]aving presented the district court with only conclusory statements regarding equivalence, without any particularlized evidence and linking argument as to the 'insubstantiality of the differences' between the claimed invention and the accused device … [Plaintiff] is now foreclosed from invoking the substantive application of the doctrine of equivalents."); *see also*, *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1363 (Fed. Cir. 2005) (holding that evidence purportedly showing the doctrine of equivalents "must be presented on a limitation-by-limitation basis. Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice.").

For each of the above reasons, AutoLink does not infringe claim 86 of the '321 patent.

### C.      There Is No Liability For Licensed Microsoft Software Users, Because Microsoft Software Users are Licensed to Use the '889 and '321 Patents.

Lastly, we turn to whether any liability attaches for licensed Microsoft software systems and users. While this issue alone is not case dispositive, Microsoft systems, software, and users account for well-over 90% of the alleged infringement by Google AutoLink asserted by HyperPhrase, so it greatly diminishes the scope of any trial and obviously any alleged damages.

Under the doctrine of patent exhaustion, an authorized, unrestricted, or unconditional sale of a patented device or process exhausts the patentee's right to control the further sale or use of the patented device by subsequent purchasers. *See LG Electronics, Inc. v. Bizcom Electronics, Inc.*, 453 F.3d 1364, 1369 (Fed. Cir. 2006) *cert. granted, Quanta Computer, Inc. v. LG Electronics, Inc.*, 128 S.Ct. 28, 168 L.Ed.2d 805, (U.S. Sep. 25, 2007) (No. 06-937). The grant of a patent license constitutes a sale for exhaustion purposes. *Id.* at 1369-70. The theory behind

29

the patent exhaustion doctrine is that in an unconditional sale or license of a device or process, "the patentee has bargained for, and received, an amount equal to the full value of" what was sold. *Id.* at 1369 (internal citations omitted). Where the exhausting "sale" is a patent license, and the question of whether the patent owner has exhausted its rights depends on contract interpretation, "patent exhaustion" is a matter of law for the Court and therefore appropriate for summary judgment. *See Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1569 (Fed. Cir. 1993). Summary judgment is appropriate when the contract terms are clear and unambiguous, even if the parties disagree as to their meaning.

Microsoft licensed, among other patents, the asserted '889 and '321 patents in connection with its litigation with HyperPhrase in 2003 for its systems, products, and users. (Wolff Decl., Exhibit I (License Agreement at ¶¶ 4(c) and 10.) Any of the claims, or any apparatus involving a licensed Microsoft user or licensed a Microsoft system or software is therefore not an infringement, nor can it contribute to any infringement.

Furthermore third parties making authorized software for Microsoft's products are also licensed under the asserted patents:

> This license extends to and includes third parties in connection with their purchase, use, sale offer for sale, exportation, or importation of any Microsoft software, product, equipment, or service that is, or that when installed, run or used as directed, instructed, intended or suggested by Microsoft is, covered by any claim of the Licensed Patents and Applications, including to make, use, sell, export, import, have made or offer for sale any software, product, equipment or service, or to practice any method covered by any claim of the Licensed Patents and Applications with respect to such Microsoft software, product, equipment or service.

(*Id*. at ¶ 10.) Read in context, this clause of the agreement licenses "third parties [Google] . . . to make [and] use . . . any software [the Toolbar]. . . or to practice any method covered by any claim of the Licensed Patent and Applications [the '321 and '889 patents] with respect to such Microsoft software [Microsoft Internet Explorer and Microsoft Windows]." Moreover, this agreement licenses the use of the Google Toolbar by Microsoft users. Microsoft directs and instructs its users to use the licensed Google Toolbar and even provides a link to download the alleged infringing Google software on its website. (Wolff Decl., Exhibit J.) Accordingly, the

30

use of Microsoft Internet Explorer and the Google Toolbar is a use "directed, instructed, intended or suggested by Microsoft," which under the agreement constitutes a licensed use.

HyperPhrase admits and the record shows that the Google Toolbar requires browser software, such as Microsoft Internet Explorer, to operate. (PFOF 50 and 55.) A computer using Microsoft's software, or used by a licensed Microsoft user, is not only necessary to use the Google Toolbar and its AutoLink feature when installed with Microsoft's Internet Explorer, but a necessary element of HyperPhrase's infringement contentions, for which excerpts are shown below for each of the independent claims asserted:

| PATENT/CLAIM | HYPERPHRASE CONTENTION[4] |
|---|---|
| '889 patent, claim 1 | "Google's interface is viewed through any widely available web browser, such as Internet Explorer" (*Id*. at 2, regarding element (a); "The Google search engine will send the appropriate URL to the user's machine" (*Id*. at 2 regarding element (b)); "which is contained within an interactive browser, e.g., Internet Explorer" (*Id*. at 3 regarding element (b)); "The user's browser including AutoLink, then retrieves the record" (*Id*. at 3, regarding element (c)); "sends it to the user through the interactive display program, the browser," "The first record is display on the browser," and "send the modified record to the user's browser" (*Id*. at 6 regarding element (f)) |
| '321 patent, claim 1 | "The web page is received by the personal computer running Google AutoLink" (*Id*. at 15 regarding element (i)); identifying the fictitious "Google AutoLink computer" (*Id*. at 15-16 regarding elements (ii), (a), (b), (c)); "using the browser software" (*Id*. at 16 regarding (a)) |
| '321 patent, claim 27 | "using the browser software" (*Id*. at 16 regarding (a)); identifying both "Google AutoLink" and the "Google AutoLink computer" (*Id*. at 16) |
| '321 patent, claim 86 | "The Google Toolbar is an application program that works with the Google AutoLink |

---

[4] Citations are to Wolff Decl., Exhibit N (2/11/08 Infringement Charts to the Supplemental Expert Report of Paul Thompson (HyperPhrase's infringement expert)).

| | Computer" (*Id.* at 17); also identifying display steps necessarily performed by browser (*Id.* at 18) |
|---|---|

Thus, because HyperPhrase's licensed the subject patents to Microsoft for its products and its users, including users of the Microsoft Internet Explorer web browser, at the very least there is no liability for systems or uses of the '889 and '321 patents associated with Microsoft's products or users and HyperPhrase has exhausted its remedies for such use. *See LG Electronics, Inc. v. Bizcom Electronics, Inc.*, 453 F.3d at 1369.

## V.    CONCLUSION

For the foregoing reasons, Google requests that the Court declare and enter judgment that AutoLink does not infringe claims 1 and 7 of the '889 patent and claims 1, 24, 27, and 86 of the '321 patent. Google further requests that the Court declare and enter judgment that there is no liability for Google pertaining to the Google Toolbar as used with Microsoft's products, software, users, or licensees because of the HyperPhrase patent license with Microsoft.

Dated: February 29, 2008                    GODFREY & KAHN, S.C.

By: */s/ James D. Peterson*
   James A. Friedman
   James D. Peterson
   One East Main Street, Suite 500
   P.O. Box 2719
   Madison, WI  53701-2719
   Phone:  (608) 257-3911

   Facsimile:  (608) 257-0609

***Of Counsel:***

| | | |
|---|---|---|
| Frank E. Scherkenbach | Michael J. Kane | Jason W. Wolff |
| Kurt L. Glitzenstein | William R. Woodford | Fish & Richardson P.C. |
| Christopher R. Dillon | Fish & Richardson P.C. | 12390 El Camino Real |
| Peter J. Kirk | 3300 Dain Rauscher Plaza | San Diego, CA  92130 |
| Fish & Richardson P.C. | 60 South Sixth Street | Telephone:  (858) 678-5070 |
| 225 Franklin Street | Minneapolis, MN  55402 | Facsimile:  (858) 678-5099 |
| Boston, MA  02110 | Telephone:  (612) 335-5070 | |
| Telephone:  (617) 542-5070 | Facsimile:  (612) 288-9696 | |
| Facsimile:  (617) 542-8906 | | |

***Attorneys for Defendant GOOGLE INC.***

3004742_1

33