# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

HYPERPHRASE TECHNOLOGIES, LLC and
HYPERPHRASE INC.,

        Plaintiffs,

   v.

GOOGLE INC.,

        Defendant.

Civil Action No. 06 C 0199 S

---

## MEMORANDUM IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY REGARDING U.S. PATENT NOS. 5,903,899 AND 6,516,321

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   SUMMARY ..........................................................................................................2

III.  STATEMENT OF FACTS ....................................................................................2

    A.    The Automatic Hyperlink-Creation Prior Art ...........................................2

        1.    PasTime ..........................................................................................3

        2.    Anthony ..........................................................................................6

        3.    The HTML Sourcebook ...................................................................8

    B.    The Subject Matter Specific Tagging Prior Art .......................................11

        1.    The MUC-6 Named Entity Task Definition .................................11

        2.    Aberdeen ......................................................................................12

    C.    The Automatic Pop-Up Prior Art .............................................................13

        1.    Gennaro .......................................................................................13

        2.    Myka ............................................................................................15

    D.    Priority Dates ...........................................................................................16

    E.    Date Of Invention ....................................................................................17

IV.   ARGUMENT .......................................................................................................17

    A.    Applicable Legal Standards .....................................................................17

    B.    '889 Patent, Claims 1 and 7, Are Invalid As Anticipated, And
        Also As Indefinite ....................................................................................17

        1.    Claim Construction And Indefiniteness .......................................17

        2.    '889 Patent, Claims 1 and 7, Are Not Entitled To Either
            A Priority Date Or A Date Of Invention Before The
            June 9, 1997, Filing Date Of The '889 Patent
            Application ....................................................................................20

        3.    PasTime Anticipates The '889 Patent, Claims 1 And 7 ...............22

i

4.  Anthony Anticipates The '889 Patent, Claims 1 And 7, As HyperPhrase Improperly Seeks To Construe And Apply Those Claims Against AutoLink ..................................27

C.  '321 Patent, Claims 1 and 24, Are Invalid As Anticipated, And Claim 24 Is Also Invalid As Indefinite ..................................30

1.  Claim Construction And Indefiniteness..................................30

2.  '321 Patent, Claims 1 and 24, Are Not Entitled To Either A Priority Date Or A Date Of Invention Before The August 13, 1999, Filing Date Of The '321 Patent Application..................................31

3.  PasTime Anticipates The '321 Patent, Claims 1 and 24..................................36

4.  The HTML Sourcebook Anticipates The '321 Patent, Claims 1 and 24 ..................................39

D.  '321 Patent, Claim 27, Is Invalid As Anticipated ..................................40

1.  Claim Construction ..................................40

2.  '321 Patent, Claim 27, Is Not Entitled To Either A Priority Date Or A Date Of Invention Before The August 13, 1999, Filing Date Of The '321 Patent Application..................................41

3.  The MUC-6 Named Entity Task Definition Anticipates The '321 Patent, Claim 27 ..................................43

4.  Aberdeen Anticipates The '321 Patent, Claim 27 ..................................44

E.  '321 Patent, Claim 86, Is Invalid As Anticipated, And Also As Indefinite ..................................48

1.  Claim Construction And Indefiniteness..................................48

2.  '321 Patent, Claim 86, Is Not Entitled To Either A Priority Date Or A Date Of Invention Before The August 13, 1999, Filing Date Of The '321 Patent Application..................................50

3.  Gennaro Anticipates The '321 Patent, Claim 86 ..................................50

4.  Myka Anticipates The '321 Patent, Claim 86..................................52

V.  CONCLUSION..................................53

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Abbott Laboratories v. Geneva Pharmaceuticals, Inc.*,
   182 F.3d 1315 (Fed. Cir. 1999)......................................................................... 17

*Biomedino LLC v. Waters Technology Corp.*,
   490 F3.d 946 (Fed. Cir. 2007)........................................................................... 20

*Chiron Corp. v. Genentech, Inc.*,
   363 F.3d 1247 (Fed. Cir. 2004).......................................................................... 32

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005).......................................................................... 49

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,
   435 F.3d 1366 (Fed. Cir. 2006).......................................................................... 31

*Halliburton Energy Services v. M-I LLC*,
   ___ F.3d ___, ___ (Fed. Cir. 2008)..................................................................... 31

*Honeywell Int'l, Inc. v.Int' l Trade Comm'n*,
   341 F.3d 1332 (Fed. Cir. 2003).......................................................................... 31

*Mahurkar v. C.R. Bard, Inc.*,
   79 F.3d 1572 (Fed. Cir. 1996)............................................................................ 20

*Price v. Symsek*, 988 F.2d 1187 (Fed. Cir. 1993) ......................................................... 21

*Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359 (Fed.
   Cir. 2001) ....................................................................................................... 21

*Refac Electronics Corp. v. R.H. Macy & Co., Inc.*,
   1988 WL 93835 (D.N.J., 1988) ......................................................................... 22

*Shu-Hui Chen v. Bouchard*,
   347 F.3d 1299 (Fed. Cir. 2003).......................................................................... 22

*Sibia Neurosciences, Inc. v. Cadus Pharmaceutical Corp.*,
   225 F.3d 1349 (Fed. Cir. 2000).......................................................................... 17

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
   247 F.3d 1316 (Fed. Cir. 2001).......................................................................... 17

i

**<u>Statutes</u>**

35 U.S.C. §102.................................................................. 26, 27, 35, 38, 42, 43, 49, 51

35 U.S.C. §112.................................................................................... 18, 30, 31, 48

35 U.S.C. §120.......................................................................................................... 31

35 U.S.C. §282.......................................................................................................... 16

3005006_1

The Federal Circuit affirmance of most of this Court's earlier summary judgment decision has significantly reduced the scope of this case. Only six claims remain, four independent and two dependent: claims 1 and 7 of U.S. Patent No. 5,903,889 ("the '889 Patent") and claims 1, 24, 27, and 86 of U.S. Patent No. 6,516,321 ("the '321 patent").[1] Defendant Google Inc. ("Google") offers this memorandum in support of its motion pursuant to Fed. R. Civ. P. 56 for summary judgment that all of these remaining asserted claims are invalid.

## I.    INTRODUCTION

The inventors of the two remaining patents in this case neither pioneered the concepts described in the patents, nor added in any meaningful way to the work that others had previously done. As so often happens in the arena of computer software patents, unbeknownst to the Examiners who allowed the patents, others had developed the claimed concepts long before. While the present motion focuses on two prior art references for each of the claims, it could easily have been ten, so pervasive is the prior art in this area.

The remaining asserted claims are generally directed to three different area. Four of the six, claims 1 and 7 of the '889 patent and claims 1 and 24 of the '321 patent, concern the automatic creation of hyperlinks. Not only was this concept widely known and implemented in the prior art, but three of these four claims do such a poor job of articulating the claimed invention that they are indefinite, and thus invalid on that basis as well.

The other two groups of claims relate to implementation minutiae. In claim 27 of the '321 patent, "subject matter specific tags" are inserted into a document around text of a certain information type, so as to demarcate and identify, e.g., names, dates, and places. This was such a common concept by the time of the patents that there was an entire conference devoted to the many known techniques for implementing this idea—all more sophisticated than the disclosure in the '321 patent—almost *four years* before the '321 patent was filed. Claim 86 of the '321 patent concerns information that automatically "pops-up" when a user "hovers" a cursor on a

---

[1] The '889 patent is found at Dkt. No. 26 (Woodford Decl.), Ex. A and the '321 patent is found at Dkt. No. 26, Ex. E. For simplicity, we will refer to them as the '889 patent and the '321 patent.

computer screen over a hyperlink. This simple notion is also found throughout the prior art. It is also so poorly articulated that this claim too is invalid as indefinite.

Google therefore respectfully requests that the Court find each of the asserted claims invalid as anticipated by the prior art described below, and claims 1 and 7 of the '889 patent and claims 24 and 86 of the '321 patent invalid as indefinite as well.

## II.    SUMMARY

While there are numerous bases for invalidity, the following table summarizes the invalidity arguments that Google is presenting on this motion:

| Patent and Claim: | Correct Priority Date: | Anticipated By: | Indefinite Term(s): |
|---|---|---|---|
| '889 patent, claim 1 | Jun, 9, 1997 | PasTime (102(a)) Anthony (102(e)) | "means for parsing" "means for modifying" "means for sending" |
| '889 patent, claim 7 | Jun, 9, 1997 | PasTime (102(a)) Anthony (102(e)) | "means for parsing" (claim 1) "means for modifying" (claim 1) "means for sending" (claim 1) |
| '321 patent, claim 1 | Aug. 13, 1999 | PasTime (102(b)) Graham | |
| '321 patent, claim 24 | Aug. 13, 1999 | PasTime (102(b)) Graham (102(b)) | "the record reference" |
| '321 patent, claim 27 | Aug. 13, 1999 | MUC-6 Task Definition (102(b)) Aberdeen (102(b)) | |
| '321 patent, claim 86 | Aug. 13, 1999 | Gennaro (102(b)) Myka (102(b)) | "seemingly general" "relatively specific." |

## III.    STATEMENT OF FACTS[2]

### A.    The Automatic Hyperlink-Creation Prior Art

Claims 1 and 7 of the '889 patent and claims 1 and 24 of the '321 patent are generally directed to identifying in one record one or more keywords that refer to another record, and then

---

[2] In granting a motion for summary judgment of invalidity, the trial court should make specific factual findings establishing that each asserted claim limitation is met by the prior art. *See Dana Corp. v. American Axe. & Mfg.*, 279 F.3d 1372, 1376 (Fed. Cir. 2002). Accordingly, Google submits herewith Proposed Findings of Fact and Conclusions of Law In Support of Its Motions for Summary Judgment Regarding U.S. Patent Nos. 5,903,889 and 6,516,321 ("PFOF").

forming a hyperlink from those keywords to the other record.  There are numerous prior art references directed to this sort of automatic hyperlink-creation; we focus on three below.

### 1.    PasTime

Thistlewaite, Paul, Automatic Construction and Management of Large Open Webs, Info. Proc. & Mgmt, Vol. 33, No. 2, pp. 161-73 (Mar. 1997) ("PasTime") was published by March of 1997.  [(Dkt. No. 32) Kirk Decl., Ex. B at GOOG074992]  The date-stamped library copy shows it was a publicly available printed publication by no later than March 22, 1997.  [*Id.*]

PasTime was a "system for the automatic detection and management of" hyperlinks.  [*Id.*, Ex. B at 161; Abstract.]  The system was used in the mid-90s by the Australian Parliament, and allowed users to request any document generated by the Australian Parliament, such as hearing transcripts, Bills, or Acts.  [*Id.* at 170.]  Prior to delivering the document, PasTime would automatically review it for one or more keywords and keyword phrases, and create hyperlinks from those keywords to other documents.  [*Id.* at 168.]

PasTime worked with a collection of databases called a "Hyperbase," which was stored on "an inexpensive Sun-5 workstation, with 32 megabytes of RAM and 10 gigabytes of disk." [*Id.* at 171 n.22.]  The Hyperbase was composed of roughly 250,000 individual documents arranged into numerous "sub-collections," such as Hansards, transcripts, reports, Orders, Bills, rules, biographies, etc. [*id.* at 170]:

> The approaches advocated in this paper have been used to build a hyperbase of the complete electronic document holdings of the Australian Parliament—in all, about 2 gigabytes of text.  Those holdings include the Hansards for the House of Representatives and the Senate from 1981 onwards, Committee Transcripts and Reports, and Explanatory Memoranda for Bills. There is a range of other material: the agenda for Parliamentary meetings is provided by the Notice Papers, while the formal minutes of meetings are provided by the Votes and Proceedings (for the House of Representatives) and the Journals (for the Senate); the Standing Orders (for each House) provide the rules by which these meetings are conducted; the House Practice and Senate Practice books describe the formal and conventional rules and practices within the Parliament, and the Parliamentary Handbook provides other information, including biographical details of past and present Members and Senators.…. In all, there are approximately 250,000 separate atomic documents in the hyperbase[.]

The individual files in the Hyperbase were stored and retrieved using a standardized address format; each file was addressed by listing the byte location where the file began in the hyperbase, and the total length of the file, in bytes [*id*. at 171; emphasis added]:

> 5.1 Data Capture
> As new files become available, Parliament uses the FTP protocol to transfer the file into a special directory on our server, which is automatically monitored. When a new file is detected the following automatic processes are applied:
> 1. the file is examined to determine which sub-collection it belongs to (e.g. Senate Hansard, Standing Orders, etc.)
> 2. ***a document identifier index is generated listing the start byte location and byte extent of each atomic component document in the file*** together with canonical identifier for that component, such as "Hasnard/Senate/1996/May/22/article_10" (but the file is not physically partitioned into separate smaller files).

When a source document such as a hearing transcript was requested by a user, the PasTime web server used pattern-matching to automatically search the document to find keywords. [*Id*. at 166-170.] The server used the keywords to search a database for related topics that either matched or were synonymous with the keywords. [*Id*.] For example, the term "bill" could be associated with synonyms such as "regulation" or "act." [*Id*.] Once found, PasTime searched the database to find target documents related to those topics. [*Id*.] When located, PasTime inserted a hyperlink into the source document, thus linking the keyword or phrase to the target document. [*Id*.] The automatically hyperlinked source document was then presented to the user in a standard HTML web browser. [*Id*. at 166 and 168.] When a user clicked on one of the hyperlinks, the system retrieved the target document for that hyperlink.

PasTime expressly recognized that in some situations, more than one piece of information in the source document could be useful or necessary to identify the appropriate target for the hyperlink. For example, the keyword "bill" could refer to numerous different bills. After identifying the keyword "bill", the system would thus continue to search the source document for additional information, such as the year (e.g., 1993). The automatically generated

4

hyperlink would then link to the proper target (e.g., the Bill of 1993, rather than, say, the Bill of 1992) [*id.* at 170.]:

> For example, the first equivalence operation may involve the case of the expression—e.g. those sentences (noun phrases) containing "Bill" or "BILL" as opposed to "bill".  Later functions could involve checking for the presence of a year designator (e.g., "… Bill ... 1993") and so on.

In another illustration of this same general approach, PasTime discloses linking the key word "Prime Minister" to that official's biography.  However, since the Prime Minister changes over time, it is necessary to identify the biography of the one who held office at the relevant time.  To avoid the *faux pas* of linking to the biography for the wrong Prime Minister, PasTime would, after identifying the text "Prime Minister" in the document, determine the date of the document (e.g., 1985).  The automatically generated hyperlink would then link to the biography of the Prime Minister in office in 1985 [*id.* at 171]:

> It is a mistake to link a reference to a Member, say their name, in a 1985 Hansard to their current biographical details in the current Parliamentary Handbook, which may now describe him or her as "the Minister for Transport" when at the time he or she was not.  Politically speaking, it is an even worse mistake to link the referring expressions "the Prime Minister" occurring in the same 1985 Hansard to biographical details of the current incumbent.  This problem was corrected by … tak[ing] additional arguments to the function for calculating the target of a source anchor expression—in addition to taking whatever string matched the pattern, the function can also take attribute information for the document (in this case, the date), which enables the identification of the correct target to be computed.

PasTime contains an extensive and detailed disclosure that would have enabled one of skill in the art to practice the disclosures contained therein, as of the date thereof.  [(Dkt. No. 34) First Croft Decl., Ex. 1 at ¶40.]  For example, PasTime provides a comprehensive disclosure of the types of hypertext links formed, tagging, and rules as well as patterns used to parse documents to identify keywords or phrases.  [*See generally* (Dkt. No. 32) Kirk Decl., Ex. B at 163-69.]  The processes described for parsing a record for text, finding entities within that text, and automatically creating hypertext links between those entities and records in a database were all well known at the time of the article.  [*See* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶29.]

5

## 2.     Anthony

U.S. Patent No. 5,815,830 to Anthony, entitled "Automatic Generation of Hypertext Links to Multimedia Topic Objects," ("Anthony") was filed on December 18, 1995, and issued on September 28, 1998.  [(Dkt. No. 32) Kirk Decl., Ex. A (cover page).]

Anthony discloses a "Hypertext information retrieval and display" system, called Auto Hyperlinks™, that automatically searches records for keywords and keyword phrases, and links those words and phrases to other records.  [*Id.* at 1:6-8.]

Anthony's Auto Hyperlinks™ system operates on a general purpose computer, such as an IBM compatible personal computer.  [*Id*. at 3:36-42.]  A database of topics and semantically related reference names resides on the computer [*id*. at 4:11-27]:

> The basic structure of data organisation in a system using the invention is shown in FIG. 3. The data portions 700 and reference names 600 are stored in the form of a database; with a reference name stored as a first field in a record, and the data portion to which that reference refers stored as a second field in that record. A reference name 600 is a unique, meaningful name which indicates the subject matter of the data portion to which it refers. The name may be a word, a phrase or other string indicative of the topic of the data portion. A data portion comprises pages of text on a particular topic, as well as any images, sound, video or executables. We refer to a record in the database, comprising topic data such as text pages, pictures or sound, reference name and any further fields of data, as a HyperNODE™. The database itself containing the records is referred to as a HyperDB™, and the application of the invention is known as XGL Hypertext VOYAGER™. The process of creating associations between data is named Auto Hyperlinking™.

When a user selects a source document from the database, the system automatically searches the document for keywords or phrases, which the patent calls "references," "topics" and "topic names."  [*Id*. at 4:16-21 ("A reference name [] is a unique, meaningful name which indicates the subject matter of the data portion to which it refers.").]

When a keyword or phrase is found in the first record, the Auto Hyperlinks™ system associates that keyword or phrase with the record it references [*id*. at 4:61-5:3]:

> On selection, the first page of topic text is compared 200 to the other topic names in the database and then displayed. The comparison is conducted by automatically searching for the occurrence of topic names in the body of text of the first page of

6

the first topic. A preferred searching technique to conduct the comparison is described later. On finding a match 300, the matched topic name occurring within the text of the first topic is associated with the topic data of the topic to which the matched topic name refers.

This process of "association" can involve automatically creating a hyperlink to the referenced record [*id*. at 5:5-18]:

> Association 400 could involve simply indicating the existence of the related topic found in the search. However, the invention advantageously provides links, known as Auto Hyperlinks™, meaning that the word or phrase in the text found to be a match with a topic name is highlighted on the display, and linked to the topic to which the topic name refers. The user may then jump to the associated topic by selecting the highlighted word or phrase in the first topic text, as in prior art Hypertext systems, or if the associated topic is a picture it is displayed on selection. The link is made with reference to the database which stores the topic text, reference name and other identifiers. Such identifiers note the location of the data for each topic, and provide the navigational links for the hypertext jumps.

Anthony gives as an example a database about the solar system.  The Auto Hyperlinks™ system automatically searches for, and creates hyperlinks using, a variety of keywords and phrases [*id*. at 6:1-10]:

| | |
|---|---|
| Earth | Io |
| Jupiter | Mars |
| Mercury | Neptune |
| Our moon | Planet |
| Pluto | Rings of Saturn. |
| Ring system | Satellites of Jupiter |
| Saturn | Solar System |
| The red spot (picture topic) | |
| Uranus | Venus |

Anthony contains an extensive and detailed disclosure that would have enabled one of skill in the art to practice the disclosures contained therein, as of the date thereof.  [(Dkt. No. 34) First Croft Decl., Ex. 1 at ¶29.]  Anthony describes an operational system, commercially sold as XGL Hypertext Voyager.  [*Id.*]  The processes described, parsing a record for text, finding entities within that text, and automatically creating hypertext links between those entities and records in a database were all well-known at the time.  [*Id.*]

7

### 3.    The HTML Sourcebook

Graham, Ian S., *HTML Sourcebook: A Complete Guide to HTML,* (John Wiley & Sons. Eds., Mar. 14, 1995), ISBN: 0-471-11849-4 ("the HTML Sourcebook") was published and publicly available by March 14, 1995.   [(Dkt. Nos. 30 and 31) Graham Decl., at ¶¶4-5; Exs. A-E.]

The HTML Sourcebook is a textbook that instructs Web page authors how to create Internet Web pages using HTML.  [(Dkt. Nos. 30 and 31)  Graham Decl., Ex. A.]  It teaches how to use the addressing format of URLs, which are addresses to target documents, and further teaches how to embed URLs in Web pages in an anchor tag.  [*See id., passim*]  When a user views the Web page in an Internet web browser such as Netscape Navigator, the browser renders these URLs and then displays them as selectable hypertext links to target documents.  [*Id.*]  If the user's computer is connected to the Internet, these target documents can be retrieved from remote servers and databases.

URLs can be long and cumbersome, and it can be tedious for a Web page author to retype the entirety of the URL for every hyperlink, particularly where very often most of the URL information does not change much from hyperlink to hyperlink.  To economize, the HTML Sourcebook teaches Web page authors to write short-hand or "partial" URL addresses for target documents.  [(Dkt. Nos. 30 and 31) Graham Decl., Ex. A at 167-68.]  These partial URLs are just the target file name (e.g., "**stuff.html**"), rather than the entire URL for that target file (e.g., "http://www.stuff.edu/main/docs/**stuff.html**").  [*Id.*; emphasis added.]  The "BASE" of the URL (e.g., "http://www.stuff.edu/main/docs/") is defined in the "head" of the Web page, whereas the partial URL is contained in the "body" of the Web page.

In operation, when the web browser renders the Web page for display, if it encounters a partial URL, it then looks for a BASE URL.  If it finds one, it concatenates the two (BASE URL + partial URL) to create a full URL address to the target document [*id.* at 167-68]:

Suppose you originally access the document file.html using the full URL:
http://www.stuff.edu/main/docs/file.html

Within this document there is a hypertext reference containing a partial URL:
<A HREF="stuff.html"> anchor text </A>
Where is this file? From inside file.html, any information not present in a URL reference is considered the same as that used to access the current document. Thus, the partial URL stuff.html is transformed into a full URL by appropriating the missing information from the URL used to access file.html. The completed URL is then:

http://www.stuff.edu/main/docs/stuff.html

which indicates, as expected, that stuff.html is on the same server and in the same directory as file.html.  Other equivalent partial URLs are then:

/main/docs/stuff .html
//www.stuff.edu/main/docs.html

The former appropriates http:/www.stuff.edu from the current URL to complete the reference, while the latter appropriates only the http: part from the base URL of the current document.
You can also use partial URLs to reference files in other directories; for example, from the example file.html the relative URL:

../../main.html

indicates the file main.html in the root HTTP directory, namely:

http://www.stuff .edu/main.html

Partial URLs are very useful when constructing large collections of documents that will be kept together.  Of course relative URLs become invalid if a document is moved to a new directory or a new Internet site.  This problem can be mitigated using the BASE element of the HTML, which is used to record the correct BASE URL of a document.  If the document is moved, all relative URLs are determined relative to the URL recorded by the BASE element.

To illustrate using the sample discussed in the above passage, the HTML Web page

"file.html" (below left) contains both a partial URL and separate base URL.  Below right shows

how that page looks when viewed in Netscape Navigator version 1.22.

9




The "<BASE HREF=" element specifies the BASE URL that all partial URLs in this HTML file will use.[3] Depending on how much of the partial URL is provided, the web browser will glean from the base URL as much as is necessary to create a full URL. [(Dkt. No. 31) Graham Decl., Ex. A at 168.] Here, the partial URL specifies only the target file name "<A HREF="stuff.html">". The web browser accordingly gleans from the BASE URL everything to the left of "file.html" from the BASE HREF specification. [*See id.*] When this Web page is viewed in a Web browser such as Netscape Navigator, version 1.22, the browser finds the partial and BASE URLs, and concatenates them to construct a full URL. [(Dkt. No. 34) First Croft Decl., Ex. 2(a), *passim.*] As shown in the right figure above, that full URL is displayed at the bottom of the browser window when the user uses the mouse to hover the cursor over the hyperlinked anchor text, without clicking on the hyperlink itself.

The HTML Sourcebook contains an extensive and detailed disclosure that would have enabled one of skill in the art to practice the disclosures contained therein, as of the date thereof. [(Dkt. No. 34) First Croft Decl., Ex. 1 at ¶¶30, 40.] This 400+ page textbook is dedicated to teaching people how to create Web pages using HTML. [*Id.* at ¶30.] The HTML Sourcebook describes in clear and easy language, with illustrations, how to create Web pages, how to link anchor text from one document to another, how to combine multiple pieces of anchor text to determine a reference (i.e., target) record, and how to format the URL addresses used to link

---

[3] This example URL address starts with "C:", which means the target document is located on the user's computer. If the document were located on the Internet, the URL would start with "http:". [*See, e.g.,* (Dkt. No. 31) Graham Decl., Ex. A at 168.]

Web pages together.  [*Id*.]  The book also illustrates operational examples of HTML code as viewed through an Internet web browser.  [*See, e.g.,* (Dkt. No. 31) Graham Decl., Ex. A at 16, 18.]  The material in the HTML Sourcebook was not new even in 1995 when this book was first published; HTML had been around for years.  [*Id*.]  Common web browsers such as Netscape Navigator, Mosaic, and others existed since at least 1994, and were designed to render and display HTML pages.  [*Id*.]

### B.    The Subject Matter Specific Tagging Prior Art

Claim 27 of the '321 patent is generally directed to inserting subject-matter specific tags before and after text of the particular subject matter.  This too was well-known in the prior art.

### 1.    The MUC-6 Named Entity Task Definition

A conference dedicated to the automatic search for and tagging of entities in text with subject-matter specific begin and end tags was conducted in November 1995.  By June 2, 1995, the conference organizers had established the goals for those participating in the conference, which was called "MUC-6," since it was the sixth in a series of Message Understanding Conferences.  [Declaration of Jason W. Wolff ISO Google's Motions for Summary Judgment Regarding U.S. Patent Nos. 5,903,889 and 6,516,321 ("Wolff Decl."), Ex. B.]

One of the goals of MUC-6 was to investigate and develop processes for accomplishing named entity recognition, specifically, the recognition of entity names (for people and organizations), place names, temporal expressions, and certain types of numerical expressions. [Second Declaration of W. Bruce Croft, PhD ("Second Croft Decl."), Ex. 1 at ¶32.]  This task was intended to be of direct practical value (in annotating text so that it can be searched for names, places, dates, etc.), to facilitate language-processing tasks, such as information extraction. [*Id*.]

The Task Overview for the MUC-6 Named Entity Task Definition included an extensive disclosure of an automatic process for recognizing specific information types, such as PERSON, LOCATION, and DATE, in a document, and then "tagging" those segments of text.

Specifically, the reference contemplated a set of search rules that would allow the system to discriminate between different data types. [Wolff Decl., Ex. B.] The system would receive a record, and a computer program would examine the record according to the search rules to identify segments of the record that include information of each type. [Second Croft Decl., Ex. 1 at ¶33.] When such segments are located, tags would be inserted for that information type, such as <PERSON> and </PERSON>, around the segment. [*Id*.] For example [Wolff Decl., Ex. B]:

> The output of the systems to be evaluated will be in the form of SGML text markup. The only insertions allowed during tagging are tags enclosed in angled brackets.
> * * *
> This subtask is limited to proper names, acronyms, and perhaps miscellaneous other unique identifiers, which are categorized via the TYPE attribute as follows:
> ORGANIZATION: named corporate, governmental, or other organizational entity
> PERSON: named person or family
> LOCATION: name of politically or geographically defined location (cities, provinces, countries, international regions, bodies of water, mountains, etc.)
> * * *
> DATE: complete or partial date expression
> TIME: complete or partial expression of time of day
> * * *
> MONEY: monetary expression
> PERCENT: percentage

A person of skill in the art at this time could have implemented a system to achieve this objective without undue experimentation. [Second Croft Decl., Ex. 1 at ¶34.] For example, such a system could have been implemented using simple pattern matching (for example, to identify dates), and/or comparison of words in the record to a known database (for example, of person names and/or names of locations). [*Id*.] Numerous people did in fact develop such computer programs in just a few months, as reported in the proceedings for the conference, held in November, 1995. One example of such a system is discussed below.

## 2.    Aberdeen

Aberdeen, J. et. al., MITRE: Description of the Alembic System Used for MUC-6, Proc. of the 6th Conf. on Message Understanding, pp. 141-55, Columbia, Maryland, is an article from

the proceedings of MUC-6, held on November 6-8 1995.  The date-stamped library copy shows it was a publicly available printed publication by no later than November 19, 1996.  [Wolff Decl., Ex. C.]  This article describes one computer program, called Alembic, developed by MITRE Corporation, to achieve Named Entity Recognition for MUC-6.  [*Id.*]  The article describes how the Alembic computer program worked to achieve the goals of the conference.

Specifically, this article discloses plural subject matter specific tags, and the tags are used in pairs with beginning and end tags.  [Second Croft Decl., Ex. 1 at ¶36.]  The article contains extensive discussion of rules that allowed the system to discriminate between different data types.  [*Id.*]  The system would receive a record, and the Alembic computer program would examine the record according to the search rules to identify segments of the record that include information of each type.  [*Id.*]  When such segments were located, the program would insert the tags for that information type around the segment.  An example of the resultant tagged text is found on page 145 of the article [*id.*]:

> *Yesterday, <none>McCann</none>made official what had been widely anticipated: <ttl>Mr.</ttl><person>James</person>, <num>57</num>years old, is stepping down as <post>chief executive</post> on <date>July 1</date> and will retire as <post>chairman</post> at the end of the year.*

Aberdeen contains an extensive and detailed disclosure that would have enabled one of skill in the art to practice the disclosures contained therein, as of the date thereof.  [*Id.* at ¶¶9, 35-36 and Ex. 2(f).]  This article contains a complete and clear disclosure of the way in which this system was implemented, using standard technologies of the day.  [*Id.* at ¶¶35-36 and Ex. 2(f).]

### C.     The Automatic Pop-Up Prior Art

Claim 86 of the '321 patent is generally directed to systems that reveal additional information about a hyperlink when the user moves the cursor over the hyperlink, without selecting it.  This too was well-known in the prior art.

### 1.     Gennaro

United States Patent No. 5,742,768 ("Gennaro") was filed in July 16, 1996, and issued on April 21, 1998.  [Wolff Decl., Ex. A (cover page).]

13

This patent discloses a method and system in which a user can hover a cursor over an item of interest to obtain more information about the item. [Second Croft Decl., Ex. 1 at ¶44.] As shown in Figs. 2A and 2B, if a user moves the cursor over a "hot spot" 44, a menu 46 pops up. The user can then move the cursor over the menu entries, in which case a URL 38 for each menu item is displayed in the lower left hand corner of the browser. [*Id.*; Wolff Decl., Ex. A FIGS 2A and 2B.]



The "hot spots" are visually distinguished from other record information because, e.g., they are adjacent a halo, which converts to a sunburst graphic when the cursor is positioned over the hot spot. [Second Croft Decl., Ex. 1 at ¶46.] The user can point to the hot spot without selecting any hyperlink by "mousing over" (using the mouse to move the cursor over the hot spot), which causes the menu 46 to pop up. [*Id.*] The menu items further detail the specific topics of information available for each hot spot, thus rendering the hot spot text more specific. [*Id.*]

The menu items are also visually distinguished from other record information because they appear in the menu. [*Id.* at ¶47.] The user can point to a menu item without selection by mousing over, in which case the URL for each menu item (item 38) is displayed in the lower left

14

hand corner of the browser, as shown above in FIG. 2B.  [*Id.*; Wolff Decl., Ex. A at FIG 2B.]
This URL information renders the menu item text more specific.  [Second Croft Decl., Ex. 1 at
¶47.]

      **2.**     **Myka**

Myka, A. & Güntzer, U., *Automatic Hypertext Conversion of Paper Document
Collections*, in Selected Papers From the Digital Libraries Workshop on Digital Libraries:
Current Issues, Lecture Notes In Computer Science, Vol. 916. Springer-Verlag, London, pp. 65-
90 (N. R. Adam et al. eds., Springer-Verlag, London) (May 19-20, 1994) ("Myka") was
published on May 19-20, 1994.  The date-stamped library copy shows it was a publicly available
printed publication by at least as early as July 16, 1995 [(Dkt. No. 32) Kirk Decl., Ex. D].

Myka discloses a batch hypertext system called HyperFacs, which automatically
generates hypertext links between documents.  [*Id.*, at Abstract, §1.]  In order to increase the
accuracy of proper link targets, HyperFacs takes into account other information from the
document beyond text, such as layout characteristics.  [*Id.,* at §3.1; *see* §3.1.3; §3.2.1; §3.2.3.]
Once hypertext links are created, they are displayed to a user in a browser window, with link
sources (text) surrounded by outlined boxes, shown below in Figure 6.9 of the reference.  [*Id.* at
§5.1 ("Additional information on a link (besides indicating the existence of a link by means of
boxes) is presented to the user if he moves the cursor into the framed boxes: then, the type of
information that is contained in the link destination is shown as well as the type of action that is
triggered.").]



**Figure 6.9** Screendump from a HYPERFACS session

The Myka article clearly enables one of skill to implement the disclosures contained therein. [(Dkt. No. 34) First Croft Decl., Ex. 1 at ¶35.] The process described therein of indicating the nature of elements pointed to on a screen, was not new at the time this article papers were published. [*Id.*]

### D. Priority Dates

The '889 patent does not claim priority to any earlier-filed patent application. [PFOF 63-64.] Accordingly, the priority date for all claims of the '889 patent is June 9, 1997, the filing date of the '889 patent. [*Id.*]

The '321 patent claims priority, as continuations-in-part, to earlier filed patent applications. [PFOF 65-68.] However, for the reasons set forth in detail below, claims 1, 24, 27, and 86 are not entitled to a priority date prior to the August 13, 1999, filing date of the '321 patent application. [*Id.*]

16

### E.    Date Of Invention

HyperPhrase contends that it conceived of the inventions described in the '889 patent on February 26, 1997.  HyperPhrase does not claim to thereafter have actually reduced the invention to practice, but rather asserts that the inventors constructively reduced it to practice by filing the '889 patent application on June 9, 1997.  [PFOF 69-74.]  It also contends that they were diligent in doing so.  For the reasons set forth in detail below, HyperPhrase has failed in its burden of identifying independent evidence to corroborate either the alleged conception date, or the alleged diligence, and as such is unable to prove its alleged prior invention.  [*Id.*]

## IV.    ARGUMENT

### A.    Applicable Legal Standards

Issued patents are entitled to a presumption of validity in infringement proceedings. 35 U.S.C. §282.  As a result, invalidity under §102(b) requires proof by clear and convincing evidence.  *See, e.g., Abbott Laboratories v. Geneva Pharmaceuticals, Inc.*, 182 F.3d 1315, 1318 (Fed. Cir. 1999).  Where, as here, the challenge to validity is based upon references that were not before the examiner, the burden of proving invalidity "may be more easily carried."  *Sibia Neurosciences, Inc. v. Cadus Pharmaceutical Corp.*, 225 F.3d 1349, 1355-56 (Fed. Cir. 2000).

Where a prior art reference discloses every limitation of the claimed invention, either explicitly or inherently, it anticipates the claimed invention.  *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1327 (Fed. Cir. 2001).  "Although anticipation is a question of fact, it still may be decided on summary judgment if the record reveals no genuine dispute of material fact."  *Id*.

### B.    '889 Patent, Claims 1 and 7, Are Invalid As Anticipated, And Also As Indefinite

#### 1.    Claim Construction And Indefiniteness

| Claim 1 | Claim Construction |
|---|---|
| *A computer system with a plurality of data records on a plurality of databases,* | "Computer system:"  Ordinary meaning<br>"Plurality:"  More than one<br>"Data records:"  Ordinary meaning<br>"Database:"  A group of related data records |
| *and a standardized format* | "A standardized format for addressing said data records:"  Each of the plurality of |

17

| | |
|---|---|
| *for addressing said data records, said computer system comprising:* | databases uses the same addressing format to store and retrieve data records (*see* Google's co-pending non-infringement brief) |
| *(a) a user interface having an interactive display program for requesting one of said data records and displaying a plurality of interface supported data formats;* | "User interface:" A screen displayed to a user on a computer monitor "Interactive display program for requesting one of said data records and displaying a plurality of interface supported data formats:" A computer program that can request a data record and display different types of data on the user interface; browsers such as Internet Explorer and Netscape Navigator are common examples of such programs. |
| *(b) means for receiving a reference to a first data record from said interactive display program;* | This term is construed in accordance with 35 U.S.C. §112, 6. The corresponding structure for this element is a web browser, and in particular the field that allows a user to type in a URL to request an HTML file (a first data record). *See* '889 patent, col. 2, ll. 50-57. |
| *(c) means for retrieving said first data record;* | This term is construed in accordance with 35 U.S.C. §112, 6. The corresponding structure for this element is a web browser, and in particular the capability to make requests for HTML files located at a URL. *See* '889 patent, col. 3, ll. 44-54. |
| *(d) means for parsing said first data record to identify a reference to a second data record;* | This term is construed in accordance with 35 U.S.C. §112, 6. The corresponding structure for this element is a generic, black-box program that parses incoming data records. *See* '889 patent, col. 8, ll. 37-40. The details of the parser are not adequately disclosed in the specification. |
| *(e) means for modifying said reference to said second data record to create an address, said address being operable to retrieve said second data record; and* | This term is construed in accordance with 35 U.S.C. §112, 6. The corresponding structure for this element is a generic, black-box program that modifies the reference in the first data record. *See* '889 patent, col. 9, ll. 1-11. The details of this program are not adequately disclosed in the specification. |
| *(f) means for sending said modified first data record to said interactive display program.* | This term is construed in accordance with 35 U.S.C. §112, 6. The corresponding structure for this element is a generic, black-box program that sends the modified first data record to the browser. See '889 patent, col. 9, ll. 12-15. The details of this program are not adequately disclosed in the specification. |

Claim 7 depends from claim 1, and adds the further requirement that the reference to the second data record comprises a "keyword phrase."

| **Claim 7** | **Claim Construction** |
|---|---|
| *The computer system of claim 1, wherein said reference to said second data record comprises a keyword phrase.* | "Keyword phrase:" A predefined **multi-word** phrase. |

As noted in the first chart above, most of the limitations of claim 1 are "means" elements, and so are construed in accordance with 35 U.S.C. §112, ¶ 6, which provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification

18

and equivalents thereof."  Thus, construing these terms requires reference to the patent specification to identify the structure that performs the function recited by these elements.

For three of these terms, this is an impossible task, because there is no corresponding structure.  The specification describes element (d), the "means for parsing," as a generic, black box.  The specification does not provide any structural detail that explains how this black box "pars[es] said first data record to identify a reference to a second data record."  The same is true for elements (e) ("means for modifying") and (f) ("means for sending"), which likewise refer only to generic black boxes.

Where, as here, a patent specification fails to provide meaningful disclosure of structure corresponding to a "means" claim term, claims that use such terms are invalid as indefinite under 35 U.S.C. §112, ¶ 2 ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."):

> In the present case, there is nothing to suggest a structure for the claimed control means. As we have previously explained, §112, ¶ 6 requires some disclosure of structure in the specification corresponding to the claimed means. "[W]hile it is true that the patentee need not disclose details of structures well known in the art, the specification must nonetheless disclose some structure." Default Proof, 412 F.3d at 1302; see also Atmel, 198 F.3d at 1382 ("There must be structure in the specification" and the requirements of §112, ¶ 6 will not be met when there is "a total omission of structure."); Med. Instrumentation, 344 F.3d at 1211 ("If the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the patentee has not paid [the price for use of the convenience of broad claiming afforded by §112, ¶ 6] but is rather attempting to claim in functional terms unbounded by any reference to structure in the specification. Such is impermissible under the statute."); Donaldson, 16 F.3d at 1195 ("[I]f one employs means-plus-function language in a claim, one must set forth in the specification an adequate disclosure showing what is meant by that language. If an applicant fails to set forth an adequate disclosure, the applicant has in effect failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112.").
>
> The inquiry is whether one of skill in the art would understand the specification itself to disclose a structure, not simply whether that person would be capable of implementing a structure. Med. Instrumentation, 344 F.3d at 1212 (citing Atmel, 198 F.3d at 1382). Accordingly, a bare statement that known techniques or methods can be used does not disclose structure. To conclude

otherwise would vitiate the language of the statute requiring "corresponding structure, material, or acts described in the specification."

*Biomedino LLC v. Waters Technology Corp.*, 490 F3.d 946, 952 (Fed. Cir. 2007).

The claim term at issue in *Biomedino* was "control means."  Similar to here, the specification described the "control means" as a generic black box:  "The only references in the specification to the 'control means' are a box labeled 'Control' in Figure 6 and a statement that the regeneration process of the invention 'may be controlled automatically by known differential pressure, valving and control equipment.'"  *Id*. at 949.  This bare statement was insufficient to meet the statutory requirements, and so the Federal Circuit affirmed the District Court's judgment of invalidity.  *Id*. at 952.  Given the lack of meaningful disclosure of corresponding structure for the terms "means for parsing," "means for modifying," and "means for sending," this Court should invalidate claims 1 and 7 of the '889 patent on this same basis.

> **2.     '889 Patent, Claims 1 and 7, Are Not Entitled To Either A Priority Date Or A Date Of Invention Before The June 9, 1997, Filing Date Of The '889 Patent Application**

The '889 patent application was filed on June 9, 1997, and does not claim priority to any earlier-filed application.  [PFOF 63-64, 69-70.]

In its opposition to Google's original invalidity summary judgment motion, HyperPhrase alleged a date of invention prior to June 9, 1997.  [(Dkt. No. 42) HyperPhrase §102 Opp. Br. at 6-7.]  However, it is HyperPhrase's burden to come forth with sufficient evidence to substantiate any alleged prior invention.  *Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572, 1578 (Fed. Cir. 1996).  It has failed to do so.

HyperPhrase does not allege an actual reduction to practice, i.e., that it actually made a system having all of the features of claims 1 and 7 prior to the filing date.  Rather, it contends that the inventors conceived of the claimed invention before the filing date, and then were diligent in constructively reducing the conception to practice through the preparation of the patent application.  [(Dkt. No. 42) HyperPhrase §102 Opp. Br. at 6-7.]

20

To antedate the application filing date on this basis, HyperPhrase must not only prove prior conception of every feature of the claims, in the claimed combination, but must also show continuous and active diligence in preparation of the application from that date of conception to the filing date of the application. *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1365 (Fed. Cir. 2001) ("To antedate (or establish priority) of an invention, a party must show either an earlier reduction to practice, or an earlier conception followed by a diligent reduction to practice."). The law imposes a strict obligation of ***independent corroboration*** of the evidence of both conception and diligence. "[C]onception by an inventor, for the purpose of establishing priority, can not be proved by his mere allegation nor by his unsupported testimony where there has been no disclosure to others or embodiment of the invention in some clearly perceptible form, which sufficient proof of identity in point of time." *Price v. Symsek*, 988 F.2d 1187, 1193-94 (Fed. Cir. 1993).

HyperPhrase's alleged proof of prior invention comes entirely from one of the named inventors, Carlos de la Huerga. HyperPhrase does not offer any testimony from any independent third party attesting to or corroborating even a single one of the events alleged in Mr. de la Huerga's declaration. [PFOF 63-64, 69-74.]

HyperPhase's alleged evidence of conception is a draft patent application purportedly bearing a date of February 26, 1997. The draft was not witnessed, and no independent witness has corroborated either the date or the contents of the draft. [*Id*.]

HyperPhrase's alleged evidence of diligence is even thinner. [*Id*.] Mr. de la Huerga speaks to the alleged diligence in paragraph 7 of his declaration, which lacks any documentary or testimonial corroboration by an independent witness. [*Id*.] This is all that he says:

7.      The eight files in this directory dated April 7 through June 3, 1997 reflect additional drafts and related documents that were exchanged between me and my patent attorney and his staff pursuant to revising the application and getting it on file. The high level of activity reflects what I remember to be the case: I and the patent attorney were working diligently to review the drafts, revise the claims, revise the specification for clarity, and add / modify certain figures to conform to the best way to explain my inventions. I understand that my patent attorney was working on the '889 application consistently and at a reasonable pace during this late February through early June 1997 timeframe.

This uncorroborated testimony is insufficient to meet HyperPhrase's burden to show diligence in reduction to practice, and so does not create a genuine dispute on the issue of prior invention. *Shu-Hui Chen v. Bouchard*, 347 F.3d 1299, 1309 (Fed. Cir. 2003) (affirming patentee's failure to corroborate diligence, noting "[i]t is well established that when a party seeks to prove conception via the oral testimony of a putative inventor, the party must proffer evidence corroborating that testimony."); *Refac Electronics Corp. v. R.H. Macy & Co., Inc.,* 1988 WL 93835, 5 (D.N.J., 1988) (a patent holder is not entitled to earlier than filing date priority on a motion for summary judgment where the patentee offered only unsubstantiated declarations of the inventors in support of priority to parent patent).

### 3.      PasTime Anticipates The '889 Patent, Claims 1 And 7

PasTime was a publicly available printed publication as of March 22, 1997. [(Dkt. No. 32) Kirk Decl., Ex. B at GOOG074992.] This date predates the June 9, 1997, filing date of the '889 patent. [PFOF 75-76.] Since HyperPhrase has failed in its burden to prove a date of invention before that date, PasTime is prior art to claims 1 and 7 of the '889 patent under 35 U.S.C. §102(a). [PFOF 63-64, 69-70.] As shown below, every feature of claims 1 and 7 of the '889 patent is disclosed in PasTime, which thus anticipates those claims.

| Claim 1 | PasTime |
|---|---|
| *A computer system with a plurality of data records on a plurality of* | PasTime discloses a computer system: "The server is an inexpensive Sun-5 workstation, with 32 megabytes of RAM and 10 gigabytes of disk." [(Dkt. No. 32) Kirk Decl., Ex. B at 171 n.22.] |

| | |
|---|---|
| *databases,* | PasTime discloses a plurality of data records on a plurality of databases. The plurality of databases is called a "Hyperbase," which is stored on the computer system. The Hyperbase is composed of roughly 250,000 individual documents arranged into numerous "sub-collections," such as Hansards, transcripts, reports, Orders, Bills, rules, biographies, etc. [*id*. at 170]:<br><br>    The approaches advocated in this paper have been used to build a hyperbase of the complete electronic document holdings of the Australian Parliament— in all, about 2 gigabytes of text. Those holdings include the Hansards for the House of Representatives and the Senate from 1981 onwards, Committee Transcripts and Reports, and Explanatory Memoranda for Bills. There is a range of other material: the agenda for Parliamentary meetings is provided by the Notice Papers, while the formal minutes of meetings are provided by the Votes and Proceedings (for the House of Representatives) and the Journals (for the Senate); the Standing Orders (for each House) provide the rules by which these meetings are conducted; the House Practice and Senate Practice books describe the formal and conventional rules and practices within the Parliament, and the Parliamentary Handbook provides other information, including biographical details of past and present Members and Senators..... In all, there are approximately 250,000 separate atomic documents in the hyperbase[.]<br><br>Since a "database" is "a group of related data records," each sub-collection constitutes a separate database, each of which has plural documents.<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶37; n.3 and Ex. 2(c); Second Croft Decl., Ex. 1 at ¶¶17-20 and Ex. 2(d).] [PFOF 77.] |
| *and a standardized format for addressing said data records, said computer system comprising:* | PasTime discloses a standardized format for addressing the data records in the hyperbase. Specifically, each file is addressed by listing the byte location where the file begins in the hyperbase, and the total length of the file, in bytes [(Dkt. No. 32) Kirk Decl., Ex. B at 171]:<br><br>    5.1 Data Capture<br><br>    As new files become available, Parliament uses the FTP protocol to transfer the file into a special directory on our server, which is automatically monitored. When a new file is detected the following automatic processes are applied:<br><br>    1. the file is examined to determine which sub-collection it belongs to (e.g. Senate Hansard, Standing Orders, etc.)<br>    2. a document identifier index is generated listing the start byte location and byte extent of each atomic component document in the file together with canonical identifier for that component, such as "Hasnard/Senate/1996/May/22/article_10" (but the file is not physically partitioned into separate smaller files.<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶37; n.3 and Ex. 2(c); Second Croft Decl., Ex. 1 at ¶¶17-20 and Ex. 2(d).] [PFOF 78.] |
| *(a) a user interface having an interactive display program for requesting one of said data records and displaying a plurality* | PasTime discloses a user interface having an interactive display program that is capable of requesting data records and displaying a plurality of data formats, namely, a HTML browser [Kirk Decl., Ex. B at 171]:<br><br>    There are two types of documents that a Web client browser can request: an |

| | |
|---|---|
| *of interface supported data formats;* | index page for the collection, for some sub-collection, or for some compound document in a sub-collection; or an atomic document. Alternately, the Web client might issue a search request against the hyperbase, or some sub-collection within the hyperbase. All such requests are mediated by a suite of CGI programs on the server. In response to a request for a particular atomic document, the relevant CGI program will automatically perform the following tasks …. |
| | An HTML browser can display a plurality of data formats, and in fact is the corresponding structure for this element disclosed in the '889 patent. *See* '889 patent, col. 2, ll. 50-57. |
| | Moreover, PasTime expressly discloses that the server can provide information in a variety of different formats [(Dkt. No. 32) Kirk Decl., Ex. B at 170]: |
| | Parliament provides data in a number of formats, including a text database format, a word-processing format, and ASCII. |
| | [*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶37; n.3 and Ex. 2(c); Second Croft Decl., Ex. 1 at ¶¶17-20 and Ex. 2(d).] [PFOF 79.] |
| *(b) means for receiving a reference to a first data record from said interactive display program;* | This "means" is the field in the web browser that allows a user to type in a URL to request an HTML file (a first data record). *See* '889 patent, col. 2, ll. 50-57. |
| | Since PasTime also uses an HTML web browser, it discloses such a means [(Dkt. No. 32) Kirk Decl., Ex. B at 166]: |
| | All requests from a client, in the form of a URL, can specify which original document is being sought, and the CGI program indicated in the URL can then: (i) locate and load the original document from the server's file system …. |
| | [*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶37; n.3 and Ex. 2(c); Second Croft Decl., Ex. 1 at ¶¶17-20 and Ex. 2(d).] [PFOF 80.] |
| *(c) means for retrieving said first data record;* | This "means" is the web browser capability to make requests for HTML files in accordance with a URL. *See* '889 patent, col. 3, ll. 44-54. |
| | PasTime discloses such a means [(Dkt. No. 32) Kirk Decl., Ex. B at 166]: |
| | All requests from a client, in the form of a URL, can specify which original document is being sought, and the CGI program indicated in the URL can then: (i) locate and load the original document from the server's file system …. |
| | *See also id.* at 171: |
| | In response to a request for a particular atomic document, the relevant CGI program will automatically undertake the following tasks:<br>1. extract the component document from the original file, and depending on the sub-collection that it belongs to, convert it into a base HTML document containing HTML formatting tags[.] |
| | [*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶37; n.3 and Ex. 2(c); Second Croft Decl., Ex. 1 at ¶¶17-20 and Ex. 2(d).] [PFOF 81.] |
| *(d) means for parsing said first data record to identify* | This "means" is a generic, black-box program that parses incoming data records. *See* '889 patent, col. 8, ll. 37-40. |

24

| | |
|---|---|
| *a reference to a second data record;* | PasTime discloses such a means for parsing the first data record to identify a second data record. Indeed, the central purpose of the PasTime system is to locate keywords in one record, and link them to the record referenced by that keyword:<br><br>As the objects of link relations are typically strings of characters in documents, lexical patterns are used to define the predicates for representing link anchors. Patterns can be as simple as literal strings, or complex regular expressions. A source (or target) anchor is located in the source (or target) document not by specifying the offset and extent of the source (or target) expression, but rather by specifying the pattern that the expression must match." [(Dkt. No. 32) Kirk Decl., Ex. B at 167.]<br><br>Consequently, at the time of serving a document to a client, a link is only embedded into the byte stream by the CGI program doing the pattern detection and link resolution if (i) an expression in the document matches one of the source anchor patterns applicable to that document, and (ii) the corresponding document exists. [*Id.* at 168.]<br><br>To illustrate, take an example from the documents of the Australian Parliament. The documents which record the debates in the parliament are called the "Hansards". Another document, which lists the rules under which such debates are conducted, is called the "Standing Orders." … Can we devise a pattern for linking any reference to the Standing Orders or a particular standing order in a Hansard document to the Standing Orders document itself? Will the following regular expression, P, be sound and complete:<br>          "standing" (SPACE) + "order" ((SPACE) + (0-9) + (A-Z)?)?<br>P[asTime] will match any string consisting of the word "standing" followed by one or more spaces (including newline characters) followed the word "order", optionally followed by more space and a string of digits, optionally followed by an uppercase alphabetical character. [*Id.* at 169.]<br><br>In response to a request for a particular atomic document, the relevant CGI program will automatically undertake the following tasks:<br>…<br>2. the attribute information for the document, and the document identifier index, are then examined to compute the structural links for this document, and these are then added at the appropriate places to the base HTML document[.] [*Id.* at 171.]<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶37; n.3 and Ex. 2(c); Second Croft Decl., Ex. 1 at ¶¶17-20 and Ex. 2(d).] [PFOF 82.] |
| *(e) means for modifying said reference to said second data record to create an address, said address being operable to retrieve said second data record; and* | This "means" is a generic, black-box program that modifies the reference in the first data record. *See* '889 patent, col. 9, ll. 1-11.<br><br>PasTime discloses such a means. Specifically, PasTime discloses that, once the reference to the second data record is identified, either the underlying data record containing that reference can be modified to create a hyperlink that includes the address for that second data record, or the underlying data record can be left undisturbed, and the hyperlink embedded into the information provided to the client browser:<br><br>***The method most familiar to authors using HTML to create a hyperbase for the Web is to take the original documents, add HTML markers for*** |

25

| | |
|---|---|
| | *formatting the documents presentationally, and add link information into documents which contain link sources.* [Fn16: If the target of a link is not a whole document but rather some point in a document, then additional markup (a named tag) must be added to the target document.] *The next step is to store the resulting HTML documents in a file system*, and make them visible to the Web via a HTTP server running on their system (see Fig. 1—HTML Embedded). [(Dkt. No. 32) Kirk Decl., Ex. B at 166; emphasis added.]<br><br>Consequently, at the time of serving a document to a client, a link is only embedded into the byte stream by the CGI program doing the pattern detection and link resolution if (i) an expression in the document matches one of the source anchor patterns applicable to that document, and (ii) the corresponding document exists. [*Id.* at 168.]<br><br>In response to a request for a particular index page, the relevant CGI program will dynamically generate a HTML page containing the HTML page containing the index information, by examining the appropriate document identifier index and attribute information. [*Id.* at 171.]<br><br>In response to a request for a particular atomic document, the relevant CGI program will automatically undertake the following tasks:<br>1. extract the component document from the original file, and depending on the sub-collection that it belongs to, convert it into a base HTML document containing HTML formatting tags….<br>2. the attribute information for the document, and the document identifier index, are then examined to compute the structural links for this document, and these are then added a the appropriate places to the base HTML document<br>3. finally, the link detection and instantiation routines are employed to embed any referential links into the base HTML document, and the resulting byte stream is dispatched to the client. [*Id.*]<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶37; n.3 and Ex. 2(c); Second Croft Decl., Ex. 1 at ¶¶17-20 and Ex. 2(d).] [PFOF 83.] |
| *(f) means for sending said modified first data record to said interactive display program.* | This "means" is a generic, black-box program that sends the modified first data record to the browser. *See* '889 patent, col. 9, ll. 12-15.<br><br>Pastime discloses a means for sending the modified first data record to the display program, as discussed above in connection with element (e). E.g.: "the link detection and instantiation routines are employed to embed any referential links into the base HTML document, and the resulting byte stream is dispatched to the client." [(Dkt. No. 32) Kirk Decl., Ex. B at 171.]<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶37; n.3 and Ex. 2(c); Second Croft Decl., Ex. 1 at ¶¶17-20 and Ex. 2(d).] [PFOF 84.] |

| Claim 7 | PasTime |
|---|---|
| *The computer system of claim 1, wherein said reference to said second data record comprises a keyword phrase.* | PasTime discloses that the reference in the first data record to a second data record can comprise a keyword phrase, such as "Native Title Bill 1992" [(Dkt. No. 32) Kirk Decl., Ex. B at 168]:<br><br>In the case of referential links, the string that matches the source anchor |

<table>
<tr><td></td><td>expression is often a strong indicator of the name of the target document. Significant economies of representation and easier link maintenance can be achieved if the source anchor pattern for a referential link can be generalized, and the identifier for the appropriate target document can be computed as a function of the string that matches the source anchor pattern. To illustrate, I may have devised separate patterns that match the names of all pieces of legislation discussed in the Australian Parliament, for example: one that matches "Native Title Bill 1992" and links such expressions to the document named Native_Title_Bill_1992, and one that matches "Taxation Amendment Bill 1995" and links such expression to the document named Taxation_Amendment_Bill_1995, and so on. However, if a pattern can be devised that will match *any* reference to *any* piece of legislation, then in such a case it is an easy matter to determine the correct target document identifier from the string that matches the source anchor expression (Form (4)).<br><br>{source = <,S − pattern>, target = <func(match_S − pattern),T − pattern>]    (4)<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶37; n.3 and Ex. 2(c); Second Croft Decl., Ex. 1 at ¶¶17-20 and Ex. 2(d).] [PFOF 85.]</td></tr>
</table>

### 4. Anthony Anticipates The '889 Patent, Claims 1 And 7, As HyperPhrase Improperly Seeks To Construe And Apply Those Claims Against AutoLink

Anthony was filed on December 18, 1995, and issued on September 28, 1998. [(Dkt. No. 32) Kirk Decl., Ex. A (cover page).] Because Anthony's filing date is prior to the June 9, 1997, filing date of the '889 patent, it is prior art to claims 1 and 7 of the '889 patent under 35 U.S.C. §102(e) ("A person shall be entitled to a patent unless … the invention was described in … a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent[.]"). [PFOF 93-94.] Even if HyperPhrase had proven a prior date of invention of February 26, 1997, this reference would remain prior art to claims 1 and 7 of the '889 patent under 35 U.S.C. §102(e). [*Id.*]

If the Court accepts HyperPhrase's erroneous claim constructions, Anthony's Auto Hyperlinks™ feature anticipates claims 1 and 7 of the '889 patent. However, properly construed and applied, claims 1 and 7 of the '889 patent are not anticipated by Anthony, but neither are they infringed by the accused AutoLink feature of the Google Toolbar. What is happening here is that HyperPhrase is trying to read the claim broadly for infringement purposes, and narrowly to save the claim from invalidity. In its infringement allegations against AutoLink, HyperPhrase ignores two aspects of the claims, namely, (1) the requirement that the system have a plurality of

databases that use a standardized format for addressing data records, and (2) the requirement that

the first data record, as stored in the database, be modified so that the reference to the second

data record has an address to retrieve the second data record.  In defending against Google's

invalidity allegations, though, HyperPhrase embraces both of those features in an effort to

distinguish claim 1 from Anthony.  HyperPhrase cannot have it both ways.

| Claim 1 | Anthony |
|---------|---------|
| *A computer system with a plurality of data records on a plurality of databases,* | Anthony discloses a computer system, namely, a general purpose computer such as an IBM compatible personal computer.  [(Dkt. No. 32) Kirk Decl., Ex. A at  3:36-42.]<br><br>The computer system includes a database of records that receives records from a text database.  [*Id.* at 3:45-48; 4:29-33.]<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶29 and Ex. 2(b).] [PFOF 95.] |
| *and a standardized format for addressing said data records, said computer system comprising:* | Anthony recognizes that HTML is a known standard for creating hypertext links. [(Dkt. No. 32) Kirk Decl., Ex. A at 2:1-3.]  Anthony's Auto Hyperlinks™ feature uses a standard addressing scheme to access its database.  [*Id.* at 5:14-18.]<br><br>Although Anthony does not expressly disclose a plurality of databases that use a standardized format for addressing said data records, that requirement of the claim is also missing from the accused Autolink feature of Google Toolbar.  On the proper construction and application of this aspect of the claim, claim 1 is neither infringed by Autolink, nor anticipated by Anthony's Auto Hyperlinks™ system.<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶29 and Ex. 2(b).] [PFOF 96.] |
| *(a) a user interface having an interactive display program for requesting one of said data records and displaying a plurality of interface supported data formats;* | Anthony discloses a display (user interface) by which the user can "interrogate the database" to request a data record, which can be in the form of any of a number of different data formats, including text or "images, sound, video, executable files or other data."  [(Dkt. No. 32) Kirk Decl., Ex. A at 3:57-61; 4:53-60.]<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶29 and Ex. 2(b).] [PFOF 97.] |
| *(b) means for receiving a reference to a first data record from said interactive display program;* | This "means" is the field in the web browser that allows a user to type in a URL to request an HTML file (a first data record).  *See* '889 patent, col. 2, ll. 50-57.<br><br>Anthony's Auto Hyperlinks™ system allows a user to "interrogate the database" to request a data record.  [(Dkt. No. 32) Kirk Decl., Ex. A at 4:53-54.]<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶29 and Ex. 2(b).] [PFOF 98.] |
| *(c) means for retrieving said first data record;* | This "means" is the web browser capability to make requests for HTML files in accordance with a URL.  *See* '889 patent, col. 3, ll. 44-54.<br><br>After being requested, Anthony's Auto Hyperlinks™ system retrieves the first data record requested by the user:  "On selection, the first page of topic text is compared 200 to the other topic names in the database and then displayed."  [(Dkt. No. 32) Kirk Decl., Ex. A at 4:61-63.]<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶29 and Ex. 2(b).] [PFOF 99.] |
| *(d) means for parsing said* | This "means" is a generic, black-box program that parses incoming data records.  *See* |

28

| | |
|---|---|
| *first data record to identify a reference to a second data record;* | '889 patent, col. 8, ll. 37-40.<br><br>Prior to display of the requested record to the user, Anthony's Auto Hyperlinks™ system compares the text to a list of references, such as topic names in order to identify any matches:  "Just prior to displaying the topic text, the invention compares the text to references, such as topic names for text, pictures, video and sound, for other data portions containing information on other topics."  [Kirk Decl., Ex. A at 3:2-6.]  "On selection, the first page of topic text is compared 200 to the other topic names in the database and then displayed. The comparison is conducted by automatically searching for the occurrence of topic names in the body of text of the first page of the first topic. A preferred searching technique to conduct the comparison is described later. On finding a match 300, the matched topic name occurring within the text of the first topic is associated with the topic data of the topic to which the matched topic name refers."  [*Id*. at 4:61-5:3.]<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶29 and Ex. 2(b).] [PFOF 100.] |
| *(e) means for modifying said reference to said second data record to create an address, said address being operable to retrieve said second data record; and* | This "means" is a generic, black-box program that modifies the reference in the first data record.  *See* '889 patent, col. 9, ll. 1-11.<br><br>Anthony's Auto Hyperlinks™ system then creates a hyperlink from the recognized keyword to the data record to which it refers:  "On finding a match 300, the matched topic name occurring within the text of the first topic is associated with the topic data of the topic to which the matched topic name refers."  [(Dkt. No. 32) Kirk Decl., Ex. A at 4:61-5:3.]<br><br>"Association 400 could involve simply indicating the existence of the related topic found in the search. However, the invention advantageously provides links, known as Auto Hyperlinks™, meaning that the word or phrase in the text found to be a match with a topic name is highlighted on the display, and linked to the topic to which the topic name refers. The user may then jump to the associated topic by selecting the highlighted word or phrase in the first topic text, as in prior art Hypertext systems, or if the associated topic is a picture it is displayed on selection. The link is made with reference to the database which stores the topic text, reference name and other identifiers. Such identifiers note the location of the data for each topic, and provide the navigational links for the hypertext jumps."  [*Id*. at 5:5-18.]<br><br>Anthony's Auto Hyperlinks™ system automatically creates hyperlinks in real time, as the first data record is requested by the user.  Although Anthony does not expressly disclose permanently modifying the underlying first data record to include the hyperlink, that requirement of the claim is also missing from the accused Autolink feature of Google Toolbar.  On the proper construction and application of this aspect of the claim, claim 1 is neither infringed by Autolink, nor anticipated by Anthony's Auto Hyperlinks™ system.<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶29 and Ex. 2(b).] [PFOF 101.] |
| *(f) means for sending said modified first data record to said interactive display program.* | This "means" is a generic, black-box program that sends the modified first data record to the browser.  *See* '889 patent, col. 9, ll. 12-15.<br><br>After all of the text has been recognized and all hyperlinks inserted, Anthony's Auto Hyperlinks™ system displays the hyperlinked record to the user:  "Prior to displaying the first page of a topic, the comparison with the topic names is conducted for that page."  [(Dkt. No. 32) Kirk Decl., Ex. A at 5:19-20.]<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶29 and Ex. 2(b).] [PFOF 102.] |

| Claim 7 | Anthony |
|---|---|
| *The computer system of claim 1, wherein said reference to said second data record comprises a keyword phrase.* | Anthony's Auto Hyperlinks™ system examiners the first record for keyword phrases, such as "Rings of Saturn."  [(Dkt. No. 32) Kirk Decl., Ex. A at 6:1-10.]<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶29 and Ex. 2(b).] [PFOF 103.] |

**C.     '321 Patent, Claims 1 and 24, Are Invalid As Anticipated, And Claim 24 Is Also Invalid As Indefinite**

**1.     Claim Construction And Indefiniteness**

| Claim 1 | PasTime |
|---|---|
| *A method for identifying a referenced record referenced in a referencing record wherein the referenced record is referenced in the referencing record by at least a combination including a data reference (DR) and a modifier reference (MR), the method comprising the steps of:* | "Referenced record:"  A record referenced in another record<br>"Referencing record:"  A record that refers to a referenced record<br>"Data reference (DR):"  A unique phrase or word which may be used in a record to refer to another record or record segment<br>"Modifier reference (MR):"  A word or phrase that further specifies a specific record or record segment (see Google's co-pending non-infringement brief) |
| *(i) receiving the referencing record;* | Ordinary meaning |
| *(ii) analyzing the referencing record to identify a DR, when a DR is identified:* | "When:"  Steps (a), (b), and (c) are done automatically in real time upon identification of a DR in the referencing record (see Google's co-pending non-infringement brief). [PFOF 35, 36, 171.] |
| *(a) identifying an MR rule set (MRRS) specifying the relationship between an MR and the DR;* | "MR rule set (MRRS):"  One or more rules that relate a MR to a DR |
| *(b) analyzing the referencing record in accordance with the MRRS to identify the existence of the MR and, when the MR is identified;* | "When:"  Step (c) is done automatically in real time upon identification of a MR in the referencing record (see Google's co-pending non-infringement brief).  [PFOF 35, 36, 171.] |
| *(c) identifying the referenced record associated with the DR/MR combination.* | "Identifying:"  looking up or otherwise determining the address, location, or other identifier of the referenced record |

Claim 24 depends from claim 1, and further requires the step of linking "the record

reference" to the referenced record.  However, the term "the record reference" has no antecedent

basis in claim 1.  Claim 1 identifies three possible "record references:"  (1) the DR alone, (2) the MR alone, and (3) the DR/MR combination.  There is simply no way to tell which of these three claim 24 requires to be "link[ed] ... to the referenced record."  Claim 24 is thus "insolubly ambiguous."  35 U.S.C. §112, ¶ 2; *Honeywell Int'l, Inc. v.Int' l Trade Comm'n*, 341 F.3d 1332, 1338-1339 (Fed. Cir. 2003). Given that it is impossible to determine the metes and bounds of the claim, it is invalid as indefinite:

> We have also stated that a claim could be indefinite if a term does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is no reasonably ascertainable.  *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370-71 (Fed. Cir. 2006).  The common thread in all of these cases is that claims were held indefinite only where a person of ordinary skill in the art could not determine the bounds of the claims, i.e., the claims were insolubly ambiguous.

*Halliburton Energy Services v. M-I LLC*, ___ F.3d ___, ___ (Fed. Cir. 2008).

| Claim 24 | Claim Construction |
|---|---|
| *The method of claim 1 further including the step of linking the record reference to the referenced record.* | "Record reference:"  Insolubly ambiguous; indefinite. |

### 2.    '321 Patent, Claims 1 and 24, Are Not Entitled To Either A Priority Date Or A Date Of Invention Before The August 13, 1999, Filing Date Of The '321 Patent Application

The '321 patent application was filed on August 13, 1999.  [PFOF 65-68, 71-74.] While it claims priority from several earlier-filed patent applications, including the '889 patent and United States Patent No. 5,895,461 ("the '461 patent"), the subject matter of claims 1 and 24 was not disclosed in either of those applications, and so these claims are not entitled to a priority date prior to August 13, 1999.  [*Id*.]

A patent claim is only entitled to the benefit of an earlier patent application filing date where that earlier application satisfies the written description requirement of 35 U.S.C. §112, ¶ 1 with regard to the subject matter of that claim:

31

> An application for patent for an invention **disclosed in the manner provided by the first paragraph of section 112 of this title** in an application previously filed in the United States ... shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application[.]

35 U.S.C. §120.  In turn, 35 U.S.C. §112 ¶ 1 requires, in part, that the application:

> shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same[.]

This provision thus imposes two requirements:  written description and enablement.

*Chiron Corp. v. Genentech, Inc.,* 363 F.3d 1247, 1253 (Fed. Cir. 2004).

Claim 1 is directed to a method in which a MR is identified after a DR is found in a referencing record.  Specifically, the DR is first found, and then the record is further searched, using a MR rule set (MRRS), to identify another reference (the MR) that allows for precise identification of the referenced record. This "two-tier" search strategy is explained at 3:22-32:

> A wrinkle of complexity is added to the referencing scheme whereby modifier references (MRs) may be used to further specify a specific record or record segment when a DR is identified. In this case, when a DR is identified, the record is further examined to identify modifier references (MRs) which identify a specific segment of a record which is associated with the data reference. When an MR is located, additional information is sought within the record for building an address to the record or record segment referenced by the DR/MR combination. Once again, a link is created between the referencing record and the referenced record or record segment.

This "wrinkle of complexity" was not disclosed in either the '461 application or the '889 application.  Those applications were instead directed to simple "one tier" search strategies, in which hyperlinks were formed on the basis of a single keyword or keyword phrase.  [*See generally* '461 patent prosecution history (Dkt No. 28) Woodford Decl., Ex. J and '889 patent prosecution history (Dkt. No. 26) Woodford Decl., Ex. B.]

In its opposition to Google's original invalidity summary judgment motion, HyperPhrase alleged that the subject matter of claims 1 and 24 was disclosed in both the '889 patent application and the '461 patent.  [(Dkt. No. 42) HyperPhrase §102 Opp. Br. at 7.]  Its support

was a claim chart submitted as Exhibit 2 to Mr. de la Huerga's declaration. [(Dkt. No. 46) de la Huerga Decl., at ¶¶4, 8-10 and Ex. 2.] There is nothing in this chart to show that the inventors were in possession of a two-tier search strategy in these earlier filings; to the contrary, it is readily apparent that this new matter arose well after these filings, and was probably even the impetus for filing the '321 application. [PFOF 65-68, 71-74.]

As to the '461 patent application, Mr. de la Huerga's claim chart lacks any citations to the text of the specification; he instead makes only vague references to the flowcharts depicted in Figures 7-9. [(Dkt. No. 46) de la Huerga Decl., Ex. 2 at 1.] In purporting to find support for claim 1 of the '321 patent in this earlier disclosure, the claim chart asserts that the system looks for "admission ECG," where "ECG" is the DR, and "admission" is the MR. [*Id.*] But the '461 patent clearly searches for "admission ECG" as a unitary phrase; it does not disclose a two-tier process in which "admission" is first located, and then the record is searched for "ECG," as HyperPhrase implicitly contends. This is the relevant disclosure in the '461 patent (8:34-42):

> If a keyword from a multi-word keyword phrase is correctly entered by the user, steps 152 and 148 scan successive words to determine if a keyword phrase is being entered, such as "admission ecg." If at any time a completed keyword or keyword phrase is entered by the user, step 154 declares that a match has been found and creates a hyperlink between that keyword (or keyword phrase) and the report to which it refers.

> Tacitly acknowledging that this is insufficient, HyperPhrase offers a fallback.

Specifically, it says that the Patient ID is also used to specify the particular Admission ECG. [(Dkt. No. 46) de la Huerga Decl., Ex. 2 at 1.] Although the chart here too offers no citations to the specification on this issue, HyperPhrase is apparently referring to the sentence immediately following the passage quoted above, which merely states that the Patient ID can be used to form the address to the Admission ECG in question (8:42-46):

> A sample address for an admission electrocardiogram report created prior to May 19, 1996 for patient ID number 987654321 would be:

> hww.st__mary.springfield/ecg/report/98765432
> 1/19__May__1996/13:42/admission.

33

There is no disclosure in the '461 patent application of a two-tier search process, in which the system first identifies "admission ECG" and then further searches the record to find the patient ID. Rather, for all it appears, the system *already knew* the patient ID from a form having previously been filled out. The de la Huerga declaration concedes this point: "the patent discusses getting the patient ID as part of a form being filled out." [(Dkt. No. 46) de la Huerga Decl., Ex.2 at 1.] There is thus no need to go searching for it.

The '889 patent application also discloses only one-tier searching. In its claim chart for this patent, HyperPhrase points to a passage from the '889 specification that allegedly discloses the subject matter of claim 1 of the '321 patent. [*Id*. at 5.] The passage in question is an expansion of the example from the '461 patent discussed above. Although HyperPhrase selectively quotes from the relevant passage, the full quotation plainly shows that this too is a one-tier search strategy, not two-tiered as in claim 1 of the '321 patent (16:26-54):

> G.  Parsing to Locate Data References
>
> FIG. 15A illustrates how a data record is parsed. A data record is parsed to locate data references by searching it for text corresponding to a hypertext link or a multimedia data request. If one is found, the URL is located after the initial control sequence and will be saved (step 812) for use after the parsing is completed. If none are found, or when the record has been completely parsed, another pass can be made to search for data references in the form of key words or key phrases (step 820).
>
> A key word or phrase is a recognized text string that is to be converted into a hypertext link. As an example, the data reference indicated by the phrase, "Admission ECG," can be converted (steps 828, 830) into the following hypertext link:
>
> <a href="hww.st__mary.springfield/ecg/987654321/
>
> 03may1997/ecg/admission.html">Admission ECG</a>.
>
> The expression "03may1997" is the date the data record being parsed was created. The patient ID (987654321), the date, and other descriptors are available from steps 200 and 226, or from steps 544 or 560. A wide variety of medical expressions can be recognized as key words or phrases, and appropriate hypertext links created from them. The URL of the hyperlink is saved for later use (step

832). When the entire record has been searched (step 836), the URLs of the located data references are returned to the section of the flow chart that requested the record to be parsed (step 840).

Shifting away from the position it took in connection with the '461 patent, where it alleged that "ECG" is the DR, and "admission" is the MR, HyperPhrase in this chart apparently contends that the entirety of the text "admission ecg" is the DR, and that the patient ID and date information are the MRs. But the patient ID and date information were not identified by searching the record for that information *after* the text "admission ecg" was identified. To the contrary, as the passage above states, they were identified in steps 200 and 226, or from steps 544 or 560. As the patent further explains, these steps occur *before* the text is parsed to locate the text "admission ecg." Moreover, as in the '461 patent, there is no need for the system to search the record for these alleged MRs after "admission ecg" is identified, because the system already knows this information:

> In step 200, the data translation and collection system 110 (FIG. 1) receives a patient identification number, which may originate from a staffed workstation 102 (FIG. 1) or automatically from the ADT system 108 (FIG. 1) or HIS 111 (FIG. 1). This may be done, for example, when a patient is admitted or after one has been discharged. In step 204, the data translation and collection system 110 may request the dates for which the system user desires to collect data for the patient or the most recent admission dates from the ADT system 108 or HIS 111. (11:29-38.)

> In step 544, the address root 522 (FIG. 11) of the data record reference 520 may be determined by removing the descriptors 524--any patient identification, chronological details, or other non-addressing information--from the received data request. The descriptors 524 are temporarily stored for use in step 560. (7:58-63.)

Thus, HyperPhrase has failed to show any disclosure in any earlier-filed patent application of the subject matter of claims 1 and 24 of the '321 patent, and so those claims are not entitled to claim priority to any date prior to the August 13, 1999, filing date of the '321 patent application. [PFOF 65-66.] As to HyperPhrase's alleged prior invention date, that is based entirely on its putative February 26, 1997, patent application. For the reasons discussed above in connection with claims 1 and 7 of the '889 patent, HyperPhrase has failed to meet its

35

burden of corroborating this alleged prior invention.  [PFOF 71-72.]  Moreover, since this is an alleged draft of the '889 patent application, and since the '889 patent application fails to disclose the subject matter of claims 1 and 24, this alleged draft for the same reasons does not evidence any conception of the subject matter of claims 1 and 24.  [*Id.*]

### 3.    PasTime Anticipates The '321 Patent, Claims 1 and 24

PasTime was a publicly available printed publication by March 22, 1997.  [(Dkt. No. 32) Kirk Decl., Ex. B at GOOG074992.]  This date predates the August 13, 1999, filing date of the '321 patent by more than one year.  [PFOF 75-76.]  PasTime is thus prior art to claims 1 and 24 of the '321 patent under 35 U.S.C. §102(b).  As shown below, every feature of claims 1 and 24 of the '321 patent is disclosed in PasTime, which thus anticipates those claims.

| Claim 1 | PasTime |
|---|---|
| *A method for identifying a referenced record referenced in a referencing record wherein the referenced record is referenced in the referencing record by at least a combination including a data reference (DR) and a modifier reference (MR), the method comprising the steps of:* | PasTime discloses a method implemented to identify a second record, referenced in a first record which is identified by at least a DR and an MR.  In one example, the DR is the text "Bill", and the MR is the year, such as "1993" [(Dkt. No. 32) Kirk Decl., Ex. B at 170]:<br><br>For example, the first equivalence operation may involve the case of the expression – e.g. those sentences (noun phrases) containing 'Bill' or 'BILL' as opposes to 'bill.' "Later functions could involve checking for the presence of a year designator (e.g. "…Bill … 1993") and so on.  At each stage, examine each equivalence class to determine whether the candidate referring expressions are sound.<br><br>In another example, the DR is the text "the Prime Minister" and the MR is the year, such as "1985" [*id.* at 172]:<br><br>It is a mistake to link a reference to a Member, say their name, in a 1985 Hansard to their current biographical details in the current Parliamentary Handbook, which may now describe him or her as "the Minister for Transport" when at the time he or she was not.  Politically speaking, it is an even worse mistake to link the referring expression "the Prime Minister" occurring in the same 1985 Hansard to biographical details of the current incumbent.  This problem was corrected by extending Form (4) link descriptors to take additional arguments to the function for calculating the target of a source anchor expression—in addition to taking whatever string matched the pattern, the function can also take attribute information for the document (in this case, the date), which enables the identification of the correct target to be computed.<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶37; n.3 and Ex. 2(c); Second Croft Decl., Ex. 1 at ¶¶25-28 and Ex. 2(d).] [PFOF 86.] |
| *(i) receiving the* | PasTime discloses receiving the referencing record [(Dkt. No. 32) Kirk Decl., Ex. B at |

| referencing record; | 166]: |
|---|---|
| | All requests from a client, in the form of a URL, can specify which original document is being sought, and the CGI program indicated in the URL can then: (i) locate and load the original document from the server's file system …. |
| | *See also id.* at 171: |
| | In response to a request for a particular atomic document, the relevant CGI program will automatically undertake the following tasks: 1. extract the component document from the original file, and depending on the sub-collection that it belongs to, convert it into a base HTML document containing HTML formatting tags[.] |
| | [*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶37; n.3 and Ex. 2(c); Second Croft Decl., Ex. 1 at ¶¶25-28 and Ex. 2(d).] [PFOF 87.] |
| *(ii) analyzing the referencing record to identify a DR, when a DR is identified:* | PasTime discloses analyzing the referencing record to identify a DR: |
| | As the objects of link relations are typically strings of characters in documents, lexical patterns are used to define the predicates for representing link anchors.  Patterns can be as simple as literal strings, or complex regular expressions.  A source (or target) anchor is located in the source (or target) document not by specifying the offset and extent of the source (or target) expression, but rather by specifying the pattern that the expression must match."  [Kirk Decl., Ex. B at 167.] |
| | Consequently, at the time of serving a document to a client, a link is only embedded into the byte stream by the CGI program doing the pattern detection and link resolution if (i) an expression in the document matches one of the source anchor patterns applicable to that document, and (ii) the corresponding document exists.  [*Id*. at 168.] |
| | To illustrate, take an example from the documents of the Australian Parliament.  The documents which record the debates in the parliament are called the "Hansards".  Another document, which lists the rules under which such debates are conducted, is called the "Standing Orders." … Can we devise a pattern for linking any reference to the Standing Orders or a particular standing order in a Hansard document to the Standing Orders document itself?  Will the following regular expression, P, be sound and complete: "standing" (SPACE) + "order" ((SPACE) + (0-9) + (A-Z)?)? P[asTime] will match any string consisting of the word "standing" followed by one or more spaces (including newline characters) followed the word "order", optionally followed by more space and a string of digits, optionally followed by an uppercase alphabetical character.  [*Id*. at 169.] |
| | In response to a request for a particular atomic document, the relevant CGI program will automatically undertake the following tasks: … 2. the attribute information for the document, and the document identifier index, are then examined to compute the structural links for this document, and these are then added at the appropriate places to the base HTML document[.] [*Id*. at 171.] |

| | |
|---|---|
| | As noted in connection with the analysis of the preamble, in one example, the DR is the text "Bill" (*id.* at 170), and in another example the DR is the text "the Prime Minister" [*id.* at 172].<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶37; n.3 and Ex. 2(c);  Second Croft Decl., Ex. 1 at ¶¶25-28 and Ex. 2(d).] [PFOF 88.] |
| *(a) identifying an MR rule set (MRRS) specifying the relationship between an MR and the DR;* | PasTime discloses the feature of identifying an MR rule set (MRRS) that specifies the relationship between an MR and the DR.  For example, the rule applied if the system identifies the text "Bill" is to look for date information in the surrounding text.  [(Dkt. No. 32) Kirk Decl., Ex. B at 170.]  The rule applied if the system identifies the text "Prime Minister" is to ascertain the date of the document.  [*Id.* at 172.]<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶37; n.3 and Ex. 2(c);  Second Croft Decl., Ex. 1 at ¶¶25-28 and Ex. 2(d).] [PFOF 89.] |
| *(b) analyzing the referencing record in accordance with the MRRS to identify the existence of the MR and, when the MR is identified;* | PasTime discloses analyzing the record containing the DR in accordance with the rule set discussed above in connection with element (ii)(a).  For example, where the DR is the text "Bill", the system then applies the rule to look for date information in the surrounding text.  [(Dkt. No. 32) Kirk Decl., Ex. B at 170.]  Where the DR is the text "Prime Minister", the system applies the rule to ascertain the date of the document. [*Id.* at 172.]<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶37; n.3 and Ex. 2(c);  Second Croft Decl., Ex. 1 at ¶¶25-28 and Ex. 2(d).] [PFOF 90.] |
| *(c) identifying the referenced record associated with the DR/MR combination.* | PasTime discloses identifying the referenced record associated with the DR/MR combination.  For example, where the DR is the text "Bill" and the MR is the text "1993", the system identifies the record for the 1993 version of the bill.  [(Dkt. No. 32) Kirk Decl., Ex. B at 170.]  Where the DR is the text "Prime Minister" and the MR is the date "1985", the system identifies the biography of the Prime Minister who held office in 1985.  [*Id.* at 172.]<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶37; n.3 and Ex. 2(c);  Second Croft Decl., Ex. 1 at ¶¶25-28 and Ex. 2(d).] [PFOF 91.] |

| Claim 24 | PasTime |
|---|---|
| *The method of claim 1 further including the step of linking the record reference to the referenced record.* | PasTime discloses linking the DR to the referenced record:<br><br>This paper describes a system for the automatic detection and management of structural and referential links.  [(Dkt. No. 32) Kirk Decl., Ex. B at 161; Abstract.]<br><br>Consequently, at the time of serving a document to a client, a link is only embedded into the byte stream by the CGI program doing the pattern detection and link resolution if (i) an expression in the document matches one of the source anchor patterns applicable to that document, and (ii) the corresponding document exists.  [*Id.* at 168.]<br><br>2. the attribute information for the document, and the document identifier index, are then examined to compute the structural links for this document, and these are then added a the appropriate places to the base HTML document<br>3. finally, the link detection and instantiation routines are employed to embed any referential links into the base HTML document, and the resulting byte stream is dispatched to the client.  [*Id.* at 171.] |

| | |
|---|---|
| | [*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶37; n.3 and Ex. 2(c);  Second Croft Decl., Ex. 1 at ¶¶25-28 and Ex. 2(d).]  [PFOF 92.] |

### 4.     The HTML Sourcebook Anticipates The '321 Patent, Claims 1 and 24

The HTML Sourcebook was published and publicly available by March 14, 1995.  [(Dkt. Nos. 30 and 31) Graham Decl., at ¶¶4-5; Exs. A-E.]  [PFOF 104-105.]  This date is more than one year prior to the August 13, 1999, filing date of the '321 patent, and so is prior art to claims 1 and 24 under 35 U.S.C. §102(b).  [*Id*.]  Even if HyperPhrase established entitlement to the earliest alleged priority date of July 30, 1996, this reference would remain prior art under 35 U.S.C. §102(b).  [*Id*.]  As shown below, every feature of claims 1 and 24 of the '321 patent is disclosed in the HTML Sourcebook, which thus anticipates those claims.

| Claim 1 | The HTML Sourcebook / Graham |
|---|---|
| *A method for identifying a referenced record referenced in a referencing record wherein the referenced record is referenced in the referencing record by at least a combination including a data reference (DR) and a modifier reference (MR), the method comprising the steps of:* | The HTML Sourcebook discloses a method for identifying a referenced record from within a referencing record, through the combination of a data reference (DR) and a modifier reference (MR).  The referencing record is an HTML file that includes both a partial URL (the DR) and a BASE URL (the MR).  The browser concatenates the BASE URL and the partial URL, which together form the full address for another HTML file (the referenced record).  This is discussed  in the HTML Sourcebook: [(Dkt. No. 31) Graham Decl., Ex. A at 167-68]:<br><br>Partial URLs are very useful when constructing large collections of documents that will be kept together.  Of course relative URLs become invalid if a document is moved to a new directory or a new Internet site.  This problem can be mitigated using the BASE element of the HTML, which is used to record the correct BASE URL of a document.  If the document is moved, all relative URLs are determined relative to the URL recorded by the BASE element."<br><br>[*See also id.* at 86-88.]<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 ¶30 and Ex. 2(a); Second Croft Decl., Ex. 2(b).] [PFOF 106.] |
| *(i) receiving the referencing record;* | The HTML Sourcebook discloses receiving a document through a web browser [(Dkt. No. 31) Graham Decl., Ex. A at xii]:<br><br>You can write simple HTML documents and view them with a WWW browser, such as Mosaic, MacWeb, lynx, Cello, or Netscape … .  Browsers understand HTML *hypertext anchors* and the URLs they contain … .<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 ¶30 and Ex. 2(a); Second Croft Decl., Ex. 2(b).]  [PFOF 107.] |
| *(ii) analyzing the referencing record to identify a DR, when a DR is identified:* | The HTML Sourcebook discloses that the web browser analyzes a received HTML file to identify partial URLs [(Dkt. No. 31) Graham Decl., Ex. A at 167]:<br><br>Suppose you originally access the document file.html using the full URL: |

| | |
|---|---|
| | http://www.stuff.edu/main/docs/file.html<br><br>Within this document there is a hypertext reference containing a partial URL:<br><A HREF="stuff.html"> anchor text </A><br><br>Where is this file? From inside file.html, any information not present in a URL reference is considered the same as that used to access the current document. Thus, the partial URL stuff.html is transformed into a full URL by appropriating the missing information from the URL used to access file.html. The completed URL is then:<br>http://www.stuff.edu/main/docs/stuff.html<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 ¶30 and Ex. 2(a); Second Croft Decl., Ex. 2(b).] [PFOF 108.] |
| *(a) identifying an MR rule set (MRRS) specifying the relationship between an MR and the DR;* | If it finds a partial URL, the browser employs rules to form complete addresses from the partial URL. Specifically, when it encounters a partial URL, it looks for a BASE URL is defined within the HTML file. This is discussed above in connection with the preamble, and in the HTML Sourcebook at 167-68. [(Dkt. No. 31) Graham Decl., Ex. A at 167-168.]<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 ¶30 and Ex. 2(a); Second Croft Decl., Ex. 2(b).] [PFOF 109.] |
| *(b) analyzing the referencing record in accordance with the MRRS to identify the existence of the MR and, when the MR is identified;* | The browser employs the rule by analyzing the HTML file to identify a BASE URL (the MR). This is discussed above in connection with the preamble, and in the HTML Sourcebook at 167-68. [(Dkt. No. 31) Graham Decl., Ex. A at 167-168.]<br><br>[*See also* First Croft Decl., Ex. 1 ¶30 and Ex. 2(a); Second Croft Decl., Ex. 2(b).] [PFOF 110.] |
| *(c) identifying the referenced record associated with the DR/MR combination.* | When the browser identifies a BASE URL (the MR), it concatenates it with the partial URL (the DR), and the resulting complete URL identifies the address of the referenced record, i.e., another HTML file. This is discussed above in connection with the preamble, and in the HTML Sourcebook at 167-68. [(Dkt. No. 31) Graham Decl., Ex. A at 167-168.]<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 ¶30 and Ex. 2(a); Second Croft Decl., Ex. 2(b).] [PFOF 111.] |

| Claim 24 | The HTML Sourcebook / Graham |
|---|---|
| *The method of claim 1 further including the step of linking the record reference to the referenced record.* | Both the DR and the MR, concatenated together, are linked to the referenced record. This is discussed above in connection with the preamble, and in the HTML Sourcebook at 167-68. [(Dkt. No. 31) Graham Decl., Ex. A at 167-168.]<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 ¶30 and Ex. 2(a); Second Croft Decl., Ex. 2(b).] [PFOF 112.] |

### D.    '321 Patent, Claim 27, Is Invalid As Anticipated

### 1.    Claim Construction

| Claim 27 | Claim Construction |
|---|---|
| *A method to be used with a rule set including subject matter specific tag pairs* | "Subject matter specific tag pair:" Two matching tags, each identifying a specific subject matter (*see* Google's co-pending non-infringement brief) |

| | |
|---|---|
| *and corresponding search rules,* | |
| *a separate tag pair for each of a plurality of different information types and a separate search rule for each pair,* | "A separate tag pair for each of a plurality of different information types:"  Each tag pair corresponds to a different type of information |
| *each pair including a begin tag and an end tag, the method comprising the steps of:* | Ordinary meaning |
| *(a) receiving a record;* | Ordinary meaning |
| *(b) examining the record according to the search rules to identify record segments including information of each of the information types;* | Ordinary meaning |
| *(c) when a record segment is identified which is of a particular information type: accessing the tag pair associated with the information type; inserting the begin tag before the identified segment and inserting the end tag after the identified segment.* | "When:"  Step (c) is done automatically in real time upon identification of a record segment of a particular information type (*see* Google's co-pending non-infringement brief).  [PFOF 35, 36, 171.] |

**2.    '321 Patent, Claim 27, Is Not Entitled To Either A Priority Date Or A Date Of Invention Before The August 13, 1999, Filing Date Of The '321 Patent Application**

The '321 patent application was filed on August 13, 1999.  [PFOF 65-68, 71-74.] While it claims priority from several earlier-filed patent applications, including the '889 patent and the '461 patent, the subject matter of claim 27 was not disclosed in either of those applications, and so that claim is not entitled to a priority date prior to August 13, 1999. [*Id.*]

Claim 27 requires the use of "subject matter specific tag pairs and corresponding search rules, a separate tag pair for each of a plurality of different information types."  This is explained extensively in the '321 patent, which makes clear that these "subject matter specific tag pairs" are different than the conventional <a> and </a> tags  used to define standard hyperlinks; indeed, the specification states that "subject matter specific tag pairs" take the concept of automatic hyperlinking, which uses the conventional tags, "one step further" (19:55-21:25; emphasis added):

41

3. Tag Enabling

While automatic address linking features described above are extremely useful, unless specific information within a record is separately addressable via conventional addressing protocols, such features do not facilitate recognition of specific information in a record after the record has been retrieved. …

According to the present invention *the concept of automatic linking is taken one step further and includes a system which automatically provides "tags" within records which can be used by processing applications to distinguish different information types within the record.* To this end, generally, processor 14 is equipped to recognize characteristic sets which correspond to different record segments and, when a specific segment is identified, can place tags around the segment which are recognizable by other applications. …

* * *

Referring again to FIG. 12, column 294 includes a begin tag BT corresponding to each XML type listed in column 298 which can be inserted into a record to indicate the beginning of information of the type in column 298. For example, tag BT-1 corresponding to XML type 300 (i.e., patient ID) may be "<patient ID>" while tag BT-2 corresponding the XML type 302 (i.e. heart rate) may be "<heart rate>".

Column 296 includes an end tag ET corresponding to each XML type listed in column 298 which can be inserted into a record to indicate the end of information of the type in column 298. For example, tag ET-1 corresponding to XML type 300 (i.e., patient ID) may be "</patient ID>" while tag ET-2 corresponding the XML type 302 (i.e. heart rate) may be "</heart rate>".

The '461 and '889 patents do not disclose "subject matter specific tag pairs." [PFOF 67, 73.] The only disclosure identified in Mr. de la Huerga's charts for these two patents is conventional hyperlink tags. [(Dkt. No. 46) de la Huerga Decl., Ex. 2 at 2 and 6.] The begin tag has the format of "<a href='[address]'>". The end tag is simply "</a>". This same tag pair is used for every hyperlink, albeit with different addresses for different referenced records. There is thus no *plurality* of different tags, let alone a plurality of *subject matter specific* tags, each with a corresponding rule. There is nothing in this chart to show that the inventors were in possession of subject matter specific tags in these earlier filings. [PFOF 67, 73.]

Thus, HyperPhrase has failed to show any disclosure in any earlier-filed patent application of the subject matter of claim 27 of the '321 patent, and so that claim is not entitled to claim priority to any date prior to the August 13, 1999, filing date of the '321 patent

42

application.  [*Id.*]  As to HyperPhrase's alleged prior invention date, that is based entirely on its putative February 26, 1997, patent application.  For the reasons discussed above in connection with claims 1 and 7 of the '889 patent, HyperPhrase has failed to meet its burden of corroborating this alleged prior invention.  [*Id.*]  Moreover, since this is an alleged draft of the '889 patent application, and since the '889 patent application fails to disclose the subject matter of claim 27, this alleged draft for the same reasons does not evidence any conception of the subject matter of claim 27.  [*Id.*]

### 3.    The MUC-6 Named Entity Task Definition Anticipates The '321 Patent, Claim 27

The MUC-6 Named Entity Task Definition was published by June 2, 1995.  [PFOF 113-114.]  This date is more than one year prior to the August 13, 1999, filing date of the '321 patent, and so is prior art to claim 27 under 35 U.S.C. §102(b).  [*Id.*]  Even if HyperPhrase established entitlement to the earliest alleged priority date of July 30, 1996, this reference would remain prior art to claim 27 under 35 U.S.C. §102(b).  [*Id.*]  As shown below, every feature of claim 27 of the '321 patent is disclosed in the MUC-6 Named Entity Task Definition, which thus anticipates that claim.

| Claim 27 | The MUC-6 Named Entity Task Definition |
|---|---|
| *A method to be used with a rule set including subject matter specific tag pairs and corresponding search rules,* | The reference discloses a method to add subject matter specific tags, such as PERSON, LOCATION and DATE, according to corresponding search rules to differentiate different information types from the text in a document, and tag the identified text strings with subject matter specific tags, such as <PERSON> and </PERSON>, <LOCATION> and </LOCATION>, and <DATE> and </DATE>. [Wolff Decl., Ex. B.]<br><br>[*See also* Second Croft Decl., Ex. 1 at ¶¶32-34 and Ex. 2(e).] [PFOF 115.] |
| *a separate tag pair for each of a plurality of different information types and a separate search rule for each pair,* | As noted in the discussion of the preceding element, each information type, such as PERSON, LOCATION, and DATE, has its own tag pair [Wolff Decl., Ex. B at 1]:<br><br>    2.2 Named Entities (ENAMEX tag element)<br>    This subtask is limited to proper names, acronyms, and perhaps miscellaneous other unique identifiers, which are categorized via the TYPE attribute as follows:<br>    ORGANIZATION: named corporate, governmental, or other organizational entity<br>    PERSON: named person or family<br>    LOCATION: name of politically or geographically defined location (cities, provinces, countries, international regions, bodies of water, mountains, etc.) |

| | |
|---|---|
| | There is a separate search rule for each pair, as discussed above in connection with the preceding element. For example, the Name Entities tag element ENAMEX, is governed by the following rules: "This subtask is limited to proper names, acronyms, and perhaps miscellaneous other unique identifiers, which are categorized via the TYPE attribute . . ." [*Id.*]<br><br>[*See also* Second Croft Decl., Ex. 1 at ¶¶32-34 and Ex. 2(e).] [PFOF 116.] |
| *each pair including a begin tag and an end tag, the method comprising the steps of:* | The reference discloses subject matter specific tags including both begin and end tags, as discussed above in connection with the first element.<br><br>[*See also* Second Croft Decl., Ex. 1 at ¶¶32-34 and Ex. 2(e).] [PFOF 117.] |
| *(a) receiving a record;* | The reference discloses a method to receive a record for subsequent processing and tagging, as discussed above in connection with the first element.<br><br>[*See also* Second Croft Decl., Ex. 1 at ¶¶32-34 and Ex. 2(e).] [PFOF 118.] |
| *(b) examining the record according to the search rules to identify record segments including information of each of the information types;* | The reference discloses a method to examine a record according to search rules to identify record segments, including information types, as discussed above in connection with the first element.<br><br>[*See also* Second Croft Decl., Ex. 1 at ¶¶32-34 and Ex. 2(e).] [PFOF 119.] |
| *(c) when a record segment is identified which is of a particular information type: accessing the tag pair associated with the information type; inserting the begin tag before the identified segment and inserting the end tag after the identified segment.* | The reference discloses a method to insert begin and end tags before and after an identified record segment, as discussed above in connection with the first element.<br><br>[*See also* Second Croft Decl., Ex. 1 at ¶¶32-34 and Ex. 2(e).] [PFOF 120.] |

### 4.    Aberdeen Anticipates The '321 Patent, Claim 27

Aberdeen is an article from the proceedings of MUC-6, held on November 6-8 1995. [PFOF 121-122.]  The date-stamped library copy shows it was a publicly available printed publication by no later than November 19, 1996.  [*Id.*]  This date predates the August 13, 1999, filing date of the '321 patent by more than one year.  [*Id.*]  Aberdeen is thus prior art to claim 27 of the '321 patent under 35 U.S.C. §102(b).  [*Id.*]  Moreover, even if claim 27 were given priority back to the filing date of the '889 patent, and even if HyperPhrase were able to substantiate its February 26, 1997, alleged conception date, Aberdeen is still prior art to claim 27 under 35 U.S.C. §102(a).  [*Id.*]  As shown below, every feature of claim 27 of the '321 patent is disclosed in Aberdeen, which thus anticipates that claim.

44

| Claim 27 | Aberdeen |
|---|---|
| *A method to be used with a rule set including subject matter specific tag pairs and corresponding search rules,* | Aberdeen discloses a system that implements an automatic method that uses rules to add subject matter specific tag pairs to a record, such as a person's name and their title (e.g., <ttl>Mr.</ttl><person>James</person>).<br><br>Aberdeen contains extensive disclosure regarding the rules that are used to identify record segments that contain information of various types.  For example:<br><br>    Rule sequences now underlie all the major processing steps in Alembic: part-of-speech tagging, syntactic analysis, inference, and even some of the set-fill processing in the Template Element task (TE). . . . The rules acquired in this way also have the characteristic that they allow one to readily mix hand-crafted and machine-learned elements.  [Wolff Decl., Ex. C at 141.]<br><br>    The central innovation in the system is its approach to syntactic analysis, which is now performed through a sequence of phrase-finding rules that are processed by a simple interpreter. The interpreter has somewhat less recognition power than a finite-state machine, and operates by successively relabeling the input according to the rule actions. . . In support of the syntactic phrase finder, or phraser as we call it, the input text must be tagged for part-of-speech. This part-of-speech tagging is the principal role of the UNIX preprocess, and it is itself supported by a number of pretaggers (e.g., for labeling dates and title words) and zoners (e.g., for word tokenization, sentence boundary determination and headline segmentation).  [*Id*.]<br><br>    Once the initial phrasing has taken place, the phraser proceeds with phrase identification proper. This is driven by a sequence of phrase-finding rules. Each rule in the sequence is applied in turn against all of the phrases in all the sentences under analysis. If the antecedents of the rule are satisfies by a phrase, then the action indicated by the rule is executed immediately. The action can either change the label of the satisfying phrase, grow its boundaries, or create new phrases.  [*Id*. at 144.]<br><br>    In support of the syntactic phrase finder, or phraser as we call it, the input text must be tagged for part-of-speech. This part-of-speech tagging is the principal role of the UNIX preprocess, and it is itself supported by a number of pretaggers (e.g., for labeling dates and title words) and zoners (e.g., for word tokenization, sentence boundary determination and headline segmentation).  [*Id*. at 141.]<br><br>    Rules can test lexemes to the left and right of the phrase, or they can look at the lexemes in the phrase. Tests in turn can be part-of-speech queries, literal lexeme matches, tests for presence of neighboring phrases, or the application of predicates that are evaluated by invoking a Lisp procedure. There are several reasons for keeping this rule language simple. In the case of hand-crafted rules, it facilitates the process of designing a rule sequence.  In the case of machine-learned rules, it restricts the size of the search space on each epoch of the learning regimen, thus making it tractable.  [*Id*. at 144.]<br><br>    It is important to note that search strategy in the phraser differs significantly from that in standard parsers. In standard parsing, one searches for any and all rules whose antecedents might apply given the state of the parser's chart: all these rules become candidates for application, and indeed they all are applied (modulo higher-order search control.) In our parser, only the current rule sequence is tested: the rule is applied wherever this test succeeds, and the |

45

<table>
<tr><td></td><td>

rule is never revisited at any subsequent stage of processing. After the final rule of a sequence is run, no further processing occurs.  [*Id.*]

To make this clearer, consider a simple name entity rule as applied to identifying persons.

    (def-phraser
        label         none
        left-1        phrase-ttl
        label-action  person)

This rule changes the label of a phrase from none to person if the phrase is bordered on its left by a ttl phrase. On the sample sentence, this rule causes the following relabeling of the phrase around "James".

*Yesterday, <none>McCann</none>made official what had been widely anticipated: <ttl>Mr.</ttl><person>James</person>, <num>57</num>years old, is stepping down as <post>chief executive</post> on <date>July 1</date> and will retire as <post>chairman</post> at the end of the year.*

Once this rule has run, the labelings it instantiates become available as input to subsequent rules in the sequence, e.g., rules that attach the title to the person in 'Mr. James', that attach the age apposition, and so forth.  [*Id.* at 145.]

[*See also* Second Croft Decl., Ex. 1 at ¶¶35-36 and Ex. 2(f).] [PFOF 123.]
</td></tr>
<tr><td>

*a separate tag pair for each of a plurality of different information types and a separate search rule for each pair,*
</td><td>

Aberdeen discloses separate tags for each of a plurality of different information types. For example, the system tags several different information types, such as numbers, posts, titles, dates and names.  Each information type has a separate tag pair.  For example [Wolff Decl., Ex. C at 145]:

*Yesterday, <none>McCann</none>made official what had been widely anticipated: <ttl>Mr.</ttl><person>James</person>, <num>57</num>years old, is stepping down as <post>chief executive</post> on <date>July 1</date> and will retire as <post>chairman</post> at the end of the year.*

To illustrate the process, consider the following walkthrough sentence, as tagged by the NE rule sequence.

*But the bragging rights to <org>Coke</org>'s ubiquitous advertising belongs to <org>Creative Artists Agency</org>, the big <location>Hollywood</location>talent agency.*

The org label on "Creative Artists Agency" was set by a predicate that tests for org keywords (like "Agency"). 'Coke' was found to be an org elsewhere in the document, and the label was then percolated. Finally, the location label on 'Hollywood' was set be a predicate that inspects the tried-and-not-so-true TIPSTER gazetteer.  [*Id.* at 145.]

Aberdeen discloses a separate search rule for each pair of subject matter specific tags, as discussed above in connection with the preceding feature.
</td></tr>
</table>

46

| | [*See also* Second Croft Decl., Ex. 1 at ¶¶35-36 and Ex. 2(f).] [PFOF 124.] |
|---|---|
| *each pair including a begin tag and an end tag, the method comprising the steps of:* | Aberdeen discloses that each pair of subject matter specific tags has a begin tag and an end tag, as discussed above in connection with the first two features of the claim.<br><br>[*See also* Second Croft Decl., Ex. 1 at ¶¶35-36 and Ex. 2(f).] [PFOF 125.] |
| *(a) receiving a record;* | Aberdeen discloses that the method implemented by the Alembic program involves receiving a record. For example: "Prior to the part-of-speech tagger, however, a text to be processed by Alembic passes through several preprocess stages; each preprocessor 'enriches' the text by means of SGML tags." [Wolff Decl., Ex. C at 142.]<br><br>[*See also* Second Croft Decl., Ex. 1 at ¶¶35-36 and Ex. 2(f).] [PFOF 126.] |
| *(b) examining the record according to the search rules to identify record segments including information of each of the information types;* | Aberdeen discloses that the method involves examining the received record according to search rules to identify record segments including information of each of the information types, as discussed above in connection with the first feature. See also:<br><br>The date-tagger identifies TIMEX phrases. It uses a lex-based scanner as a front-end for tokenizing and typing its input; then pattern-matching engine finds the actual date phrases." [Wolff Decl., Ex. C at 142.]<br><br>The Alembic phrase finder, or phraser for short, performs the bulk of the system's syntactic analysis. As noted above, it has somewhat less recognition power than a finite-state machine, and as such shares many characteristics of pattern-matching systems, such as Circus [10] or FASTUS[2]. Where it differs from these systems is in being driven by rule sequences. [*Id*. at 144.]<br><br>The phraser process operates in several steps. First, a set of initial phrasing functions is applied to all of the sentences to be analyzed. These functions are responsible for seeding the sentences with likely candidate phrases of various kinds. This seeding process is driven by word lists, part-of-speech information, and pre-taggings provided by the processors. Initial phrasing produces a number of phrase structures, many of which have the initial null labeling (none), while some have been assigned an initial label (e.g. num). [*Id*. at 144.]<br><br>[*See also* Second Croft Decl., Ex. 1 at ¶¶35-36 and Ex. 2(f).] [PFOF 127.] |
| *(c) when a record segment is identified which is of a particular information type: accessing the tag pair associated with the information type; inserting the begin tag before the identified segment and inserting the end tag after the identified segment.* | Aberdeen discloses that when the method identifies a record segment of a particular information type, the tag pair associated with the information type is accessed, and the begin tag is inserted before the identified segment and the end tag after the identified segment, as discussed above in connection with the first two features of the claim. *See also*:<br><br>Prior to the part-of-speech tagger, however, a text to be processed by Alembic passes through several preprocess stages; each preprocessor 'enriches' the text by means of SGML tags. [Wolff Decl., Ex. C at 142.]<br><br>The preprocess includes specialized phrase taggers. The title-tagger makes personal titles, making distinctions along the lines drawn by NE and ST tasks. Included are personal honorifics (Dr., Mrs.); military and religious titles (Vicar, Sgt.); corporate posts (CEO, chairman); and "profession" words (analyst, spokesperson).<br><br>The date-tagger identifies TIMEX phrases. It uses a lex-based scanner as a front-end for tokenizing and typing its input; then pattern-matching engine |

| | |
|---|---|
| | finds the actual date phrases.  [*Id*. at 142.]<br><br>[*See also* Second Croft Decl., Ex. 1 at ¶¶35-36 and Ex. 2(f).]  [PFOF 128.] |

### E.     '321 Patent, Claim 86, Is Invalid As Anticipated, And Also As Indefinite

#### 1.     Claim Construction And Indefiniteness

| Claim 86 | Claim Construction |
|---|---|
| *A method for use with an application wherein specifying references (SRs) in one record to other records which are selectable to access the other records are visually distinguished from other record information so as to indicate selectability,* | "Specifying reference (SR):"  Either (1) a combination of a first DR, a second DR, and a MR, or (2) it is a combination of a DR, a first MR, and second MR (*see* Google's co-pending non-infringement brief.<br><br>"Selectable"/"Selectability:"  A user can access other records referred to by a SR |
| *the method also for use with a system which enables a user to designate and also select SRs where designation comprises pointing to an SR without selection and,* | "Designate"/"Designation:"  Point to text on a display screen (e.g., via a mouse controlled cursor) without actually taking an affirmative step to select the text (e.g., without clicking a mouse button).  (*See* '321, 14:62-15:14.) |
| *wherein a seemingly general SR is modified by other record information which renders the SR relatively specific,* | "Seemingly general:"  This term is insolubly ambiguous, and fails to provide any meaningful guidance as to scope of the term.  [*See* Second Croft Decl., Ex. 1 at ¶¶41-43.]<br><br>"Relatively specific:"  This term is insolubly ambiguous, and fails to provide any meaningful guidance as to scope of the term.  [*See id.*] |
| *the method for indicating the specific nature of an SR prior to selection and comprising the steps of:* | "Indicating the specific nature of an SR:"  Displaying other information concerning the SR |
| *when an SR is designated, indicating the specific nature of the SR* | As defined above. |

The corresponding disclosure for claim 86 is found at 14:62-15:14 of the '321 patent, and is shown in FIG. 26 (reproduced below).  The "designate without selecting" feature of claim 86 is intended to address the situation where a passage of text in a document is ambiguous, in that it refers to multiple different records.  In this situation, the user can position the cursor 551 over the text in question (e.g., "X-ray image of Jan. 16, 1996") and a menu 553 pops-up to reveal additional choices.  The user can then click on the desired menu item to retrieve the record, in the manner of a standard hyperlink ('321 patent, 14:62-15:14; Fig. 26):

48

After links are formed and when a record including highlighted SRs is presented to a user, upon designation of an overlapping SR, processor 14 provides a choice box for a user. Herein the term "designate" is used to refer to a process whereby a system user may point to text on a display screen (e.g., via a mouse controlled cursor) without actually taking an affirmative step to select the text. This action is also referred to in the industry as "hovering over" an icon or object. For example, a user may place a pointing arrow icon on an SR without selecting the SR.

Referring to FIG. 26, boxed text indicates highlighted text corresponding to one ore more SRs. Assuming each of "X-ray image" and "X-ray image of Jan. 16, 1996" are overlapping SRs which correspond to different records, when the phrase "X-ray image" is designated via a mouse controlled cursor 551 or the like, processor 14 automatically provides a selection box 553 including a list of possible SRs for linking. In this case the list includes "X-ray image" and "X-ray image of Jan. 16, 1996." One list SR can be selected via appropriate mouse activation to form a desired link.



Fig. 26

However, the specification provides no meaningful guidance on the objective metes and bounds of two terms in claim 86: "seemingly general" and "relatively specific." To the contrary, these terms are entirely subjective, and thus insolubly ambiguous in violation of 35 U.S.C. §112 ¶ 2. "[T]he definiteness of claim terms depends on whether those terms can be given any reasonable meaning." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005). In *Datamize*, the Federal Circuit affirmed a grant of summary judgment that a claim was invalid under 35 U.S.C. §112 ¶ 2 because of its use of the term "aesthetically

pleasing." The relevant intrinsic and extrinsic record was insufficient to give this term an objective definition: "In short, the definition of 'aesthetically pleasing' cannot depend on the undefined views of unnamed persons …" *Id.* at 1352.

So too here is the record devoid of meaning for these terms. The words "seemingly" and "seem" do not appear anywhere in the '321 patent, outside the claims. The term "seemingly" is wholly subjective, turning on the associations a given word or phrase in a document might conjure up in the mind of a particular user. The adjective "relatively specific" fares no better, since the level of "relative specificity" is likewise determined by whether a particular user would perceive other information in the record as conveying more specificity than what he or she initially perceived in the "seemingly general" SR. In short, it layers one subjective assessment on top of another. Just as in *Datamize*, the adjectives "seemingly general" and "relatively specific" depend on entirely subjective considerations, and are thus "insolubly ambiguous" and render claim 86 invalid as indefinite.

### 2. '321 Patent, Claim 86, Is Not Entitled To Either A Priority Date Or A Date Of Invention Before The August 13, 1999, Filing Date Of The '321 Patent Application

The '321 patent application was filed on August 13, 1999. [PFOF 65-66, 71-74.] While it claims priority from several earlier-filed patent applications, including the '889 patent and United States Patent No. 5,895,461 ("the '461 patent"), the subject matter of claim 86 was not disclosed in either of those applications, and so that claim is not entitled to a priority date prior to August 13, 1999. [PFOF 68, 74.] HyperPhrase does not contend to the contrary. [*See* (Dkt. No. 46) de la Huerga Decl., at ¶2 and Ex. 2.]

### 3. Gennaro Anticipates The '321 Patent, Claim 86

Gennaro was filed on July 16, 1996, and issued on April 21, 1998. [Wolff Decl., Ex. A (cover page).] Because Gennaro issued more than one year before the August 13, 1999, filing date of the '321 patent application, it is prior art to claim 86 under 35 U.S.C. §102(b). [PFOF 129-130.] Moreover, because Gennaro's filing date is prior to the earliest claimed priority date

for the '321 patent (the July 30, 1996, filing date of the provisional application that led to the

'461 patent application), and because HyperPhrase has not shown a date of invention before that

date, it is in any event prior art to claim 86 under 35 U.S.C. §102(e).  [PFOF 68, 74, 129-130.]

As shown below, every feature of claim 86 of the '321 patent is disclosed in Gennaro, which

thus anticipates that claim.  Indeed, Gennaro's disclosure is nearly identical to the preferred

embodiment of claim 86 in the '321 patent specification, as described above.

| Claim 86 | Gennaro |
|---|---|
| *A method for use with an application wherein specifying references (SRs) in one record to other records which are selectable to access the other records are visually distinguished from other record information so as to indicate selectability,* | Gennaro discloses a method to be used with an application, specifically a web browser, where SRs that are capable of accessing other records are made selectable and visually distinguishable from other record information.  Hot spots 44 are one example of SRs, and are visually distinguished from other record information by adjacent halos.  [Wolff Decl., Ex. A at FIG. 2A.]  The individual items in menu 46 are also SRs, and are visually distinguished from other record information by being contained in a menu box.  [*Id.*, FIG. 2B.]<br><br>[*See also* Second Croft Decl., Ex. 1 at ¶¶44-47 and Ex. 2(a).]  [PFOF 131.] |
| *the method also for use with a system which enables a user to designate and also select SRs where designation comprises pointing to an SR without selection and,* | Gennaro disclose a method implemented by a system which allows a user to designate SRs by mousing over the SRs to determine more specific information about them, without selection. In the case of the hot spots 44, mousing over them designates them, without selecting them, to reveal the menu 46:<br><br>In one implementation, the web page has one or more hot spots. When a pointer is positioned over one of these hot spots, a corresponding menu is displayed to provide links to multiple additional web pages.  A user can then select a link by positioning the pointer over one of the links and initiating an action such as by clicking a mouse button.  [Wolff Decl., Ex. A at 2:47-53; FIG. 2B.]<br><br>Likewise, mousing over the individual menu items designates them, without selecting them, to reveal the underlying URL:<br><br>If the mouse pointer remains inside the embedded menu, then, in step 80, the applet highlights the selected link within the embedded menu and displays the destination URL associated with the selected link. [*Id.* at 6:7-10]<br><br>[*See also* Second Croft Decl., Ex. 1 at ¶¶44-47 and Ex. 2(a).] [PFOF 132.] |
| *wherein a seemingly general SR is modified by other record information which renders the SR relatively specific,* | In the case of the hot spots 44, the hot spot 44 is "seemingly general," but is modified by the underlying entries in the menu 46 to be rendered "relatively specific."<br><br>In the case of the individual menu items, they too are "seemingly general," but are modified by the underlying URL information to be rendered "relatively specific."<br><br>[*See also* Second Croft Decl., Ex. 1 at ¶¶44-47 and Ex. 2(a).] [PFOF 133.] |
| *the method for indicating the specific nature of an SR prior to selection and* | Gennaro discloses a method for indicating the specific nature of an SR, as explained in connection with the preceding element. |

| | |
|---|---|
| *comprising the steps of:* | [*See also* Second Croft Decl., Ex. 1 at ¶¶44-47 and Ex. 2(a).] [PFOF 134.] |
| *when an SR is designated, indicating the specific nature of the SR* | As explained in connection with the preceding three elements, when the cursor is moved over the hot spots 44, the menu 46 pops up to reveal the specific underlying nature of the hot spots.

When the cursor is moved over the menu items, the URL information (near item 38 in FIG. 2B) pops up to reveal the specific underlying nature of each menu item.

[*See also* Second Croft Decl., Ex. 1 at ¶¶44-47 and Ex. 2(a).] [PFOF 135.] |

### 4.      Myka Anticipates The '321 Patent, Claim 86

Myka's was published on May 19-20, 1994, and the date-stamped library copy shows it was a publicly available printed publication by at least as early as July 16, 1995  [(Dkt. No. 32) Kirk Decl., Ex. D.]  Because this date is more than one year prior to the earliest claimed priority date for the '321 patent (the July 30, 1996, filing date of the provisional application that led to the '461 patent application), it is prior art to claim 86 under 35 U.S.C. §102(b).  [PFOF 68, 74, 136-137.]  As shown below, every feature of claim 86 of the '321 patent is disclosed in Myka, which thus anticipates that claim.

| Claim 86 | Myka |
|---|---|
| *A method for use with an application wherein specifying references (SRs) in one record to other records which are selectable to access the other records are visually distinguished from other record information so as to indicate selectability,* | Myka discloses a digital library called the HyperFacs system that indicates specific information about the specifying reference when the user moves the cursor over recognized hyperlinks. Recognized links (the SRs) are visually distinguished from other text by being surrounded by a box, indicating selectability:

A screendump from a HyperFacs session is shown in figure 9. There, part of an article as published in the journal "Numerische Mathematik", Springer-Verlag, is presented. The viewer on the left side displays a page from an article containing eight different link sources and one highlighted link destination. The sources are marked by means of surrounding boxes which may be turned off by the user.  [(Dkt. No. 32) Kirk Decl., Ex. D at 86; *see also* Fig. 6.9.]

[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶¶35-36 and Ex. 2(e);  Second Croft Decl., Ex. 1 at ¶¶50-51 and Ex. 2(c).]  [PFOF 138.] |
| *the method also for use with a system which enables a user to designate and also select SRs where designation comprises pointing to an SR without selection and,* | The user can position the cursor over these boxed hyperlinks (the SRs) to designate them, without selecting the underlying hyperlink:

Additional information on a link (besides indicating the existence of a link by means of boxes) is presented to the user if he moves the cursor into the framed boxes: then, the type of information that is contained in the link destination is shown as well as the type of action that is triggered. On the right side of the figure the central control window is shown. There, different kind of actions may be initiated, e.g. full text searches, selection of objects or sets of objects, manual link generation and manual link deletion, generation and deletion of annotations, selection of the display type for showing search results, and indication whether internal nodes (sections) or external nodes |

| | |
|---|---|
| | (pages) should be used." [(Dkt. No. 32) Kirk Decl., Ex. D at 86.]<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶¶35-36 and Ex. 2(e); Second Croft Decl., Ex. 1 at ¶¶50-51 and Ex. 2(c).] [PFOF 139.] |
| *wherein a seemingly general SR is modified by other record information which renders the SR relatively specific,* | The "seemingly general" boxed hyperlink is modified by the other record information revealed when the cursor is positioned over the box, to thereby be rendered "relatively specific," such as by displaying "the type of information that is contained in the link destination is shown as well as the type of action that is triggered." [(Dkt. No. 32) Kirk Decl., Ex. D at 86.] *See* the full quoted passage in the preceding claim element.<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶¶35-36 and Ex. 2(e); Second Croft Decl., Ex. 1 at ¶¶50-51 and Ex. 2(c).] [PFOF 140.] |
| *the method for indicating the specific nature of an SR prior to selection and comprising the steps of:* | Myka discloses a method for indicating the specific nature of an SR, as explained in connection with the preceding element.<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶¶35-36 and Ex. 2(e); Second Croft Decl., Ex. 1 at ¶¶50-51 and Ex. 2(c).] [PFOF 141.] |
| *when an SR is designated, indicating the specific nature of the SR* | As explained in connection with the preceding three elements, when the cursor is moved over the boxed hyperlink, the menu of information pops up on the right-hand side of the screen to reveal the specific underlying nature of the hyperlink, such as "the type of information that is contained in the link destination is shown as well as the type of action that is triggered." [(Dkt. No. 32) Kirk Decl., Ex. D at 86.]<br><br>[*See also* (Dkt. No. 34) First Croft Decl., Ex. 1 at ¶¶35-36 and Ex. 2(e); Second Croft Decl., Ex. 1 at ¶¶50-51 and Ex. 2(c).] [PFOF 142.] |

## V.    CONCLUSION

WHEREFORE, for the foregoing reasons, Google respectfully requests that this Court grant Google's motion for summary judgment of invalidity as a matter of law on the following issues:

1.    Claims 1 and 7 of United States Patent 5,903,889 patent are invalid; and

2.    Claims 1, 24, 27, and 86 of United States Patent 6,516,321 patent are invalid.

Dated:  February 29, 2008

GODFREY & KAHN, S.C.

By: */s/ James D. Peterson*

James A. Friedman
James D. Peterson
One East Main Street, Suite 500
P.O. Box 2719
Madison, WI  53701-2719
Phone:  (608) 257-3911

Facsimile:  (608) 257-0609

**Of Counsel:**

| | | |
|---|---|---|
| Frank E. Scherkenbach | Michael J. Kane | Jason W. Wolff |
| Kurt L. Glitzenstein | William R. Woodford | Fish & Richardson P.C. |
| Christopher R. Dillon | Fish & Richardson P.C. | 12390 El Camino Real |
| Peter J. Kirk | 3300 Dain Rauscher Plaza | San Diego, CA  92130 |
| Fish & Richardson P.C. | 60 South Sixth Street | Telephone:  (858) 678-5070 |
| 225 Franklin Street | Minneapolis, MN  55402 | Facsimile:  (858) 678-5099 |
| Boston, MA  02110 | Telephone:  (612) 335-5070 | |
| Telephone:  (617) 542-5070 | Facsimile:  (612) 288-9696 | |
| Facsimile:  (617) 542-8906 | | |

**Attorneys for Defendant GOOGLE INC.**

54