IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

HYPERPHRASE TECHNOLOGIES, LLC and HYPERPHRASE INC.,

Plaintiffs,

v.

GOOGLE INC.,

Defendant.

Civil Action No. 06 C 0199 S

**TABLE OF CONTENTS FOR EXHIBITS ATTACHED TO THE DECLARATION OF JASON W. WOLFF IN SUPPORT OF GOOGLE'S MOTIONS FOR SUMMARY JUDGMENT REGARDING U.S. PATENT NOS. 5,903,889 AND 6,516,321**

**PART 1:**

Exhibit A, U.S. Patent No. 5,742,768 ........ pages 3-11

Exhibit B, *MUC-6 Named Entity Task Definition* ........ pages 12-13

Exhibit C, Aberdeen, J., et al., *MITRE: Description of the Alembic System Used for MUC-6* ........ pages15-39

**PART 2:**

Exhibit D, U.S. Patent No. 5,530,852 ........ pages 1-28

Exhibit E, *Webster's Ninth New Collegiate Dictionary* (definition of "when") ........ pages 29-31

**PART 3:**

Exhibit F, Prosecution History of U.S. Patent No. 6,308,171 ........ pages 1-212

Exhibit G, U.S. Patent No. 6,128,635 ........ pages 213-277

**PART 4:**

Exhibit H, U.S. Patent No. 5,745,908 ........ pages 1-40

Exhibit I, [FILED SEPARATELY UNDER SEAL], Settlement, Release and License Agreement between HyperPhrase and Microsoft ........ page 41

Exhibit J, Microsoft.com web pages ........ pages 42-59

Exhibit K-1, Library of Congress web page ........ pages 60-61

Dockets.Justia.com

Exhibit K-2, Library of Congress web page source code ............................................ pages 62-65

Exhibit L-1, Library of Congress web page after selection of AutoLink ...................... pages 66-67

Exhibit L-2, Library of Congress web page after selection of AutoLink source code .. pages 68-71

Exhibit M, U.S. Patent No. 5,377,323 ............................................................................ pages 72-87

Exhibit N, Paul Thompson infringement charts ............................................................ pages 88-99

3003738_1

# EXHIBIT A



US005742768A

# United States Patent [19]

Gennaro et al.

[11] Patent Number: 5,742,768

[45] Date of Patent: Apr. 21, 1998

[54] SYSTEM AND METHOD FOR PROVIDING AND DISPLAYING A WEB PAGE HAVING AN EMBEDDED MENU

[75] Inventors: **Giuseppe Gennaro**, Cupertino; **Jake McGowan**, San Jose; **Anne P. Wagner**, Menlo Park; **Kinney Wong**, San Jose; **Benjamin A. Zamora**, Stanford, all of Calif.

[73] Assignee: **Silicon Graphics, Inc.**, Mountain View, Calif.

[21] Appl. No.: **680,836**

[22] Filed: **Jul. 16, 1996**

[51] **Int. Cl.[6]** .................... **G06F 13/00**

[52] **U.S. Cl.** .................... **295/200.33**

[58] **Field of Search** .................... 364/DIG. 1, DIG. 2; 395/761, 762, 326, 352, 353, 354, 355, 356, 357, 358, 200.47, 200.48, 20.33

[56] **References Cited**

U.S. PATENT DOCUMENTS

5,572,643 11/1996 Judson .................... 395/200.48

OTHER PUBLICATIONS

John C. Dhabolt "Re: Help with Menus" http://dejanews.com (Jun. 13, 1996) p. 1.

*Primary Examiner*—Robert B. Harrell
*Attorney, Agent, or Firm*—Baker & Botts, L.L.P.

[57] **ABSTRACT**

A method for providing a web page (**26**) having an embedded menu (**46**) to a web browser (**24**) and for displaying the web page (**40**) to a user of the web browser (**24**) are provided. A request for a web page (**20**) is received from a web browser (**24**). In response to the request, a web page (**26**) and an applet (**28**) associated with the web page (**20**) are packaged for transmission to the web browser (**24**). The web page (**26**) and the applet (**28**) are then transmitted to and downloaded by the web browser (**24**). When the web page (**26**) is displayed and the applet (**28**) is executed by the web browser (**24**), the applet (**28**) creates and manages an embedded menu (**46**) in the displayed web page (**40**)under control of the applet (**28**). This embedded menu (**46**) provides a user of the web browser (**24**) with a plurality of links (**48**) through one action in the displayed web page (**40**).

**20 Claims, 3 Drawing Sheets**

U.S. Patent Apr. 21, 1998 Sheet 1 of 3 5,742,768

FIG. 1
HOST SYSTEM
12
WEB SERVER
20
22
WEB PAGE
APPLET
18
16
IP NETWORK (INTERNET/ INTRANET)
14
CLIENT SYSTEM
WEB BROWSER
26
28
WEB PAGE
APPLET
24
FIG. 2A
30
32
File Edit View Go Bookmarks Options Directory Window Help
34
Back Forward Home Reload Images Open Print Find Stop
36
Location: http://www.sgi.com/ss.home.page.htm1
40
SILICON SURF
WHO WE ARE
42
PRODUCTS & SOLUTIONS
GLOBAL SITES
CUSTOMER SUPPORT
TECHNOLOGY & DEVELOPERS
SERIOUS FUN
WEB INNOVATION
44
38
Welcome to Silicon surf!

GOOG086547



U.S. Patent Apr. 21, 1998 Sheet 2 of 3 5,742,768

FIG. 2B
30
32
File Edit View Go Bookmarks Options Directory Window Help
34
Back Forward Home Reload Images Open Print Find Stop
36
Location: http://www.sgi.com/ss.home.page.html
40
SILICON SURF
WHO WE ARE
46
CORPORATE OVERVIEW
Job Opportunities
Investor Relations
Subsidiaries
Sales Offices
42
48
GLOBAL SITES
CUSTOMER SUPPORT
TECHNOLOGY & DEVELOPERS
SERIOUS FUN
WEB INNOVATION
44
38
http://www.sgi.com/Overview/corp/overview.html
A
50
52
1
2
FIG. 3A
54
a
b
c
56
i
B
58
52
1
2
FIG. 3B
54
a
b
c
i
56

GOOG086548



FIG. 4
START
INITIALIZE
60
MOUSE EVENT
62
64
IS POINTER OVER LINK SPOT?
YES
NO
66
DISPLAY DESTINATION URL ASSOCIATED WITH LINK SPOT
68
DID MOUSE EVENT INCLUDE MOUSE CLICK?
NO
YES
70
LINK TO DESTINATION URL ASSOCIATED WITH LINK SPOT
72
IS POINTER OVER HOT SPOT?
NO
YES
DISPLAY EMBEDDED MENU ASSOCIATED WITH HOT SPOT
74
MOUSE EVENT
76
78
IS POINTER INSIDE MENU?
NO
YES
HIGHLIGHT SELECTED OPTION AND DISPLAY DESTINATION URL ASSOCIATED WITH SELECTED OPTION
80
DID MOUSE EVENT INCLUDE MOUSE CLICK?
NO
82
YES
LINK TO DESTINATION URL ASSOCIATED WITH SELECTED MENU OPTION
84
DONE

# SYSTEM AND METHOD FOR PROVIDING AND DISPLAYING A WEB PAGE HAVING AN EMBEDDED MENU

## TECHNICAL FIELD OF THE INVENTION

This invention relates in general to the field of electronic systems, and more particularly to a system and method for providing and displaying a web page having an embedded menu.

## BACKGROUND OF THE INVENTION

Web servers and web browsers operating across an IP (internet protocol) network are widely used to provide remote access to information stored on a host system. The public Internet and private intranets are examples of such IP networks and use a communication protocol referred to as the hyper-text transfer protocol (HTTP). The information is commonly packaged as multiple web pages created using a hyper-text markup language (HTML) which can be interpreted by a web browser to generate the display to the user.

In general, URLs (uniform resource locators) are used to identify web pages located on web servers operating on the network. A user of a web browser can request a web page by entering the appropriate URL into the web browser. A request for the selected web page is then transmitted to the web server across the network. The web server receives the request and then packages and transmits the web page back to the web browser for display to the user.

The interaction between web servers and web browsers across the IP network provides a relatively easy and increasingly popular means for accessing remote information. However, the process of navigating through this information in conventional web pages is a linear process. Web pages provide links that correspond one-to-one with other web pages and resources. Thus, one action inside the web page (e.g., a mouse click) can initiate one link to another web page.

One of the means for enhancing a web page is the use of an executable program attached to web page which is downloaded to and executed by the web browser along with the associated web page. These executable programs are commonly referred to as applets and are constructed from a programming language which is executable by the web browser. Once executed by the web browser, the applet provides programmed functionality. For example, the JAVA programming language established by SUN MICROSYSTEMS provides a means for creating JAVA applets which can be attached to web pages to provide enhanced functionality for the displayed web page. One example of a function created by applets is animating an image to produce moving objects on the web page. Applets have also been used to create executable spots in a web page such that graphics on that spot animate when a mouse pointer is moved over the targeted area. An additional function created by applets is to generate and display a separate window on top of a web page in response to a mouse click inside the web page. Such a window can provide a menu bar across the top of the window and provide user options within that window, but it is not within the web page itself. There are, of course, a number of other functions that can be implemented using applets in association with web pages. However, conventional web pages and applets have not altered the linear navigation process.

## SUMMARY OF THE INVENTION

In accordance with the present invention, a system and method for providing and displaying a web page having an embedded menu are provided which substantially eliminate or reduce disadvantages and problems associated with previously developed web pages.

According to one aspect of the present invention, a method for providing a web page having an embedded menu to a web browser is provided. This method includes receiving a request for a web page from a web browser. In response to the request, a web page and an applet associated with the web page are packaged for transmission to the web browser. The web page and the applet are then transmitted to the web browser. The applet is operable to create and manage an embedded menu in the displayed web page when the web page is displayed and the applet is executed by the web browser. This embedded menu provides a user of the web browser with a plurality of links through one action in the displayed web page.

According to another aspect of the present invention, a method for displaying a web page having an embedded menu to a user of a web browser is provided. This method includes downloading a web page and an applet from a web server. The web page is then displayed to a user of the web browser, and the applet is executed by the web browser. An embedded menu is created and managed in the displayed web page under control of the applet. This embedded menu provides a user of the web browser with a plurality of links through one action in the displayed web page.

According to a further aspect of the present invention, a host system for providing and a client system for displaying a web page having an embedded menu are provided. The host system includes a data storage device, a memory and a processor and executes a web server for packaging and transmitting the web page and applet. The client system includes a display, a memory and a processor and executes a web browser for downloading the web page and the applet and for displaying the web page and executing the applet. The applets enhance the web page to have an embedded menu that provides a plurality of links through one action in the displayed web page.

Embedding a menu in a web page to allow a user of a web browser to access multiple links through one action in the web page is a technical advantage of the present invention. The web page is enhanced through the use of an applet which creates and manages the embedded menu. A web page having an embedded menu according to the present invention provides an easier and more efficient way to access information from that web page, thus increasing the quality of the web page. In one implementation, the web page has one or more hot spots. When a pointer is positioned over one of these hot spots, a corresponding embedded menu is displayed to provide links to multiple additional web pages. A user can then select a link by positioning the pointer over one of the links and initiating an action such as by clicking a mouse button.

Another technical advantage of the embedded menus of the present invention is the ability to allow a user of a web browser to scan the information content of a web site from an initial displayed web page without linking to new web pages. A user can reposition a pointer over each hot spot to invoke each embedded menu and be provided with multiple links at one or more levels within the web site. For example, an operator of a web server can create a web site for which the initial web page can display, through the use of embedded menus, the overall structure of the web site as well as links to numerous location therein. A user of the web browser can thereby identify and link to desired information more quickly and easily than possible with conventional linear links.

## BRIEF DESCRIPTION OF THE DRAWINGS

A more complete understanding of the present invention and advantages thereof may be acquired by referring to the following description taken in conjunction with the accompanying drawings in which like reference numbers indicate like features and wherein:

FIG. 1 is a block diagram of a web server and a web browser in an IP network;

FIGS. 2A and 2B illustrate an embedded menu in a web page according to the teachings of the present invention;

FIGS. 3A and 3B illustrate a comparison between one-to-one and multiple-to-one correspondence between links and actions in a web page; and

FIG. 4 is a flow chart of a process for managing links and embedded menus in a web page.

## DETAILED DESCRIPTION OF THE INVENTION

FIG. 1 is a block diagram of a web server 12 and a web browser 14 in an IP (internet protocol) network 16. IP network 16 can be, for example, the public Internet or a private intranet, and host system 12 and client system 14 can communicate across IP network 16 using a hyper-text transfer protocol (HTTP).

Host system 12 and client system 14 can be, for example, a personal computer or computer workstation, and generally include a data storage device, a memory device, a processor and a display. The memory device in host system 12 can store code for and the processor can execute a web server 18. The data storage device in host system 12 can store a web page 20 and an associated applet 22. Web page 20 can be written in the hyper-text mark-up language (HTML), and applet 22 can be written in an interpretive language such as JAVA. Analogous to host system 12, the memory device in client system 14 can store code for and the processor can execute a web browser 24. The memory device in client system 14 can store a downloaded web page 26 and an associated applet 28. Web browser 24 is an applet-capable web browser and can both display web page 26 and execute applet 28.

In operation, a user of client system 14 can use web browser 24 in order to transmit a request for web page 20 across IP network 16. The request can be, for example, a URL (uniform resource locator) for web page 20. Web server 18 can receive the request from web browser 24 and, in response, can package and transmit web page 26 and applet 28 to web browser 24 across IP network 16. Web server 18 packages web page 26 and applet 28 based upon web page 20 and applet 22 stored on host system 12. After downloading web page 26 and applet 28, web browser 24 can display web page 26 to a user of client system 14 and can execute applet 28. Applet 28 only needs to be downloaded once and is executed by web browser 24. When a link is selected in web page 26, web server 18 is sent a request across IP network 16 and can transmit the selected page.

The execution of applet 28 by web browser 24 can provide enhanced functionality to web page 26. According to the teachings of the present invention, applet 28 creates and manages one or more embedded menus in the displayed web page 26. Each embedded menu provides a user of web browser 24 with a plurality of links through one action in the displayed web page 26.

FIGS. 2A and 2B illustrate an embedded menu in a web page according to the teachings of the present invention. As shown in FIG. 2A, a display window generated by web browser 24, indicated generally at 30, can include a menu bar 32 and a plurality of buttons 34 each providing one of various functions for a user of web browser 24. Display window 30 also includes a location field 36 which serves a dual function of indicating the URL of the current location and of allowing a user to enter a new destination URL. In the illustrated example, web browser 24 is being used to navigate the public Internet, and the URL shown in location field 36 is the URL of a web page on the world wide web. Display window 30 further includes a status bar 38 that provides information about the operation of web browser 24. The items in menu bar 32 and buttons 34 and the general layout of display window 30 as shown in FIG. 2A are common features of the NETSCAPE NAVIGATOR web browser available from NETSCAPE COMMUNICATIONS.

Display window 30 includes a displayed web page, indicated generally at 40, which is generated by web browser 24 from the downloaded web page 26 and associated applet 28. Displayed web page 40 provides the user of web browser 24 with the information content accessed from web server 18. The user generally interacts with display window 30 and displayed web page 40 using a pointer device (e.g., a mouse) which controls the position of a pointer 42 and allows a user to initiate actions (e.g., through a mouse click). According to the teachings of the present invention, displayed web page 40 includes a plurality of hot spots 44 that provide access to embedded menus created and managed by applet 28. The embedded menus can be accessed by positioning pointer 42 over one of hot spots 44.

FIG. 2B shows an embedded menu 46 in displayed web page 40 which has been invoked by positioning of pointer 42 over the upper hot spot 44. In the illustrated example, selection of the upper hot spot 44 is indicated by highlighting that hot spot 44 with a halo, as shown. Embedded menu 46 includes a banner that matches the text ("WHO WE ARE") that was associated with the selected hot spot 44 in FIG. 2A. Embedded menu 46 also includes a number of links 48, each providing a link to another web page or resource. The links 48 provided by embedded menu 46 may or may not be URLs directly accessible without initially passing through the initial displayed web page 40.

In FIG. 2B, the "Corporate Overview" link is selected by the positioning of pointer 42 over that portion of embedded menu 46, and status bar 40 reflects the URL associated with the "Corporate Overview" link. If desired, the user of web browser 24 can link to the "Corporate Overview" information by initiating an action, for example by clicking a mouse button, while pointer 42 is in this position. The user could also move pointer 42 elsewhere in embedded menu 46 to select and initiate one of the other links. In other embodiments, embedded menu 46 can have multiple levels of menus accessible through initial menu options.

When pointer 42 is moved outside of embedded menu 46, embedded menu 46 will be removed and displayed web page 40 will again look as shown in FIG. 2A. The user can move pointer 42 over any of hot spots 44 and invoke an associated embedded menu, each of which would provide multiple links to other web pages or resources.

Another technical advantage of the embedded menus of the present invention is the ability to allow a user of web browser 24 to scan the information content that can be linked from an initial displayed web page 40 without linking to new web pages. A user can reposition pointer 42 over each hot spot 44 and be provided with link options within a web site at one or more levels. For example, an operator of web server 18 can create a web site for which the initial web page

can display, through the use of embedded menus, the overall structure of the web site as well as links to a number of locations therein. A user of web browser **24** can thereby identify and link to desired information more quickly and easily than possible with conventional linear links.

FIGS. **3A** and **3B** illustrate a comparison between one-to-one and multiple-to-one correspondence between links and actions in a web page. In FIG. **3A**, web page **50** includes conventional links which correspond on a one-to-one basis with actions in web page **50**. For example, link "A" points to web page **52**, and a user can initiate a link to web page **52** from web page **50** by positioning a mouse pointer on link "A" and clicking the mouse button. Similarly, link "2" in web page **52** points to a web page **54**, and link "c" in web page **54** points to a web page **56**. Link "1" in web page **52**, links "a" and "b" in web page **54** and link "i" in web page **56** point to other web pages, which are not shown. In order to navigate web pages **52**, **54** and **56** from a starting point of web page **50**, a user is required to travel linearly through links "B", "c" and "i" in web pages **50**, **52** and **54**. This linear navigation requires the user to wait as each link is processed. If using conventional links, an operator of web page **50** would need to add two links to web page **50** on order to allow a user to initiate a direct link to all three web pages **52**, **54** and **56**. The user is still only able to access one link for each action in web page **50**.

Web page **58** of FIG. **3B** has an embedded menu according to the teachings of the present invention that provides multiple-to-one correspondence between links and actions in web page **58**. Web page **58** provides a user with a much easier and more efficient access to web pages **52**, **54** and **56**. Web page **52** has an associated applet that creates and manages an embedded menu accessible through hot spot "B". When the embedded menu is invoked, the embedded menu provides the user with links to web pages **52**, **54**, and **56**. Through one action in web page **58**, the user can access all three links. This allows the user to more quickly and easily navigate web pages **58**, **52**, **54** and **56**. For example, the user does not have to wait for multiple links to be processed in order to reach web page **56** as is required for the linear links described above.

FIG. **4** is a flow chart of a process for managing link spots and hot spots in a web page according to the teachings of the present invention. With respect to this process, the term "link spots" is used to refer to conventional one-to-one links within a web page. In general, this process is performed by an applet executed by a web browser in along with the display of an associated web page.

In step **60**, the web page and applet are initialized such that they are displayed and executed by the web browser. In step **62**, the web browser recognizes a mouse event initiated by a user of the web browser. In step **64**, the applet checks whether the mouse pointer is over a link spot in the web page. If so, in step **66**, the applet displays the destination URL associated with that link spot. In step **68**, the applet checks whether the mouse event included a mouse click. If so, in step **70**, the applet initiates a link through the web browser to the destination URL associated with the link spot. At this point, a new web page associated with the destination URL will be loaded which may or may not have an associated applet. If no mouse click occurred, the applet follows step **68** by returning to step **62** and obtaining information about the next mouse event.

If, in step **64**, the mouse pointer is not over a link spot, then, in step **72**, the applet determines whether the mouse pointer is over a hot spot. If not, the applet returns to step **62**

and waits for information about the next mouse event. If the mouse pointer is over a hot spot, then, in step **74**, the applet displays the embedded menu associated with that hot spot.

After displaying the embedded menu, the applet waits, in step **78**, for information about the next mouse event. If the mouse pointer moves outside of the embedded menu, the applet returns to step **64**. If the mouse pointer remains inside the embedded menu, then, in step **80**, the applet highlights the selected link within the embedded menu and displays the destination URL associated with the selected link. In step **82**, the applet determines whether the mouse event included a mouse click. If not, the applet returns to step **76** to obtain information about the next mouse event. If the mouse event did include a mouse click, then, in step **84**, the applet initiates a link to the destination URL associated with the selected menu link. At this point, a new web page associated with the destination URL will be loaded by the web browser which may or may not have an associated applet.

One implementation of an applet according to the teachings of the present invention uses the JAVA programming language established by SUN MICROSYSTEMS. The JAVA programming language provides features to allow frame and window classes to be defined where the frame class provides a separate window created and displayed on top of the web page, and the window class provides an ability to have a menu bar across the top of that separate window. However, the JAVA language does not contemplate embedding a menu in a web page to provide multiple links from one action in the web page. In order to create such an embedded menu using a JAVA applet, the present invention defines a new JAVA class which implements the embedded menu.

The following TABLE provides an outline of the JAVA applet and new class of this implementation of the present invention.

TABLE

| Applet and Embedded Menu Class |
|---|
| APPLET |
| Import Java elements |
| Import Embedded Menu Class |
| Define variables |
| Define defaults for embedded menus |
| (Main loop) |
| Obtain hot spots and images, overwriting defaults of they exist |
| Load default menu parameters |
| Obtain embedded menu for each hot spot |
| Define default links |
| Obtain additional links |
| Draw and cache images |
| Reset flag for mouse click |
| Check whether mouse click inside embedded menu or on link spot |
| EMBEDDED MENU CLASS |
| Import Java elements |
| Define variables |
| Construct menus |
| Set menu colors |
| Set menu title |
| Highlight appropriate menu item |
| Draw embedded menus, items and border |

Although the present invention has been described in detail, it should be understood that various changes, substitutions and alterations can be made hereto without departing from the spirit and scope of the invention as defined by the appended claims.

What is claimed is:

1. A method for providing a web page having an embedded menu to a web browser, the method comprising:

receiving a request for a web page from a web browser;

packaging the web page and an applet associated with the web page for transmission to the web browser; and

transmitting the web page and the applet to the web browser;

wherein the applet is operable to create and manage an embedded menu in a displayed web page when the web page is displayed and the applet is executed by the web browser, the embedded menu providing a user of the web browser with a plurality of links through one action in the displayed web page.

**2**. The method of claim **1**, wherein packaging the applet comprises packaging an applet that creates and manages a pop-up menu.

**3**. The method of claim **2**, wherein the applet creates and manages a pop-up menu that is invoked by positioning a pointer over a hot spot in the displayed web page.

**4**. The method of claim **2**, wherein the applet creates and manages a pop-up menu which has a plurality of menu levels.

**5**. The method of claim **1**, wherein receiving a request comprises receiving a request across the public Internet.

**6**. The method of claim **1**, wherein receiving a request comprises receiving a request across a private intranet.

**7**. The method of claim **1**, wherein packaging the applet comprises a JAVA applet having a definition for an embedded menu class.

**8**. The method of claim **1**, wherein the request for the web page is received across a private intranet.

**9**. A method for displaying a web page having an embedded menu to a user of a web browser, the method comprising:

downloading a web page and an applet transmitted by a web server;

displaying the web page to a user of the web browser; and

executing the applet, the applet creating and managing an embedded menu in the displayed web page under control of the applet, the embedded menu providing a user of the web browser with a plurality of links through one action in the displayed web page.

**10**. The method of claim **9**, wherein creating and managing the embedded menu comprises creating and managing a pop-up menu.

**11**. The method of claim **10**, wherein creating and managing the embedded menu comprises creating and managing a pop-up menu which is invoked by positioning a pointer over a hot spot in the displayed web page.

**12**. The method of claim **10**, wherein creating and managing the embedded menu comprises creating and managing a pop-up menu which has a plurality of menu levels.

**13**. The method of claim **9**, wherein downloading a web page and an applet comprises downloading the web page and the applet across the public Internet.

**14**. The method of claim **9**, wherein downloading a web page and an applet comprises downloading the web page and the applet across a private intranet.

**15**. The method of claim **9**, wherein downloading the applet comprises downloading a JAVA applet having a definition for an embedded menu class.

**16**. A host system executing a web server to provide a web page having an embedded menu to a web browser, the host system comprising:

a data storage device storing a web page and an associated applet;

wherein the associated applet, when executed, can create and manage an embedded menu in a displayed web page;

a memory device storing code for the web server; and

a processor coupled to the data storage device and to the memory device, the processor executing code for the web server such that the web server is operable to:

receive a request for the web page from a web browser;

package the web page and the applet for transmission to the web server; and

transmit the web page and the applet to the web browser;

such that the applet creates and manages an embedded menu in the displayed web page when the web page is displayed and the applet is executed by the web browser, the embedded menu providing a user of the web browser with a plurality of links through one action in the displayed web page.

**17**. The host system of claim **16**, wherein the embedded menu is a pop-up menu.

**18**. The host system of claim **17**, wherein the pop-up menu is invoked by positioning a pointer over a hot spot in the displayed web page.

**19**. The host system of claim **16**, wherein the pop-up menu has a plurality of menu levels.

**20**. The host system of claim **16**, wherein the request for the web page is received across the public Internet.

* * * * *

# EXHIBIT B

Named Entity Task Definition

# 2 TASK OVERVIEW

**2.1** - Markup Description
**2.2** - Named Entities (ENAMEX tag element)
**2.3** - Temporal Expressions (TIMEX tag element)
**2.4** - Number Expressions (NUMEX tag element)

---

### 2.1 Markup Description

The output of the systems to be evaluated will be in the form of SGML text markup. The only insertions allowed during tagging are tags enclosed in angled brackets. No extra whitespace or carriage returns are to be inserted; otherwise, the offset count would change, which would adversely affect scoring.

The markup will have the following form:

```
<ELEMENT-NAME ATTR-NAME="ATTR-VALUE" ...>text-string</ELEMENT-NAME>
```

Example:

```
<ENAMEX TYPE="ORGANIZATION">Taga Co.</ENAMEX>
```

The markup is defined in SGML Document Type Descriptions (DTDs), written for MUC-6 use by personnel at MITRE and maintained by personnel at NRaD. The DTDs enable annotators and system developers to use SGML validation tools to check the correctness of the SGML-tagged texts produced by the annotator or the system. The validation tools are available to MUC-6 participants in the file called muc6-sgml-tools. Annotators are using a software tool provided for MUC-6 by SRA Corporation to assist in generating the answer keys to be used for system training and testing.

### 2.2 Named Entities (ENAMEX tag element)

This subtask is limited to proper names, acronyms, and perhaps miscellaneous other unique identifiers, which are categorized via the TYPE attribute as follows:

ORGANIZATION: named corporate, governmental, or other organizational entity

PERSON: named person or family

LOCATION: name of politically or geographically defined location (cities, provinces, countries, international regions, bodies of water, mountains, etc.)

### 2.3 Temporal Expressions (TIMEX tag element)

This subtask is for "absolute" temporal expressions only; explanation is provided in appendix B. The

tagged tokens are categorized via the TYPE attribute as follows:

DATE: complete or partial date expression

TIME: complete or partial expression of time of day

**2.4 Number Expressions (NUMEX tag element)**

This subtask is for two useful types of numeric expressions, monetary expressions and percentages. The numbers may be expressed in either numeric or alphabetic form.

The task covers the complete expression, which is categorized via the TYPE attribute as follows:

MONEY: monetary expression

PERCENT: percentage

---

*Named Entity Task Definition - 02 JUN 95*
[Next] [Previous] [Top] [Back to MUC-6 main page]

Generated with CERN WebMaker

# EXHIBIT C

Proceedings

# Sixth Message Understanding Conference (MUC-6)

November 1995

<ENAMEX TYPE="PERSON">John Simon</ENAMEX>, Chief Financial Officer of <ENAMEX TYPE="ORGANIZATION">Prime Corp.</ENAMEX> since <TIMEX TYPE"DATE">1986</TIMEX>, saw his pay jump <NUMEX TYPE="PERCENT">20%</NUMEX>, to <NUMEX TYPE="MONEY">$1.3 million</NUMEX>, as the 37-year-old also became the financial-services company's president.

```
<TEMPLATE-93-1> :=
  DOC_NR: "93"
  CONTENT: <SUCCESSION_EVENT-93-1>
<SUCCESSION_EVENT-93-1> :=
  SUCCESSION_ORG: <ORGANIZATION-93-1>
  POST: "president"
  IN_AND_OUT: <IN_AND_OUT-93-1>
  VACANCY_REASON: OTH_UNK
<IN_AND_OUT-93-1> :=
  IO_PERSON: <PERSON-93-1>
  NEW_STATUS: IN
  ON_THE_JOB: YES
  OTHER_ORG: <ORGANIZATION-93-1>
  REL_OTHER_ORG: SAME_ORG
<ORGANIZATION-93-1> :=
  ORG_NAME: "Prime Corp."
  ORG_DESCRIPTOR: "the financial-
    services company"
  ORG_TYPE: COMPANY
<PERSON-93-1> :=
  PER_NAME: "John Simon"
```

<COREF ID="0">John Simon, <COREF ID="1" REF="0">Chief Financial Officer of <COREF ID="5">Prime Corp.</COREF> since 1986</COREF>,</COREF> saw <COREF ID="2" REF="1">his</COREF> pay jump 20%, to $1.3 million, as <COREF ID="3" REF="2">the 37-year-old</COREF> also became <COREF ID="4" REF="3"><COREF ID="6" REF="5">the financial-services company</COREF>'s president</COREF>.

**Sponsored by:**

**Defense Advanced Research Projects Agency**
**Information Technology Office**
**Tipster Text Program**

7/96

# Sixth Message Understanding Conference (MUC-6)

## Proceedings of a Conference Held in Columbia, Maryland November 6-8, 1995

Sponsored by:

**Defense Advanced Research Projects Agency**
**Information Technology Office**
**Tipster Text Program**

This document contains copies of reports and other materials prepared for use at the Sixth Message Understanding Conference.

**APPROVED FOR PUBLIC RELEASE**
**DISTRIBUTION UNLIMITED**

The views and conclusions contained in this document are those of the authors and should not be interpreted as necessarily representing the official policies, either expressed or implied, of the Defense Advanced Research Projects Agency or the United States Government.

Distributed by
Morgan Kaufmann Publishers, Inc.
340 Pine Street, 6th Floor
San Francisco, California 94104
ISBN 1-55860-402-2
Printed in the United States of America

# Preface

This volume documents the proceedings of the Sixth Message Understanding Conference (MUC-6), which was held on 6-8 November, 1995, in Columbia, Maryland. The conference was sponsored by the Defense Advanced Research Projects Agency, Information Technology Office (D. Gunning, Program Manager) under the auspices of the Tipster Text Program and was organized by the MUC-6 program committee, co-chaired by Beth Sundheim (NCCOSC/NRaD) and Ralph Grishman (NYU). Other members of the committee were Chinatsu Aone (SRA Corp.), Lois Childs (Lockheed Martin Corp.), Nancy Chinchor (SAIC), Jerry Hobbs (SRI International), Boyan Onyshkevych (U.S. Dept. of Defense), Marc Vilain (The MITRE Corp.), Takahiro Wakao (Univ. of Sheffield), and Ralph Weischedel (BBN Systems and Technologies).

The topic of the conference was performance assessment of text analysis software systems that analyze free text in accordance with prespecified task definitions. To represent the output of analysis, the systems either insert certain types of annotations into the text or extract certain types of information from the text. Prior to the conference, systems were developed and tested on up to four different tasks: insertion of Named Entity annotations, insertion of Coreference annotations, extraction of Organization and Person information, and extraction of event information concerning corporate management changes.

The conference was attended by representatives of organizations that participated in the evaluation, US Government representatives, and other invited guests. Sessions included task overviews presented by T. Wakao, C. Aone, L. Childs, and B. Sundheim; a presentation concerning MUC-6 scoring methodology by N. Chinchor; an overview of evaluation results by B. Sundheim; system demonstrations and papers on systems and test results given by the participating organizations in the evaluation; and presentations on the Coreference task and other topics by some of the evaluation participants, accompanied by discussions led by R. Grishman to critique the evaluation and make recommendations for future evaluations.

Papers in this volume reflect the information presented at the conference. The introductory paper by Grishman and Sundheim provides additional background, and the paper by Vilain et al. elaborates on the Coreference scoring method, which was new for this evaluation.

GOOG016142

# TABLE OF CONTENTS

Page

**Preface** .......... i

**PAPERS: EVALUATION**

**Design of the MUC-6 Evaluation** .......... 1
R. Grishman (New York University) and B. Sundheim (Naval Command, Control and Ocean Surveillance Center)

**Overview of Results of the MUC-6 Evaluation** .......... 13
B. Sundheim (Naval Command, Control and Ocean Surveillance Center)

**Four Scorers and Seven Years Ago: The Scoring Method for MUC-6** .......... 33
N. Chinchor and G. Dungca (Science Applications International Corporation)

**Statistical Significance of MUC-6 Results** .......... 39
N. Chinchor (Science Applications International Corporation)

**A Model-Theoretic Coreference Scoring Scheme** .......... 45
M. Vilain, J. Burger, J. Aberdeen, D. Connolly, L. Hirschman (The MITRE Corporation)

**PAPERS: SYSTEMS**

**BBN: Description of the PLUM System as Used for MUC-6** .......... 55
Weischedel, R. (BBN Systems and Technologies)

**University of Durham: Description of the LOLITA System as Used in MUC-6** .......... 71
R. Morgan, R. Garigliano, P. Callaghan, S. Poria, M. Smith, A. Urbanowicz, R. Collingham, M. Costantino, C. Cooper, and the LOLITA Group

**Knight-Ridder Information's Value Adding Name Finder: A Variation on the Theme of FASTUS** .......... 87
A. Borkovsky (Knight-Ridder Information, Inc. and Verity, Inc.)

**Lockheed Martin: LOUELLA PARSING, an NLToolset System for MUC-6** .......... 97
L. Childs, D. Brady, L. Guthrie, J. Franco, D. Valdes-Dapena, B. Reid, J. Kielty, G. Dierkes and I. Sider (Lockheed Martin Corporation)

**University of Manitoba: Description of the PIE System Used for MUC-6** .......... 113
D. Lin (University of Manitoba)

**Description of the UMass System as Used for MUC-6** .......... 127
D. Fisher, S. Soderland, J. McCarthy, F. Feng and W. Lehnert (University of Massachusetts, Amherst)

**MITRE: Description of the *Alembic* System Used for MUC-6** .......... 141
J. Aberdeen, J. Burger, D. Day, L. Hirschman, P. Robinson and M. Vilain (The MITRE Corporation)

**CRL/NMSU: Description of the CRL/NMSU Systems Used for MUC-6** .......... 157
J. Cowie (New Mexico State University Computing Research Laboratory)

**The NYU System for MUC-6 or Where's the Syntax?** .......... 167
R. Grishman (New York University)

GOOG016143

Page

**University of Pennsylvania: Description of the University of Pennsylvania System Used for MUC-6** ........ 177
B. Baldwin, J. Reynar, M. Collins, J. Eisner, A. Ratnaparkhi, J. Rosenzweig, A. Srinivas (University of Pennsylvania)

**Description of the SAIC DX System as Used for MUC-6** ........ 193
L. Miller (Science Applications International Corporation)

**University of Sheffield: Description of the LaSIE System as Used for MUC-6** ........ 207
R. Gaizauskas, T. Wakao, K. Humphreys, H. Cunningham, Y. Wilks (University of Sheffield)

**SRA: Description of the SRA System as Used for MUC-6** ........ 221
G. Krupka (Systems Research and Applications)

**SRI International FASTUS System: MUC-6 Test Results and Analysis** ........ 237
D. Appelt, J. Hobbs, J. Bear, D. Israel, M. Kameyama, A. Kehler, D. Martin, K. Myers and M. Tyson (SRI International)

**Sterling Software: An NLToolset-Based System for MUC-6** ........ 249
R. Lee (Sterling Software)

**Wayne State University: Description of the UNO Natural Language Processing System as Used for MUC-6** ........ 263
L. Iwanska, M. Croll, T. Yoon, M. Adams (Wayne State University)

**APPENDICES**

**Appendix A:** **System Walkthrough Reference Materials** ........ 281

**Appendix B:** **MUC-6 Test Scores** ........ 291

**Appendix C:** **Named Entity Task Definition (v2.1)** ........ 317

**Appendix D:** **Coreference Task Definition (v2.3)** ........ 333

**Appendix E:** **Information Extraction Task Definition (v2.1)** ........ 345

**Appendix F:** **Information Extraction Task: Scenario on Management Succession (v1.1)** ........ 361

## AUTHOR INDEX

| AUTHOR | PAGE(S) |
|---|---|
| Adams, Maria | 263 |
| Aberdeen, John | 45, 141 |
| Appelt, Douglas E. | 237 |
| Baldwin, Breck | 177 |
| Bear, John | 237 |
| Borkovsky, Arkady | 87 |
| Brady, Deb | 97 |
| Burger, John | 45, 141 |
| Callaghan, Paul | 71 |
| Childs, Lois | 97 |
| Chinchor, Nancy | 33, 39 |
| Collingham, Russell | 71 |
| Collins, Mike | 177 |
| Connolly, Dennis | 45 |
| Cooper, Chris | 71 |
| Costantino, Marco | 71 |
| Cowie, Jim | 157 |
| Croll, Mary | 263 |
| Cunningham, H. | 207 |
| Day, David | 141 |
| Dierkes, Glenn | 97 |
| Dungca, Gary | 33 |
| Eisner, Jason | 177 |
| Feng, Fangfang | 127 |
| Fisher, David | 127 |
| Franco, Jose | 97 |
| Gaizauskas, R. | 207 |
| Garigliano, Roberto | 71 |
| Grishman, Ralph | 1, 167 |
| Guthrie, Louise | 97 |
| Hirschman, Lynette | 45, 141 |
| Hobbs, Jerry R. | 237 |
| Humphreys, K. | 207 |

| AUTHOR | PAGE(S) |
|---|---|
| Israel, David | 237 |
| Iwanska, Lucja | 263 |
| Kameyama, Megumi | 237 |
| Kehler, Andy | 237 |
| Kielty, John | 97 |
| Krupka, George R. | 221 |
| Lee, Richard | 249 |
| Lehnert, Wendy | 127 |
| Lin, Dekang | 113 |
| LOLITA Group | 71 |
| Martin, David | 237 |
| McCarthy, Joseph | 127 |
| Miller, Lance A. | 193 |
| Morgan, Richard | 71 |
| Myers, Karen | 237 |
| Poria, Sanjay | 71 |
| Ratnaparkhi, Adwait | 177 |
| Reid, Bill | 97 |
| Reynar, Jeff | 177 |
| Robinson, Patricia | 141 |
| Rosenzweig, Joseph | 177 |
| Sider, Ira | 97 |
| Smith, Mark | 71 |
| Soderland, Stephen | 127 |
| Srinivas, Anoop | 177 |
| Sundheim, Beth M. | 1, 13 |
| Tyson, Mabry | 237 |
| Urbanowicz, Agnieszka | 71 |
| Valdes-Dapena, Dan | 97 |
| Vilain, Marc | 45, 141 |
| Wakao, T. | 207 |
| Weischedel, Ralph | 55 |
| Wilks, Y. | 207 |
| Yoon, Taewan | 263 |

# MITRE: DESCRIPTION OF THE *ALEMBIC* SYSTEM USED FOR MUC-6

*John Aberdeen, John Burger, David Day, Lynette Hirschman, Patricia Robinson, and Marc Vilain*

The MITRE Corporation
202 Burlington Rd.
Bedford, MA 01730

{aberdeen, john, day, lynette, parann, mbv}@mitre.org

As with several other veteran MUC participants, MITRE's *Alembic* system has undergone a major transformation in the past two years. The genesis of this transformation occurred during a dinner conversation at the last MUC conference, MUC-5. At that time, several of us reluctantly admitted that our major impediment towards improved performance was reliance on then-standard linguistic models of syntax. We knew we would need an alternative to traditional linguistic grammars, even to the somewhat non-traditional categorial pseudo-parser we had in place at the time. The problem was, which alternative?

The answer came in the form of rule sequences, an approach Eric Brill originally laid out in his work on part-of-speech tagging [5, 7]. Rule sequences now underlie all the major processing steps in *Alembic*: part-of-speech tagging, syntactic analysis, inference, and even some of the set-fill processing in the Template Element task (TE). We have found this approach to provide almost an embarrassment of advantages, speed and accuracy being the most externally visible benefits. In addition, most of our rule sequence processors are trainable, typically from small samples. The rules acquired in this way also have the characteristic that they allow one to readily mix hand-crafted and machine-learned elements. We have exploited this opportunity to apply both machine-learned and hand-crafted rules extensively, choosing in some instances to run sequences that were primarily machine-learned, and in other cases to run sequences that were entirely crafted by hand.

## ALEMBIC'S OVERALL ARCHITECTURE

For all the changes that the system has undergone, the coarse architecture of the MUC-6 version of *Alembic* is remarkably close to that of its predecessors. As illustrated in Fig. 1, below, processing is still divided into three main steps: a UNIX- and C-based preprocess, a Lisp-based syntactic analysis, and a Lisp-based inference phase. Beyond these coarse-grain similarities, the system diverges significantly from earlier incarnations. We replaced our categorial grammar pseudo-parser, as suggested above. We also redesigned the preprocess from the ground up. Only the inferential back end of the system is largely unchanged.

The internal module-by-module architecture of the current *Alembic* is illustrated in Fig. 2, below. The central innovation in the system is its approach to syntactic analysis, which is now performed through a sequence of phrase-finding rules that are processed by a simple interpreter. The interpreter has somewhat less recognition power than a finite-state machine, and operates by successively relabeling the input according to the rule actions—more on this below. In support of the syntactic phrase finder, or phraser as we call it, the input text must be tagged for part-of-speech. This part-of-speech tagging is the principal role of the UNIX preprocess, and it is itself supported by a number of pretaggers (*e.g.*, for labeling dates and title words) and zoners (*e.g.*, for word tokenization, sentence boundary determination and headline segmentation).

The phrases that are parsed by the phraser are subsequently mapped to facts in the inferential database, a mapping mediated by a simple semantic interpreter. We then exploit inference to instantiate domain

UNIX preprocess ⇒ Syntactic analysis (Lisp) ⇒ Tractable Inference (Lisp)
NE markup
TE templates
ST templates

Figure 1: Coarse-grained system architecture.

GOOG016289



Figure 2: Processing modules in *Alembic*.

constraints and resolve restricted classes of coreference. The inference system also supports equality reasoning by congruence closure, and this equality machinery is in turn exploited to perform TE-specific processing, in particular, acronym and alias merging. Finally, the template generation module forms the final TE and ST output by a roughly one-to-one mapping from facts in the inferential database to templates.

## THE PREPROCESSORS

As noted above, the UNIX-based portion of the system is primarily responsible for part-of-speech tagging. Prior to the part-of-speech tagger, however, a text to be processed by Alembic passes through several preprocess stages; each preprocessor "enriches" the text by means of SGML tags. All of these preprocess components are implemented with LEX (the lexical analyzer generator) and are very fast.

An initial preprocessor, the *punctoker*, makes decisions about word boundaries that are not coincident with whitespace. It tokenizes abbreviations (*e.g.*, "Dr."), and decides when sequences of punctuation and alphabetic characters are to be broken up into several lexemes (*e.g.*, "Singapore-based"). The punctoker wraps <LEX> tags around text where necessary to indicate its decisions, as in the following:

Singapore<LEX pos=JJ>-based</LEX>

As this example suggests, in some cases, the punctoker guides subsequent part-of-speech tagging by adding a part-of-speech attribute to the <LEX> tags that it emits.

The *parasenter* zones text for paragraph and sentence boundaries, the former being unnecessary for MUC-6. The sentence tagging component is both simple and conservative. If any end-of-sentence punctuation has not been "explained" by the punctoker as part of a lexeme, as in abbreviations, it is taken to indicate a sentence boundary. The parasenter is also intended to filter lines in the text body that begin with "@" (but see our error analysis below). A separate *hl-tagger* is invoked to zone sentence-like constructs in the headline field.

The preprocess includes specialized phrase taggers. The *title-tagger* marks personal titles, making distinctions along the lines drawn by the NE and ST tasks. Included are personal honorifics (Dr., Ms.); military and religious titles (Vicar, Sgt.); corporate posts (CEO, chairman); and "profession" words (analyst, spokesperson).

The *date-tagger* identifies TIMEX phrases. It uses a lex-based scanner as a front-end for tokenizing and typing its input; then a pattern-matching engine finds the actual date phrases. The date-tagger is fast, since the pattern matcher itself is highly optimized, and since the lex-based front-end does not actually tokenize the input or fire the pattern-matcher unless it suspects that a date phrase may be occurring in the text.

Both the *date-* and *title-tagger* can tag a phrase as either (1) a single SGML element, or (2) individual lexemes, with special attributes that indicate the beginning and end of the matrix phrase, as in

<LEX post=start>chief</LEX > <LEX post=mid>executive</LEX > <LEX post=end>officer</LEX >

We adopted this LEX-based phrase encoding so as to simplify (and speed up) the input scanner of the part-of-speech tagger. In addition, a phrase's LEX tags can encode parts-of-speech to help guide the p-o-s tagger.

## THE PART-OF-SPEECH TAGGER

Our part-of-speech tagger is closest among the components of our MUC-6 system to Brill's original work on rule sequences [5, 6, 7]. The tagger is in fact a re-implementation of Brill's widely-disseminated system, with various speed and maintainability improvements. Most of the rule sequences that drive the tagger were automatically learned from hand-tagged corpora, rather than hand-crafted by human engineers. However, the rules are in a human-understandable form, and thus hand-crafted rules can easily be combined with automatically learned rules, a property which we exploited in the MUC-6 version of *Alembic*.

The tagger operates on text that has been lexicalized through pre-processing. The following, for example, is how a sample walkthrough sentence is passed to the part-of-speech tagger. Note how punctuation has been tokenized, and "Mr." has been identified as a title and assigned the part-of-speech NNP (proper noun).

<S>Even so<lex>,</lex> <LEX pos=NNP ttl=WHOLE>Mr.</LEX> Dooner is on the prowl for more creative talent and is interested in acquiring a hot agency<lex>.</lex></S>

The part-of-speech tagger first assigns initial parts-of-speech by consulting a large lexicon. The lexicon maps words to their most frequently occurring tag in the training corpus. Words that do not appear in the lexicon are assigned a default tag of NN (common noun) or NNP (proper noun), depending on capitalization.

For unknown words, after a default tag is assigned, lexical rules apply to improve the initial guess. These rules operate principally by inspecting the morphology of words. For example, an early rule in the lexical rule sequence retags unknown words ending in "ly" with the RB tag (adverb). In the sentence above, the only unknown word ("*Dooner*") is not subject to retagging by lexical rules; in fact, the default NNP tag assignment is correct. Lexical rules play a larger role when the default tagging lexicon is less complete than our own, which we generated from the whole Brown Corpus plus 3 million words of Wall Street Journal text. For example, in our experiments tagging Spanish texts (for which we had much smaller lexica), we have found that lexical rules play a larger role (this can also be partially attributed to the more inflected nature of Spanish).

After the initial tagging, contextual rules apply in an attempt to further fix errors in the tagging. These rules reassign a word's tag on the basis of neighboring words and their tags. In this sentence, "*more*" changes from its initial JJR (comparative adjective) to RBR (comparative adverb). Note that this change is arguably erroneous, depending on how one reads the scope of "*more*". This tagging is changed by the following rule, which roughly reads: change word W from JJR to RBR if the the word to W's immediate right is tagged JJ

JJR RBR nexttag JJ

Table 1, below, illustrates the tagging process. The sample sentence is on the first line; its initial lexicon-based tagging is on the second line; the third line shows the final tagging produced by the contextual rules.

In controlled experiments, we measured the tagger's accuracy on Wall Street Journal text at 95.1% based on a training set of 140,000 words. The production version of the tagger, which we used for MUC-6, relies on the

| Even | so | , | Mr. | Dooner | is | on | the | prowl | for | more | creative | talent | and | is | interested | in | acquiring | a | hot | agency |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| rb | rb | , | nnp | NNP | vbz | in | dt | nn | in | JJR | jj | nn | cc | vbz | jj | in | vbg | dt | jj | nn |
| rb | rb | , | nnp | NNP | vbz | in | dt | nn | in | RBR | jj | nn | cc | vbz | jj | in | vbg | dt | jj | nn |

**Table 1:** Tagging a text with the lexicon (line 2) and contextual rules (line 3). Note the default lexicon assignment of *nnp* to "*Dooner*" and the rule-based correction of "*more*".

learned rules from Brill's release 1.1 (148 lexical rules, 283 contextual rules), for which Brill has measured accuracies that are 2-3 percentage points higher than in our own smaller-scale experiments. For MUC-6, we combined these rules with 19 hand-crafted contextual rules that correct residual tagging errors that were especially detrimental to our NE performance. Tagger throughput is around 3000 words/sec.

## THE PHRASER

The *Alembic* phrase finder, or phraser for short, performs the bulk of the system's syntactic analysis. As noted above, it has somewhat less recognition power than a finite-state machine, and as such shares many characteristics of pattern-matching systems, such as CIRCUS [10] or FASTUS [2]. Where it differs from these systems is in being driven by rule sequences. We have experimented with both automatically-learned rule sequences and hand-crafted ones. In the system we fielded for MUC-6, we ended up running entirely with hand-crafted sequences, as they outperformed the automatically-learned rules.

### How the phraser works

The phraser process operates in several steps. First, a set of initial phrasing functions is applied to all of the sentences to be analyzed. These functions are responsible for seeding the sentences with likely candidate phrases of various kinds. This seeding process is driven by word lists, part-of-speech information, and pre-taggings provided by the preprocessors. Initial phrasing produces a number of phrase structures, many of which have the initial null labeling (*none*), while some have been assigned an initial label (*e.g.*, *num*). The following example shows a sample sentence from the walkthrough message after initial phrasing.

*Yesterday*, <none>McCann</none> *made official what had been widely anticipated:* <ttl>Mr.</ttl> <none>James</none>, <num>57</num> *years old, is stepping down as* <post>*chief executive officer*</post> *on* <date>July 1</date> *and will retire as* <post>chairman</post> *at the end of the year*.

The *post*, *ttl*, and *date* phrases were identified by the title and date taggers. Mr. James' *num*-tagged age is identified on the basis of part of speech information, as is the organization name "McCann".

Once the initial phrasing has taken place, the phraser proceeds with phrase identification proper. This is driven by a sequence of phrase-finding rules. Each rule in the sequence is applied in turn against all of the phrases in all the sentences under analysis. If the antecedents of the rule are satisfied by a phrase, then the action indicated by the rule is executed immediately. The action can either change the label of the satisfying phrase, grow its boundaries, or create new phrases. After the *n*th rule is applied in this way against every phrase in all the sentences, the *n+1*th rule is applied in the same way, until all rules have been applied. After all of the rules have been applied, the phraser is done.

It is important to note that the search strategy in the phraser differs significantly from that in standard parsers. In standard parsing, one searches for any and all rules whose antecedents might apply given the state of the parser's chart: all these rules become candidates for application, and indeed they all are applied (modulo higher-order search control). In our phraser, only the *current* rule in a rule sequence is tested: the rule is applied wherever this test succeeds, and the rule is never revisited at any subsequent stage of processing. After the final rule of a sequence is run, no further processing occurs.

### The language of phraser rules

The language of the phraser rules is as simple as their control strategy. Rules can test lexemes to the left and right of the phrase, or they can look at the lexemes in the phrase. Tests in turn can be part-of-speech queries, literal lexeme matches, tests for the presence of neighboring phrases, or the application of predicates that are evaluated by invoking a Lisp procedure. There are several reasons for keeping this rule language simple. In the case of hand-crafted rules, it facilitates the process of designing a rule sequence. In the case of machine-learned rules, it restricts the size of the search space on each epoch of the learning regimen, thus making it tractable. In either case, the overall processing power derives as much from the fact that the rules are sequenced, and feed each other in turn, as it does from the expressiveness of the rule language.

To make this clearer, consider a simple named entity rule that is applied to identifying persons.

```
(def-phraser
  label         none
  left-1        phrase ttl
  label-action  person)
```

This rule changes the label of a phrase from *none* to *person* if the phrase is bordered on its left by a ttl phrase. On the sample sentence, this rule causes the following relabeling of the phrase around "James".

*Yesterday, <none>McCann</none> made official what had been widely anticipated: <ttl>Mr.</ttl> <person>James</person>, <num>57</num> years old, is stepping down as <post>chief executive officer</post> on <date>July 1</date> and will retire as <post>chairman</post> at the end of the year.*

Once this rule has run, the labelings it instantiates become available as input to subsequent rules in the sequence, *e.g.*, rules that attach the title to the person in "Mr. James", that attach the age apposition, and so forth. Phraser rules do make mistakes, but as with other sequence-based processors, the phraser applies later rules in a sequence to patch errors made by earlier rules. In the walkthrough message, for example, "Amarati & Puris" is identified as an organization, which ultimately leads to an incorrect *org* tag for "Martin Puris", since this person's name shares a common substring with the organization name. However, rules that find personal names occur later in our named entities sequence than those which find organizations, thus allowing the phraser to correctly relabel "Martin Puris" as a person on the basis of a test for common first names.

## Rule sequences for MUC-6

For MUC-6, ***Alembic*** relies on three sequences of phraser rules, divided roughly into rules for generating NE-specific phrases, those for finding TE-related phrases, and those for ST phrases. The division is only rough, as the NE sequence yields some number of TE-related phrases as a side-effect of searching for named entities.

To illustrate this process, consider the following walkthrough sentence, as tagged by the NE rule sequence.

*But the bragging rights to <org>Coke</org>'s ubiquitous advertising belongs to <org>Creative Artists Agency </org>, the big <location>Hollywood</location> talent agency.*

The *org* label on "Creative Artists Agency" was set by a predicate that tests for *org* keywords (like "Agency"). "Coke" was found to be an *org* elsewhere in the document, and the label was then percolated. Finally, the *location* label on "Hollywood" was set by a predicate that inspects the tried-and-not-so-true TIPSTER gazetteer.

What is important to note about these NE phraser rules is that they do not rely on a large database of known company names. Instead, the rules are designed to recognize organization names in almost complete absence of any information about particular organization names (with the sole exception of a few acronyms such as IBM, GM, *etc.*). This seems to auger well for the ability to apply ***Alembic*** to different application tasks.

Proceeding beyond named entities, the phraser next applies its TE-specific rule sequence. This sequence performs manipulations that resemble NP parsing, *e.g.*, attaching locational modifiers. In addition, a subsequence of TE rules concentrates on recognizing potential organization descriptors. These rules generate so-called *corpnp* phrases, that is noun phrases that are headed by an organizational common noun (such as "agency", "maker", and of course "company"). The rules expand these heads leftwards to incorporate lexemes that satisfy a set of part-of-speech constraints. One such phrase, for example, is in the sample sentence above.

*But the bragging rights to <org>Coke</org>'s ubiquitous advertising belongs to <org><org>Creative Artists Agency </org>, <corpnp> the big <location>Hollywood</location> talent agency</corpnp></org>*

After *corpnp* phrases have been marked, another collection of TE rules associates these phrases with neighboring *org* phrases. In this case such a phrase is found two places to the left (on the other side of a comma), so a new *org* phrase is created which spans both the original *org* phrase and its *corpnp* neighbor. See above.

Note that these rule sequences encode a semantic grammar. Organizationally-headed noun phrases are labeled as *org*, regardless of whether they are simple proper names or more complex constituents such as the

* * * TOTAL SLOT SCORES * * *

| SLOT | POS | ACT | COR | PAR | INC | SPU | MIS | NON | REC | PRE | UND | OVG | ERR | SUB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| <enamex> | 938 | 991 | 881 | 0 | 0 | 110 | 57 | 0 | 94 | 89 | 6 | 11 | 16 | 0 |
| type | 938 | 991 | 775 | 0 | 106 | 110 | 57 | 0 | 83 | 78 | 6 | 11 | 26 | 12 |
| text | 938 | 991 | 840 | 0 | 41 | 110 | 57 | 0 | 90 | 85 | 6 | 11 | 20 | 5 |
| subto | 1876 | 1982 | 1615 | 0 | 147 | 220 | 114 | 0 | 86 | 81 | 6 | 11 | 23 | 8 |
| ALL OB | 2286 | 2406 | 1993 | 0 | 163 | 250 | 130 | 0 | 87 | 83 | 6 | 10 | 21 | 8 |
| MATCHD | 2156 | 2156 | 1993 | 0 | 163 | 0 | 0 | 0 | 92 | 92 | 0 | 0 | 8 | 8 |

| | P&R | 2P&R | P&2R |
|---|---|---|---|
| F-MEASURES | 84.95 | 83.67 | 86.28 |

* * * TASK SUBCATEGORIZATION SCORES * * *

| SLOT | POS | ACT | COR | PAR | INC | SPU | MIS | NON | REC | PRE | UND | OVG | ERR | SUB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Enamex: | | | | | | | | | | | | | | |
| organi | 454 | 493 | 392 | 0 | 28 | 73 | 34 | 0 | 86 | 80 | 7 | 15 | 26 | 7 |
| person | 373 | 364 | 292 | 0 | 60 | 12 | 21 | 0 | 78 | 80 | 6 | 3 | 24 | 17 |
| locati | 111 | 134 | 91 | 0 | 18 | 25 | 2 | 0 | 82 | 68 | 2 | 19 | 33 | 16 |

Figure 4: Performance of rules learned for the ENAMEX portion of the NE task (unofficial score)

*org-corpnp* apposition above. This semantic characteristic of the phraser grammar is clearer still with ST rules. These rules are responsible for finding phrases denoting events relevant to the MUC-6 scenario templates.[1] For the succession scenario, this consists of a few key phrase types, most salient among them: *job* (a *post* at an *org*), *job-in* and *job-out* (fully specified successions) and *post-in* and *post-out* (partially specified successions). The following example shows the ST phrases parsed out of a key sentence from the walkthrough message.

*Yesterday, <person>McCann</person> made official what had been widely anticipated:*
*<post-out>*
*<person>*
*<person><ttl>Mr.</ttl><person>James</person></person>,*
*<age><num>57</num> years old</age>*
*</person>,*
*is stepping down as*
*<post>chief executive officer</post>*
*</post-out>* [...]

The *post-out* phrase encodes the resignation of a *person* in a *post*. Note that in the formal evaluation we failed to find a more-correct *job-out* phrase, which should have included "McCann". This happened because we did not successfully identify "McCann" as an organization, thus precluding the formation of the *job-out* phrase.

## Learning Phrase Rules

We have applied the same general error-reduction learning approach that Brill designed for generating part-of-speech rules to the problem of learning phraser rules in support of the NE task. The official version of Alembic for MUC-6 did not use any of the rule sequences generated by this phrase rule learner, but we have since generated unofficial scores. In these runs we used phrase rules that had been learned for the ENAMEX expressions only—we still used the hand-coded pre-processors and phraser rules for recognizing TIMEX and NUMEX phrases. Our performance on this task is shown in Fig. 4, above. These rules yield six fewer points of P&R than the hand-coded ENAMEX rules—still an impressive result for machine-learned rules. Interestingly, the bulk of the additional error in the machine-learned rules is not with the "hard" organization names, but with person names ($\Delta R$=-15, $\Delta P$=-14) and locations ($\Delta R$=-12, $\Delta P$=-18).

[1] We put about one staff week of work into the ST task, during which we experienced steep hill-climbing on the training set. Nevertheless, we felt that the maturity of our ST processing was sufficiently questionable to preclude participating in the official evaluation. The present discussion should be taken in this light, *i.e.*, with the understanding that it was not officially evaluated at MUC-6.

GOOG016294

## PHRASE INTERPRETATION AND INFERENCE

The inference component is central to all processing beyond phrase identification. It has three roles.

- As a representational substrate, it records propositions encoding the semantics of parsed phrases;
- As an equational system, it allows initially distinct semantic individuals to be equated to each other, and allows propositions about these individuals to be merged through congruence closure.
- As a limited inference system, it allows domain-specific and general constraints to be instantiated through carefully controlled forward-chaining.

### Phrase Interpretation

Facts enter the propositional database as the result of phrase interpretation. The phrase interpreter is controlled by a small set of Lisp interpretation functions, roughly one for each phrase type. Base-level phrases, i.e. phrases with no embedded phrases, are mapped to unary interpretations. The phrase

<person>Robert L. James</person>,

for example is mapped to the following propositional fact. Note the pers-01 term in this proposition: it designates the semantic individual denoted by the phrase, and is generated in the process of interpretation.

person(pers-01)

Complex phrases, those with embedded phrases, are typically interpreted as conjuncts of simpler interpretations (the exception being NP coordination, as in "chairman and chief executive"). Consider the phrase "Mr. James, 57 years old" which is parsed by the phraser as follows. Note in particular that the overall person-age apposition is itself parsed as a person phrase.

<person><person>Mr. James</person>, <age><num>57</num> years old</age></person>

The treatment of age appositions is compositional, as is the case for the interpretation of all but a few complex phrases. Once again, the embedded base-level phrase ends up interpreted as a unary person fact. The semantic account of the overall apposition ends up as a has-age relation modifying pers-02, the semantic individual for the embedded person phrase. This proposition designates the semantic relationship between a person and that person's age. More precisely, the following facts are added to the inferential database.

person(pers-02)
has-age((pers-02, age-03) ha-04)
age(age-03)

What appears to be a spare argument to the has-age predicate above is the event individual for the predicate. Such arguments denote events themselves (in this case the event of being a particular number of years old), as opposed to the individuals participating in the events (the individual and his or her age). This treatment is similar to the partial Davidsonian analysis of events due to Hobbs [8]. Note that event individuals are by definition only associated with relations, not unary predicates.

As a point of clarification, note that the inference system does not encode facts at the predicate calculus level so much as at the interpretation level made popular in such systems as the SRI core language engine [1, 3]. In other words, the representation is actually a structured attribute-value graph such as the following, which encodes the age apposition above.

```
[[head :person]
 [proxy pers-02]
 [modifiers [[head has-age]
             [proxy ha-04]
             [arguments (pers-02 [[head age]
                                  [proxy age-03]])]]]]
```

The first two fields correspond to the embedded phrase: the head field is a semantic sort, and the proxy field holds the designator for the semantic individual denoted by the phrase. The interpretation encoding the

overall apposition ends up in the *modifiers* slot, an approach adopted from the standard linguistic account of phrase modification. Inference in *Alembic* is actually performed directly on interpretation structures, and there is no need for a separate translation from interpretations to more traditional-looking propositions. The propositional notation is more perspicuous to the reader, and we have adopted it here.

Finally, note that the phrase interpretation machinery maintains pointers between semantic individuals and the surface strings from which they originated. One of the fortunate—if unexpected—consequences of the phraser's semantic grammar is that maintaining these cross-references is considerably simpler than was the case in our more linguistically-inspired categorial parser of old. Except for the ORG_DESCRIPTOR slot, the fill rules line up more readily with semantic notions than with syntactic considerations, e.g., maximal projections.

## Equality reasoning

Much of the strength of this inferential framework derives from its equality mechanism. This subcomponent allows one to make two semantic individuals co-designating, *i.e.*, to "equate" them. Facts that formerly held of only one individual are then copied to its co-designating siblings. This in turn enables inference that may have been previously inhibited because the necessary antecedents were distributed over (what were then) distinct individuals.

This equality machinery is exploited at many levels in processing semantic and domain constraints. One of the clearest such uses is in enforcing the semantics of coreference, either definite reference or appositional coreference. Take for example the following phrase from the walkthrough message, which we show here as parsed by the phraser.

```
<org>
    <org>Creative Artists Agency</org>,
    <orgnp>the big <location>Hollywood</location> talent agency</orgnp>
</org>
```

In propositional terms, the embedded organization is interpreted as

```
organization(org-05)                    ; "Creative Artists Agency"
```

The appositive noun phrase is interpreted as

```
organization(org-06)                    ; "the...agency"
geo-region(geo-07)                      ; "Hollywood"
has-location((org-06, geo-07) hasloc-08)  ; locational pre-modifier
```

Pressing on, the phraser parses the overall *org-orgnp* apposition as an overarching *org*. To interpret the apposition, the interpreter also adds the following proposition to the database.

```
entity-np-app((org-05, org-06) e-n-a-09)
```

This ultimately causes *org-05* and *org-06* to become co-designating through the equality system, and the following fact appears in the inferential database.

```
has-location((org-05, geo-07) hasloc-10)   ; i.e., Creative Artists Agency is located in Hollywood
```

This propagation of facts from one individual to its co-designating siblings is the heart of our coreference mechanism. Its repercussions are particularly critical to the subsequent stage of template generation. By propagating facts in this way, we can dramatically simplify the process of collating information into templates, since all the information relevant to, say, an individual company will have been attached to that company by equality reasoning. We will touch on this point again below.

## Inference

The final role of the *Alembic* inference component is to derive new facts through the application of carefully-controlled forward inference. As was the case with our MUC-5 system, the present *Alembic* allows only limited forward inference. Though the full details of this inference process are of legitimate interest in

GOOG016296

their own right, we will only note some highlights here. To begin with, the tractability of forward inference in this framework is guaranteed just in case the inference axioms meet a certain syntactic requirement. To date, all the rules we have written for even complex domains, such as the joint-venture task in MUC-5, have met this criterion. Aside from this theoretical bound on computation, we have found in practice that the inference system is remarkably fast, with semantic interpretation, equality reasoning, rule application, and all other aspects of inference together accounting for 6-7% of all processing time in *Alembic*. Details are in [11].

We exploited inference rules in several primary ways for the TE and ST tasks. The first class of inference rules enforce so-called terminological reasoning, local inference that composes the meaning of words. One such rule distributes the meaning of certain adjectives such as "*retired*" across coordinated titles, as in "*retired chairman and CEO*". The phrase parses as follows; note the embedded *post* semantic phrase types.

```
<post>
    <post-qual>retired</post-qual>
    <post>
        <post>chairman</post>
        and
        <post>CEO</post>
    </post>
</post>
```

This particular example propositionalizes as follows, where the group construct denotes a plural individual in Landman's sense (roughly a set [9]).

```
title(ttl-11)                    ; "chairman"
title(ttl-12)                    ; "CEO"
group((ttl-11, ttl-12) grp-13)   ; "chairman and CEO"
retired-ttl(grp-13)              ; "retired"
```

To shift the scope of "*retired*" from the overall coordination to individual titles, the following rule applies.

```
retired-ttl(ttl) <— group((ttl, x) grp) + retired(grp)
```

This rule yields the fact retired-ttl(ttl-11), and a similar rule yields retired-ttl(ttl-12). Other like rules distribute coordinated titles across the title-holder, and so forth. The fact that *multiple* rules are needed to distribute adjectives over coordinated noun phrases is one of the drawbacks of semantic grammars. On the other hand, these rules simplify semantic characteristics of distributivity by deferring questions of scope and non-compositionality to a later stage, *i.e.*, inference. Interpretation procedures can thus remain compositional, which makes them substantially simpler to write. Additionally, these kinds of distribution rules further contribute to collating facts relevant to template generation onto the individuals for which these facts hold.

Of greater importance, however, is the fact that inference rules are the mechanism by which we instantiate domain-specific constraints and set up the particulars required for scenario-level templates. Some of this information is again gained by fairly straightforward compositional means. For example, the phrase "*Walter Rawleigh Jr., retired chairman of Mobil Corp.*" yields a succession template through the mediation of one inference rule. The phrase is compositionally interpreted as

```
organization(org-14)
title(ttl-15)
retired-ttl(ttl-15)
job((ttl-15, org-14), job-16)
person(pers-17)
holds-job((pers-17, job-16) h-j-18)
```

The rule that maps these propositions to a succession event is

```
job-out(pers, ttl, org) <— holds-job((pers, job) x) + job((ttl, org), job) + retired-ttl(ttl)
```

When applied to the above propositions this rule yields job-out((pers-17, ttl-15, org-07) j-o-19). This fact is all that is required for the template generator to subsequently issue the appropriate succession event templates.

The most interesting form of domain inference is not compositional of course, but based on discourse considerations. In the present ST task, for example, succession events are not always fully fleshed out, but depend for their complete interpretation on information provided earlier in the discourse. In the walkthrough message, this kind of contextualized interpretation is required early on:

> Yesterday, McCann made official what had been widely anticipated: Mr. James, 57 years old, is stepping down as chief executive officer on July 1 [...]. He will be succeeded by Mr. Dooner, 45.

ST-level phrasing and interpretation of this passage produces two relevant facts, a job-out for the first clause, and a successor for the second. Note that although successor is normally a two-place relation, its valence here is one by virtue of the phraser not finding a named person as a subject to the clause.

```
person(pers-20)                          ; "Mr. James"
title(ttl-21)                            ; "chairman"
organization(org-22)                     ; "McCann"
job-out((pers-20, ttl-21, org-22) j-o-23)

person(pers-24)                          ; "Mr. Dooner"
successor((pers-24) succ-25)
```

One approach to contextualizing the succession clause in this text would require first resolving the pronominal subject "He" to "Mr. James" and then exploiting any job change facts that held about this antecedent. An equally effective approach, and simpler, is to ignore the pronoun and reason directly from the successor fact to any contextualizing job-out fact. The rule that accomplishes this is

```
job-in(pers-a, ttl, org) <—  successor((pers-a) succ) + job-out-in-context?((succ, job-out) x-1) +
                             job-out((pers-b, ttl, org) x-2)
```

The mysterious-looking job-out-in-context? predicate implements a simple discourse model: it is true just in case its second argument is the most immediate job-out fact in the context of its first argument. Context-encoding facts are not explicitly present in the database, as their numbers would be legion, but are instantiated "on demand" when a rule attempts to match such a fact. Note that what counts as a most immediate contextualized fact is itself determined by a separate search procedure. The simple-minded strategy we adopted here is to proceed backwards from the current sentence, searching for the most recent sentence containing an occurrence of a job-out phrase, and returning the semantic individual it denotes. In this example, the job-out-in-context? predicate succeeds by binding the succ variable to j-o-23, with the rule overall yielding a job-in fact.

```
job-in((pers-24, ttl-21, org-22) j-i-26)
```

As with job-out, this fact is mapped directly by the template generator to an incoming succession template.

Note that this process of combining a job-out and successor fact effectively achieves what is often accomplished in data extraction systems by template merging. However, since the merging takes place in the inferential database, with propagation of relevant facts as a side-effect, the process is greatly simplified and obviates the need for explicit template comparisons.

One final wrinkle must be noted. Inference is generally a non-deterministic search problem, with no firm guarantee as to whether facts will be derived in the same chronological order as the sentences which underlie the facts. Rules that require contextualized facts, however, crucially rely on the chronological order of the sentences underlying these facts. We have thus pulled these rules out of the main fray of inference, and apply them only after all other forward chaining is complete. In fact, these rules are organized as a Brill-style rule sequence, where each rule is allowed to run to quiescence at only one point in the sequence before the next rule becomes active. It is our hypothesis, though, that *all* domain inference rules can be so organized, not just contextualized ones, and that by this organizational scheme, rules can be automatically learned from example.

## TASK-SPECIFIC PROCESSING AND TEMPLATE GENERATION

Aside from phrasing and inference, a relatively small—but critical—amount of processing is required to perform the MUC-6 named entities and template generation tasks.

GOOG016298

For NE, little is actually required beyond careful document management and printing routines. TIMEX forms, introduced by the preprocessing date-tagger, must be preserved through the rest of the processing pipe. Named entity phrases that encode an intermediate stage of NE processing must be suppressed at printout. Examples such as these abound, but by and large, *Alembic*'s NE output is simply a direct readout of the result of running the named entity phraser rules.

### Name coreference in TE

Of all three tasks, TE is actually the one that explicitly requires most idiosyncratic processing beyond phrasing and inference. Specifically, this task is the crucible for name coreference, *i.e.*, the process by which short name forms are reconciled with their originating long forms.

This merging process takes place by iterating over the semantic individuals in the inferential database that are of a namable sort (*e.g.*, person or organization). Every such pair of same-sort individuals is compared to determine whether one is a derivative form of the other. Several tests are possible.

- Identity. If the forms are identical strings, as in the frequently repeated "Dooner", or "McCann" in the walkthrough article, then they are merged.
- Shortening. If one form is a shortening of the other, as in "Mr. James" for "Robert L. James", then the short form is merged as an alias of the longer.
- Acronyms. If one form appears to be an acronym for the other, as in "CAA" and "Creative Artists Agency", then the forms should be merged, with the acronym designated as an alias.

Merging two forms takes place in several steps. First, their respective semantic individuals are equated in the inferential database. This allows facts associated with one form to become propagated to the other. In this way, the nationality information in "Japanese giant NEC" becomes associated with the canonical name "Nippon Electric Corp." As a second step, names that are designated as aliases are recorded as such.

### Template generation

We mentioned above that the inferential architecture that we have adopted here is in good part motivated by a desire to simplify template generation. Indeed, template generation consists of nothing more than reading out the relevant propositions from the database.

For the TE task, this means identifying person and organization individuals by matching on person(x) or organization(y). For each so-matching semantic individual, we create a skeletal template. The skeleton is initialized with name and alias strings that were attached to the semantic individuals during name merging. It is further fleshed out by looking up related facts that hold of the matched individual, *e.g.*, has-location(y, z) for organizations or has-title(x, w) for persons. These facts are literally just read out of the database.

Finalization routines are then invoked on the near-final template to fill the ORG_TYPE slot and to normalize the geographical fills of the ORG_LOCALE and ORG_COUNTRY slots.

## PERFORMANCE ANALYSIS

We participated in two officially-scored tasks at MUC-6, named entities and template elements. As noted above, we put roughly a staff week into customizing the system to handle the scenario templates task, but chose not to participate in the evaluation because another staff week or so would have been required to achieve performance on a par with other parts of the system.

### Overall performance

On the named entity task, we obtained an official P&R score of 91.2, where the separate precision and recall scores were both officially reported to be 91. The overall score is remarkably close to our performance on the

| | Formal training | | Official test | | | |
|---|---|---|---|---|---|---|
| | Recall | Precision | Recall | Precision | Recall Δ | Precis. Δ |
| organization | 86 | 92 | 84 | 92 | -2 | — |
| name | 76 | 78 | 77 | 80 | +1 | +2 |
| alias | 60 | 79 | 56 | 78 | -4* | -1 |
| descriptor | 27 | 62 | 16 | 49 | -11* | -13* |
| type | 83 | 90 | 81 | 89 | -2 | -1 |
| locale | 46 | 87 | 43 | 87 | -3 | — |
| country | 47 | 88 | 45 | 93 | -2 | +5 |
| person | 94 | 92 | 95 | 87 | +1 | -5* |
| name | 93 | 91 | 93 | 84 | — | -7* |
| alias | 94 | 95 | 86 | 96 | -8* | +1 |
| title | 95 | 96 | 94 | 93 | -1 | -3 |
| *All Objects* | *75* | *86* | *73* | *85* | *-2* | -1 |
| *F-Measure, unrevised* | *80.21* | | *78.52* | | *-1.69* | |

Table 2: Slot-by-slot performance differences, TE task (unrevised scores).

dry-run test set which served as our principal source of data for NE training and self-evaluation. To be precise, our final dry-run P&R score prior to the MUC-6 evaluation run was 91.8, a scant 0.6 higher than the officially measured evaluation score. The fact that the score dropped so little is encouraging to us.

On the template elements task, our initial TE score was P&R=78.5, and our revised official score was 77.3. Once again, this performance is encouragingly close to *Alembic's* performance on our final self-evaluation using the formal training data set. By the non-revised metric, we achieved a performance of P&R=80.2 on the training data, with an overall drop of 1.7 points of P&R between training and official test. Table 2 summarizes slot-by-slot differences between our training and test performance on the TE task. The major differences we noted between training and testing performance lie in the organization alias and descriptor slots, and in the person name and alias fields; we have marked these discrepancies with asterisks (*) and will address their cause later on in this document.

## Walkthrough errors

In order to quantify *Alembic's* performance on the walkthrough message, we compiled an exhaustive analysis of our errors on this text. This was a difficult message for us, and we scored substantially less well on this message than in average, especially on the NE task. To our surprise, the majority of our errors was due not to knowledge gaps in the named entity tagger, so much as to odd bugs and incompletely thought-out design decisions. Table 3 summarizes these errors. Entries marked with daggers (†) correspond to knowledge gaps, *e.g.*, missing or incorrect rules; the other entries are coding or design problems. Fully half the problem instances were due to string matching issues for short name forms. For example, by not treating embedded mid-word hyphens as white space, we failed to process "McCann" as a shortened form of "McCann-Erickson".

Turning now to the template element task, we note that the largest fraction of TE errors are repercussions of errors committed while performing the NE task. In particular, the people-name companies that were treated as persons during NE processing in turn led to spurious person templates. The magnitude of the NE error is mitigated by the fact that identical mentions of incorrectly-tagged named entities are merged for the sake of TE template generation, and thus do not all individually spawn spurious templates. Among the TE errors not arising from NE processing errors, note in particular those that occurred on the most difficult slots, ORG_DESCRIPTOR, ORG_LOCALE, and ORG_COUNTRY. These are all due in this case to missing locational and

GOOG016300

| Nature of the problem | Problem cases | Resulting errors |
|---|---|---|
| Naive string matching | "McCann" *vs.* "McCann-Erickson" | 9 inc type |
| | "John Dooner" *vs.* "John J. Dooner Jr." | 1 inc text, 1 spu type/text |
| Missing phraser patterns† | "Fallon McElligott" — treated as person | 1 inc type |
| | "Taster's Choice" — naive 's processing | 1 spu type/text |
| Poor phraser patterns† | "Coca-Cola Classic" — zealous org rule | 1 spu type/text |
| Missing date patterns† | "the 21st century" | 1 mis type/text |
| Ambiguous name | "New York Times" — not an org | 1 spu type/text |
| Misc. embarrassing bugs | "James" in <HL> — treated as location | 1 inc. type |
| | "J. Walter Thompson" — punctoker lost "J." | 1 inc type, 1 inc text |

Table 3: NE errors on walkthrough message

| Nature of the problem | Problem cases | Resulting errors |
|---|---|---|
| Repercussions of NE errors | "Walter Thompson", "Fallon McElligott", "McCann" all treated as person | 3 spu pers. 1 mis org. alias |
| | "John Dooner" treated as two persons | 2 spu pers, 1 mis pers. alias |
| | "Coca-Cola Classic" treated as organization | 1 inc org. name††, 1 inc. org alias |
| Missing org. NP patterns† | "the agency with billings of $400 million" "one of the largest world-wide agencies" | 2 mis org. descriptor |
| Missing location patterns† | "Coke's headquarters in Atlanta" | 1 mis org. locale/country |
| Org. type determination† | "Creative Artists Agency" — treated as gov. | 1 inc. org type |
| Acronym resolution snafu | "CAA" *vs.* "Creative Artists Agency" | 1 inc org. name††, 1 mis org. alias |
| Enthusiastic scorer mapping | "New York Times" (spurious entity) mapped to "Fallon McElligott" (inc. entity type) | 1 inc. org. name†† |

Table 4: TE errors on walkthrough message

organizational NP phraser rules, which is consistent with trends we noted during training. These observations are summarized in Table 4. Once again, single daggers (†) mark errors attributable to knowledge gaps.

Note also that because of lenient template mappings on the part of the scorer, a number of errors that might intuitively have been whole organization template errors turned out only to manifest themselves as organization name errors. These cases are marked with double daggers (††).

## Other trends

In addition to this analysis of the single walkthrough message, we opened up some 10% of the test data to inspection, and performed a rough trend estimation. In particular, we wanted to explain the slot-by-slot discrepancies we had noted between our training and test performance (*cf.* Table 2). We found a combination of knowledge gaps, known design problems that had been left unaddressed by the time of the evaluation run, and some truly embarrassing bugs.

To dispense quickly with the latter, we admit to failing to filter lines beginning with "@" in the body of the message. This was due to the fact that earlier training data had these lines marked with <S> tags, whereas the official test data did not. These @-lines were so rare in the formal training data that we had simply not noticed our omission. This primarily affected our NUMEX and TIMEX precision in the named entity task.

In the template element task, our largest performance drop was on the ORG_DESRIPTOR slot, where we lost 11 points of recall and 13 points of precision. This can be largely attributed to knowledge gaps in our phraser rules for organizational noun phrases. In particular, we were missing a large number of head nouns that would have been required to identify relevant descriptor NPs.

On the PERSON_NAME and PERSON_ALIAS slots, we respectively found a 7 point drop in precision and an 8 point drop in recall. These were due to the same problem, a known flaw that had been left unaddressed in the days leading to the evaluation. In particular, we had failed to merge short name forms that appeared in headlines with the longer forms that appeared in the body of the message. For example, "James" in the walkthrough headline field should have been merged with "Robert L. James" in the body of the message. Because these short forms went unmerged, they in turn spawned incorrect person templates, hence the drop in PERSON and PERSON_NAME precision. For the same reason, the templates that were generated for the long forms of these names ended up without their alias slot filled, accounting for the drop in PERSON_ALIAS recall.

A similar problem held true for the ORG_ALIAS slot. In this case, we failed both to extract organization templates from the headline fields, or merge short name forms from headlines with longer forms in the text bodies. We were aware of these "mis-features" in our handling of person and organization name templates, but had left these problems unaddressed since they seemed to have only minimal impact on the formal training data. *Errare humanum est.*

## POST-HOC EXPERIMENTS

With this error analysis behind us, we pursued a number of post-hoc experiments. Most interesting among them was a simple attempt at improving recall on organization names. Indeed, *Alembic* has only a short list of known organizations—less than a half-dozen in total. Virtually all of the organizations found by *Alembic* are recognized from first principles. We decided to compare this strategy with one that uses a large lexicon of organization names.

All of the MUC-6 NE training set was used to generate a list of 1,808 distinct organization name strings. This could certainly be larger, but seemed a reasonable size. Nonetheless, this lexicon by itself got less than half of the organizations in the official named-entity test corpus: organization recall was 45 and precision 91. Another interesting question is how much an organization lexicon might have helped had it been *added* to our rule-based phrasing algorithm, not simply used by itself. This configuration actually decreased our performance slightly (F-score down by 0.5 points of P&R), trading a slight increase in organization recall for a larger decrease in precision. The biggest problem here is due to overgeneration (up from 4% to 6%), and partial matches such as the following,

Kraft <ENAMEX>General Foods</ENAMEX>
First <ENAMEX>Fidelity</ENAMEX>

where "General Foods" and "Fidelity" were in the training corpus for the organization lexicon, but the longer names above were not.

Admittedly, the way we integrated the organization lexicon into Alembic was relatively naïve, thereby leading to some of these silly precision errors. We believe that if we more intelligently took advantage of this knowledge source, we could reduce the additional precision errors almost entirely. In addition, we were disappointed by the fact that our exhaustive compilation only produced somewhat less than 2,000 organization names, and only led to a piffling improvement in recall. Perhaps had we made use of larger name lists, we might have obtained better recall improvements—a case in point is the gargantuan Dunn & Bradstreet listing exploited by Knight-Ridder for their named entities tagger [4]. Note, however, that all but a few of the organizations that were found in both the training name list and the test data were found by *Alembic* from first principles anyway. We may thus tentatively conclude that short of being as encyclopedic as the D&B listing, a larger, better-integrated organization lexicon may have provided no more than a limited improvement in F-score. To further improve our organization tagging, it appears that we will simply have to expend more energy writing named entity phraser rules.

GOOG016302

## CONCLUDING THOUGHTS

All in all, we are quite pleased with the performance of *Alembic* in MUC-6. While we regret not participating in the ST task, we do believe that the framework was up to it, especially in light of our TE scores. There were many lessons learned, and there will continue to be, as we further analyze our results and make improvements to the system. Several points stand out. We had hoped to avoid full NP parsing, but the definition of the ORG_DESCRIPTOR slot clearly requires this, and we will need to return to larger-scale parsing strategies in the future. We had hoped to include more machine-learned phraser rules, and as the rule learner matures, we almost certainly will.

One thing is clear to us, however, and that is that rule sequences are an extremely powerful tool. They were easy to hand-craft and adapt to the MUC-6 requirements. They run fast. And they work well.

### References

[1] Alshawi, H. & Van Eijck, J. "Logical forms in the core language engine". In *Proceedings of the 27th Meeting of the Assoc.iation for Computational Linguistics* (ACL-89). Vancouver, B.C., 1985.

[2] Appelt, D., Hobbs, J., Bear, J., Israel, D., & Tyson, M. "FASTUS: A finite-state processor for information extraction from real-world text". In *Proceedings of the 13th Intl. Joint Conference on Artificial Intelligence* (IJCAI93). Chambéry, 1993. 1172-1178.

[3] Bayer, S. & Vilain, M. "The relation-based knowledge representation of King Kong". SIGART *Bulletin*, 2(3), 15-21.

[4] Borkovsky, A. "Knight-Ridder's value adding name finder: a variation on the theme of FASTUS". In *Proceedings of the 6th Message Understanding Conference* (MUC-6). Columbia, Md., 1995.

[5] Brill, E. "Some advances in rule-based part of speech tagging". In *Proceedings of the 12th National Conference on Artificial Intelligence* (AAAI-94). Seattle, 1994.

[6] Brill, E. *A corpus-based approach to language learning.* Doctoral Dissertation, Univ. Pennsylvania. 1993.

[7] Brill, E. "A simple rule-based part of speech tagger". In *Proceedings of the 3rd Conference on Applied Natural Language Processing* (Applied ACL 92). Trento, 1992.

[8] Hobbs, J. "Ontological promiscuity". In *Proceedings of the 23rd Meeting of the Association for Computational Linguistics* (ACL-85). Chicago, Ill., 1985.

[9] Landman, F. "Groups". *Linguistics and Philosophy,* 12(3), 359-605 and 12(4), 723-744.

[10] Lehnert, W., McCarthy, J., Soderland, S., Riloff, E., Cardie, C., Peterson, J., Feng, F., Dolan, C., & Goldman, S. "University of Massachusetts/Hughes: Description of the CIRCUS system as used for MUC-5". In *Proceedings of the 5th Message Understanding Conference* (MUC-5). Baltimore, Md., 1993.

[11] Vilain, M. Semantic inference in natural language: validating a tractable approach. In *Proceedings of the 14th Intl. Joint Conference on Artificial Intelligence* (IJCAI95). Montreal, 1995. 1346-1351.

GOOG016303