IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

HYPERPHRASE TECHNOLOGIES, LLC and
HYPERPHRASE INC.,

               Plaintiffs,

     v.                                                                 Civil Action No. 06-cv-199-bbc

GOOGLE INC.,

               Defendant.

---

**REPLY IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT OF
INVALIDITY REGARDING U.S. PATENT NOS. 5,903,899
AND 6,516,321**

Dockets.Justia.com

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     Introduction...................................................................................................1

II.    Argument ......................................................................................................2

    A.    Claim 86 Of The '321 Patent Is Invalid.................................................2

        1.    The Terms "Seemingly General" And "Relatively Specific" Render Claim 86 Fatally Indefinite............................................3

        2.    Myka Anticipates Claim 86 ...................................................4

        3.    Gennaro Anticipates Claim 86, For Two Independent Reasons ...........................................................................7

            a.    Gennaro Is Prior Art To Claim 86 .................................8

            b.    Gennaro's "Hot Spots" Anticipate Claim 86 .............11

            c.    Gennaro's "Menu Items" Anticipate Claim 86.........12

    B.    Claims 1 And 24 Of The '321 Patent Are Invalid ................................14

        1.    PasTime Anticipates Claims 1 And 24 ...................................14

        2.    Graham Anticipates Claims 1 And 24 .....................................18

    C.    Claim 27 Of The '321 Patent Is Invalid As Anticipated By MUC-6 And Aberdeen.........................................................................20

        1.    Claims 1 And 7 Of The '889 Patent Are Invalid As Anticipated By PasTime ........................................................20

            a.    PasTime Is Prior Art To Claims 1 And 7....................20

            b.    PasTime Anticipates Claims 1 And 7 .........................22

III.    **Conclusion** ................................................................................................24

i

# TABLE OF AUTHORITIES

**Page(s)**

 **Cases**

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343, 1353 (Fed. Cir. 2001)................................................................................ 3

*Cooper v. Goldfarb*,
154 F.3d 1321, 1327 (Fed. Cir. 1998)............................................................................... 21

*Datamize, LLC v. Plumtree Software, Inc.*,
417 F.3d 1342, 1347 (Fed. Cir. 2005)................................................................................ 3

*Hahn v. Wong*,
892 F.2d 1028, 1033 (Fed. Cir. 1989)............................................................................... 21

*Honeywell Int'l, Inc. v.Int' l Trade Comm'n*,
341 F.3d 1332,1338-39 (Fed. Cir. 2003) ........................................................................... 4

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
381 F.3d 1111, 1117 (Fed. Cir. 2004)............................................................................... 20

*Mahurkar v. CR Bard, Inc.*,
79 F.3d 1572, 1577-78 (Fed.Cir.1996) ............................................................................ 21

*Medichem, S.A. v. Rolabo, S.L.*,
437 F.3d 1157, 1170-72 (Fed. Cir. 2006) ......................................................................... 21

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
522 F.3d 1299, 1305-06 (Fed. Cir. 2008) ........................................................................... 8

*Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*,
237 F.3d 1359, 1365 (Fed. Cir. 2001)............................................................................... 21

*Refac Electronics Corp. v. R.H. Macy & Co., Inc.*,
1988 WL 93835, 5 (D.N.J., 1988) ..................................................................................... 21

*Stern v. Trustees of Columbia Univ.*,
434 F.3d 1375, 1378 (Fed. Cir. 2006).............................................................................. 21

**Statutes**

35 U.S.C. § 102............................................................................................................ 8, 14, 17

35 U.S.C. §112...................................................................................................................... 3

## I.    INTRODUCTION

Hundreds of pages of opposition briefing and declarations cannot obscure the central fact that HyperPhrase built its patent portfolio around work that others did long before it—work that the Patent Office knew nothing about when it allowed HyperPhrase's claims.

HyperPhrase's principal opposition strategy is to try to rewrite its claims, often in ways counter to both its infringement positions and the Federal Circuit's construction, to try to save them from invalidity.  The attempt fails.  In 1996, when HyperPhrase started filing its patent applications, the concepts of automatic hyperlinking, pop-up informational windows, and tagging that HyperPhrase sought to monopolize were far from new.  They were simple notions that others had already developed, and were so lacking in innovation that even those who had developed them before HyperPhrase generally did not seek to patent them.

Claim 86 of the '321 patent is generally directed to having additional information pop up when a cursor is hovered over a visually distinguished term.  HyperPhrase does not dispute that both Myka and Gennaro bear striking resemblance to HyperPhrase's preferred embodiment of this alleged invention.  Nor is there any dispute that Myka is prior art to this claim.  Although HyperPhrase contends that Gennaro is not, the undisputed record plainly shows that it was filed years before HyperPhrase disclosed this feature in the '321 patent application.  Beyond this, HyperPhrase principally tries to avoid anticipation by rewriting claim 86 to include numerous extraneous features.  None of this is warranted by either the intrinsic or the extrinsic record, and the law does not permit HyperPhrase to redraft its overbroad claim at this late date to try to distinguish the prior art.

This pattern repeats with regard to claims 1 and 24 of the '321 patent, and claims 1 and 7 of the '889 patent, both of which are generally directed to automatic hyperlinking.  HyperPhrase first makes a token, and unsupported, challenge to the prior art status of the PasTime (Thistlewaite) reference—but not the Graham reference—and then seeks to distinguish the references on the basis of features that either are not in the claims, or are without question disclosed in the prior art.

1

In short, the major issues on this motion, as with so many other patent issues, turn on issues of claim construction, and thus can be fully addressed and resolved on summary judgment. HyperPhrase's fallback strategy of trying to create the appearance of factual disputes on the issues of what the prior art teaches, and when HyperPhrase allegedly developed the claimed subject matter, do not show the existence of any *genuine* issue of material fact in view of the clear, simple, and comprehensive disclosures of the prior art.

## II.    ARGUMENT

### A.    Claim 86 Of The '321 Patent Is Invalid

Although poorly phrased, there is no dispute that claim 86 is generally directed to the idea of information that automatically pop-ups when the user hovers the cursor over a hyperlink. An embodiment is shown in Figure 26, which is new matter in the '321 patent, added when the '321 patent application was filed on August 13, 1999:



Fig. 26

Text on the screen (e.g., "X-ray image of January 16, 1996") is visually distinguished from the other text by virtue of being in a box.  The boxed text is an SR.  (Woodford Decl. (Dkt. No. 26), Ex. E, ('321 patent) at 15:5-8: "each of 'X-ray image' and 'X-ray image of Jan. 16, 1996' are overlapping SRs which correspond to different records.")  If the user moves the cursor (represented by the arrow 551) over the box, without clicking the mouse button, other

2

information about the boxed text appears in another box, item 553, which in this case consists of two menu items.  (*Id*. at 14:62-15:14.)

While HyperPhrase does not dispute that claim 86 is directed to this embodiment, it also does not address, discuss, or even mention this disclosure in its brief.  (*See* HyperPhrase Invalidity Opp. (Dkt. No. 128) at 43-45, 78-91.)  No doubt this is because of the striking parallels between the Figure 26 embodiment and the disclosures of the two prior art references on which Google in this motion relies for invalidity—Myka and Gennaro.

### 1.    The Terms "Seemingly General" And "Relatively Specific" Render Claim 86 Fatally Indefinite

HyperPhrase does not even attempt to counter Google's directly on-point authority showing that claim 86 is invalid under 35 U.S.C. §112 ¶ 2.  That case is *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005), where the Federal Circuit affirmed a grant of summary judgment that a claim was invalid under 35 U.S.C. §112 ¶ 2 because of its use of the subjective term "aesthetically pleasing:" "In short, the definition of 'aesthetically pleasing' cannot depend on the undefined views of unnamed persons …"  *Id*. at 1352.  *See also Amazon.com, Inc. v. Barnesandnoble.com, Inc*., 239 F.3d 1343, 1353 (Fed. Cir. 2001) ("We are not prepared to assign a meaning to a patent claim that depends on the state of mind of the accused infringer.").

To the contrary, HyperPhrase concedes the subjectivity of the term:  "***To a physician***, this text is a general reference to images, and using the text of the claim, it is a 'seemingly general SR'."  (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 43, emphasis added.)  It then proceeds to attempt to rewrite the claim to eliminate the "seemingly" adverb:  "One of ordinary skill in the art would understand that a 'seemingly general' SR is one that can refer to multiple records." (*Id*. at 44.)  Not so.  A ***general*** SR is one that can refer to multiple records.  A "seemingly general" SR is meaningless, given its obscure premise that the SR must somehow appear or suggest an unspecified level of generality to some unnamed reader, whereas it in fact may or may not be.  If ever a claim term were "insolubly ambiguous," it is this one, with all of its

3

subjective, philosophical, and semantic connotations. *Honeywell Int'l, Inc. v. Int' l Trade Comm'n*, 341 F.3d 1332,1338-39 (Fed. Cir. 2003).

### 2.    Myka Anticipates Claim 86

There is no dispute that Myka is prior art to claim 86. (*See* Google's Reply to its PFOF (Dkt. No. 137) No. 136.) There is also no dispute about the scope and content of this prior art. (de la Huerga Decl. ISO Invalidity Opp. (Dkt. No. 130) at para.18.) In particular, HyperPhrase concedes, as it must, that Myka discloses a method in which layout information in a document is used to identify references to other data. (*Id*.: "Myka examines the font size or layout position in the document to make certain judgments about the contents of the document. Based on this, he attempts to determine the presence of a linkable portion of the raster image.") As shown below, the identified references are visually distinguished from the surrounding text by boxes, just as in the Figure 26 embodiment.



**Figure 6.9** Screendump from a HYPERFACS session

4

It is also undisputed that when a user hovers the cursor over the box, other information concerning what is in the box (the SR) is displayed in a menu on the right of the screen, also as in the Figure 26 embodiment. (*Id*. at para 18: "Additional information on a link (besides indicating the existence of a link by means of boxes) is presented to the user if he moves the cursor into the framed boxes: then the type of information that is contained in the link destination is shown as well as the type of action that is triggered.") That is all that is required to anticipate claim 86, and invalidity is clear as a matter of law.

HyperPhrase's opposition rests entirely on its efforts to read three extraneous features into the claim. Since this is an issue of claim construction, it is an issue of law for this Court, and amenable to resolution on summary judgment.

HyperPhrase's principal effort to distinguish the Myka reference turns on its contention that the boxed text in Myka's disclosure is not anticipatory because it is presented as a "raster-scanned" image. According to HyperPhrase, the claim only covers: (1) "ASCII display text" (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 85); (2) that can be copied using the "cut-and-paste" option of Windows (*id*. at 86); (3) on a character-by-character basis (*id*. at 87); (4) so that it can be edited (*id*.); and (5) so that its font and size can be changed (*id*. at 89).

None of this detail is required by claim 86. The claim requires a specifying reference, or "SR". That is expressly defined in the patent specification as including a data reference (DR), and one or modifier references (MRs): "Hereinafter the term 'specifying reference' (SR) will be used to refer generically to each of a DR and a DR/MR combination or a DR/MR/MR combination." (Woodford Decl. (Dkt. No. 26) Ex. E ('321 patent) at 4:34-36.)[1] In construing the term DR, the Federal Circuit did not require any of the detail that HyperPhrase contends distinguishes this claim from Myka. The Federal Circuit's construction merely requires "a unique phrase or word which may be used in a record to refer to another record or record

---

[1] Moreover, HyperPhrase in its opposition to our motion for summary judgment of noninfringement now says that an SR and a DR are the same thing, an overbroad construction that if, accepted, would further underscore the invalidity of claim 86. (*See* Google Noninf. Reply Br. (Dkt. No. 136) at § IV.D.)

segment." (Fed. Cir. Opinion (Dkt. No. 125-2) at 10.) Clearly the Myka reference discloses unique words or phrases, shown in the boxes in the figure reproduced above, that refer to another record—i.e., target documents that are retrieved when the boxed text items are clicked on using the cursor and mouse button. These links were created by Myka based on key words found in the underlying document. (Kirk Decl. (Dkt. No. 32) Ex. D at 74: "The SYNTAX part defines a list of possible strings that characterize a link source… a string may contain fixed components … fixed components contain key words[.]") Whether Myka's boxed text is in ASCII form, or whether it can be cut-and-pasted into another document, is irrelevant.

HyperPhrase's second alleged distinction is that "Myka does not use subject matter specific search rules." (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 89.) Claim 86 does not require "subject matter specific search rules," and HyperPhrase cannot rewrite this feature into the claim now. This alleged distinction is thus likewise irrelevant.

HyperPhrase's last alleged distinction is that "Myka does not use any *display text* record information to make a specifying reference more specific." (*Id.*; emphasis added.) The claim does not require the use of "display text" record information. The claim simply states that "seemingly general SR is modified by *other* record information which renders the SR relatively specific". Thus, as long as the SR is modified by *any* other record information, this feature is anticipated. As noted above, and as HyperPhrase concedes, Myka uses layout information in the document to identify references to other data, i.e., the words that it locates and puts boxes around in the text to form links. (Kirk Decl. (Dkt. No. 32), Ex. D (Myka) at 69-71 and 86.) When the user hovers the cursor over these links, additional information about the links is displayed on the right-hand side of the screen, as also discussed above. (*Id.*) Claim 86 requires "indicating the specific nature of an SR" when the cursor is hovered over the SR. The parties agree that this term simply means "displaying other information concerning the SR." (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 33.) Since there is no dispute that Myka clearly discloses "[a]dditional information on a link (besides indicating the existence of a link by means of boxes) is presented to the user if he moves the cursor into the framed boxes" (de la Huerga Decl. ISO Invalidity Opp.

6

(Dkt. No. 130) at para 18; Kirk Decl. (Dkt. No. 32), Ex. D (Myka) at 86.), this final claim feature is also present in Myka, and the reference therefore anticipates claim 86.

### 3.    Gennaro Anticipates Claim 86, For Two Independent Reasons

Gennaro is another dead-on hit.[2]  As explained in detail in Google's moving papers, two aspects of this reference clearly anticipate claim 86.  The first is Gennaro's "Hot Spots."  These are halos with adjacent associated text.  When the cursor 42 is moved to the Hot Spot, without clicking the mouse button, a menu 46 is displayed, as shown in Fig. 2B of the reference below.  In the second aspect, when the cursor 42 is then moved to any one of the individual menu items, without clicking the mouse button, the specific address information for that menu item is shown in the lower left hand corner of the screen (item 38).



These basic aspects of Gennaro are undisputed.  HyperPhrase's principal response to Gennaro is instead that the reference is not prior art to claim 86.  (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 78.)  As discussed in the next section, this contention is unfounded.

---

[2] *See* Exhibit 1 (attached hereto), which shows Fig. 26 of the '321 patent along side Fig. 2B of the Gennaro patent.

### a.     Gennaro Is Prior Art To Claim 86

The relevant dates for prior art purposes are as follows:  Gennaro was filed on July 16, 1996, and issued on April 21, 1998.  (*See* Google Reply to Its PFOF (Dkt. No. 137) No. 129.)  The '321 patent was filed on August 13, 1999.  (*Id*. at No. 18.)  HyperPhrase bears the burden of proving entitlement to priority to any earlier-filed patent application.  *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1305-06 (Fed. Cir. 2008)  For the reasons explained below, it has failed to do so.  Consequently, Gennaro is prior art to claim 86 under 35 U.S.C. § 102(b), because it issued more than one year before the filing date of the '321 patent.  Because Gennaro is statutory bar prior art, any alleged prior invention by HyperPhrase is irrelevant.

HyperPhrase contends that claim 86 is entitled to claim priority from United States Patent No. 5,895,461, which was filed on October 9, 1996, and from which the '321 patent claims priority.[3]  In order to prove such entitlement, HyperPhrase must show that every feature of claim 86 was disclosed in this earlier-filed application.[4]  *Id*. at 1307-1310.

There are two fundamental differences between claim 86 and the portion of the '461 patent on which HyperPhrase relies to show priority.  First, claim 86 is directed to a method for use with an already-existing hyperlink; the portion of the '461 patent on which HyperPhrase relies is concerned with the generation of hyperlinks, i.e., before any hyperlink even exists.  Second, claim 86 requires that other record information be used to render the SR relatively specific.  The '461 patent does not disclose this either.

HyperPhrase contends that all of the details of claim 86 are found in the "typedown" feature disclosed at 6:55-61, 11:20-30, and Fig. 5B, Steps 422 and 424 of the '461 patent.  (de la Huerga Decl., (Dkt. No. 130) Appendix A-2, at 24-28.)  As the '461 patent itself says at 11:28-

---

[3] This date is still not early enough to remove Gennaro as prior art.  Even if HyperPhrase were able to show entitlement to this priority date, Gennaro would still be prior art under 102(e).
[4] The Figure 26 embodiment was introduced for the first time in the August 13, 1999, patent application that issued as the '321 patent, which was a continuation-in-part application (i.e., it added new matter).  HyperPhrase fails to explain why it bothered to file a CIP application if this subject matter had already been disclosed three years earlier in the '461 application.  Moreover, the claim term "specifying reference," which the inventor admits was expressly defined in the '321 patent (de la Huerga Invalidity Rebuttal Rpt. (Dkt. No. 130-2) at 193 of 307), is also new matter as of the filing date, August 13, 1999, of the '321 patent.

29, this is a standard convenience technique, for use when a computer system has a predefined library of terms, or keywords. (Woodford Decl. (Dkt. No. 27) Ex. I ('461 patent) at GOOG074391.) When a user starts to type a term that partially matches multiple keywords in the library, the software displays all of the possible candidate matches, so that the user can select the desired one without having to type the remainder of the word. (*Id.*)

The '461 patent is directed to a system in which keywords are recognized in "real time," as they are typed in by the user. The patent discloses a typedown feature such as described above, but only for the time prior to the formation of the hyperlink. If the user types in a partial keyword that matches multiple keywords in the library, the typedown feature will present a list of all possible matches. The user selects one, and only then does the system form a hyperlink using that keyword. This is all clearly explained at 11:3-40—from which HyperPhrase selectively identifies only 11:20-30 as its alleged priority support:

### D. Alternative Keyword Recognition

According to another aspect of the invention, FIGS. 5A–5D illustrate the capability of word processor 14 to recognize keywords and keyword phrases by the use of a special leading character entered by the user. As an alternative to steps 146–154 of FIG. 2D in which word processor 14 monitors text entered into a data record and attempts to recognize text as keywords, word processor 14 may attempt to recognize as keywords only those words which are preceded by a special character. Referring to FIG. 5A, in response to the entry or modification of text by the user (step 400), word processor 14 determines whether the user is modifying a previously entered keyword or keyword phrase (step 402). If not, word processor 14 monitors the inputted text for a special character indicating the start of a keyword (step 406). When the leading character is detected, the start of a keyword is indicated and the characters of the word or phrase being entered may be changed in color (step 408). In steps 412 and 422 (FIG. 5B), word processor 14 determines whether characters being entered following the special character match a selectable threshold number of characters from a defined keyword or keyword phrase. If so, a list of possible keyword matches is presented to the user (step 424) from which the user may select the intended keyword (step 426) if available from the list. This is the conventional "typedown" function common to word processors.

If the user selects a keyword from the list presented, word processor 14 in step 430 (FIG. 5C) declares that a match has been found, and creates a link between that keyword (or keyword phrase) and the report to which it refers, as in step 154 of FIG. 2D. Word processor 14 then reverts to monitoring new text entered by the user (step 432). Even if the user does not select a match from the list presented in step 426, the user may continue to type letters until an exact match is found, or he may respell the keywords as needed (step 428).

As noted above, two aspects of this feature bear emphasis.  As explained in the penultimate sentence of the above-quoted passage, the hyperlink is created *after* the user selects the keyword from the "typedown" list presented.  Thus, this is a feature that is used to *form* a hyperlink.  By contrast, claim 86 is expressly directed to methods for use with already-existing hyperlinks:  "A method for use with an application wherein *specifying references (SRs)* in one record to other records *which are selectable to access the other records are visually distinguished from other record information so as to indicate selectability* …"

10

Second, as the above-quoted passage also makes clear, the "typedown" list of candidate keyword matches comes from a preexisting library of terms. That library exists outside of the document being analyzed. Thus, even if the partial keywords typed in by the user constituted a SR, as HyperPhrase apparently contends, the typedown list presented by the computer would not constitute "other ***record information*** which renders the SR relatively specific," as claim 86 also requires, since it does not come from the record. Rather, the "other information" provided by the typedown list apparently comes from the library of keywords outside the record. More importantly, since it bears the burden on this issue, HyperPhrase has not identified any disclosure in the '461 patent of using words present within the record itself for this purpose. There is therefore no support in the '461 patent for claim 86 of the '321 patent.

### b.      Gennaro's "Hot Spots" Anticipate Claim 86

HyperPhrase attempts to distinguish Gennaro's "Hot Spots" on two bases, one pertaining to what Gennaro teaches regarding these "Hot Spots," and the second on an unfounded issue of claim construction.

HyperPhrase's principal point of distinction is that Genera's inclusion of halos in the "Hot Spots" somehow precludes them from constituting SRs. (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 80-81.) This is misdirection. HyperPhrase is apparently arguing that Gennaro's "Hot Spots" consist entirely of the graphical halos. Not so. The reference clearly states that a "Hot Spot" includes both the graphical halo and the ***associated text*** next to the halo: "Embedded menu 46 includes a banner that matches ***the text*** ('WHO WE ARE') ***that was associated with the selected hot spot 44*** in FIG. 2A." (Wolff Decl. (Dkt. No. 106) Ex. A, (Gennaro) at 4:34-37 (emphasis added)) This is also a matter of simple logic. When a user sees the array of halos, he or she of course immediately recognizes that there is a relationship between each halo and its adjacent text. Thus, just as the SRs in Figure 26 of the '321 patent "are visually distinguished from other record information so as to indicate selectability" by boxes enclosing text, the SRs in Gennaro are visually distinguished by halos/circles adjacent to text. HyperPhrase's position boils down to contending that putting text inside a box as in Figure 26 is

11

covered by the claim, but putting the text alongside a circle is not—a distinction with no meaningful, let alone patentable, difference. There is nothing in claim 86 that requires any particular format for "visually distinguish[ing a SR] from other record information so as to indicate selectability," and the halo adjacent to the text in Gennaro without question performs this function.

HyperPhrase's second position is one of claim construction, and is likewise without foundation. HyperPhrase attempts to distinguish Gennaro on the basis that "no other information in the *display text* record is used to make graphic hot spot [sic] more specific." (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 81; emphasis added.) As noted above, claim 86 does not require that the SR be modified by "display text." This is simply another attempt by HyperPhrase to rewrite its claim to avoid the prior art. Claim 86 says that the SR can be modified by any other record information: "wherein a seemingly general SR is modified by *other record information* which renders the SR relatively specific." As Google explained in its moving papers, the menu information that pops up when a user hovers over the Hot Spot is part of the record, a point that HyperPhrase does not seriously dispute.

### c.    Gennaro's "Menu Items" Anticipate Claim 86

As to Gennaro's menu items, these too are SRs that anticipate claim 86. Despite the remarkable similarity to its own Figure 26, HyperPhrase offers four specious alleged points of distinction over this aspect of Gennaro, three based on what Gennaro teaches, and the fourth based on claim construction.

HyperPhrase's main argument is that the menu items do not "correspond to text in a record." (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 82.) HyperPhrase offers no citation for this remarkable, and demonstrably false, assertion. The menu items are clearly text. They are clearly shown in Figure 2B. Figure 2B is part of a record. The menu items are thus clearly part of the record.

Second, HyperPhrase contends that the menu items are not "visually distinguished from other record information so as to indicate selectability." (HyperPhrase Invalidity Opp. (Dkt. No.

128) at 81.)  But the menu items are enclosed in a box, as clearly shown in Figure 2B.  Every entry in the box is selectable.  In the Figure 26 embodiment of the '321 patent, the selectable text is also enclosed in a box, thus indicating selectability.  HyperPhrase cannot seriously contend that putting one selectable item in a box is within the claim, but putting several items in a box is not.[5]

Third, HyperPhrase asserts that the address information displayed when the user hovers over an individual menu item does not thereby "render[] the [menu item] relatively specific." (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 82-83.)  This too is unsupportable.  The menu item is a "user-friendly" description of the information that will be retrieved if the user chooses to click on that item.  The associated address information displayed at the lower left hand corner of the browser when the user hovers over each menu item is the "computer-friendly" detail, i.e., the very specific URL information that tells the computer exactly where to look for the webpage containing the information.

Fourth, HyperPhrase raises a claim construction issue, asserting that Gennaro's menu items are outside the claim because they do not each point to multiple other records:  "Gennaro also fails to show how the text in the menu box could be used to refer to more than one record as required by the Federal Circuit's definition of specifying reference."  (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 83.)  With this, HyperPhrase moves from specious to disingenuous.  The Federal Circuit did not construe "specifying reference."  It construed "data reference."  More fundamentally, it did not construe that term to *require* reference to *multiple* other records, as HyperPhrase represents.  The Federal Circuit only said that a data reference requires "a unique phrase or word which may be used in a record to refer to another record or record segment." (Niro Decl. Ex. A (Dkt. No. 125-2) Federal Circuit Opinion at 10.)

---

[5] HyperPhrase's position now is contrary to a point the Federal Circuit made in its decision in this very case.  (Niro Decl., Ex. A (Dkt. No. 125-2) Federal Circuit Opinion at 8 ("we have held that the use of the singular form of 'a' in conjunction with 'comprising' … typically encompasses both singular and plural possibilities."))

**B.    Claims 1 And 24 Of The '321 Patent Are Invalid**

Claim 1 of the '321 patent is directed to a method in which a record is analyzed to first find a data reference (DR).  Once the DR is found, a rule set (MRRS) is identified that specifies a relationship between the DR and a modifier reference (MR).  The record is then further analyzed, using the rule set, to locate the MR, and then a referenced record associated with the DR/MR combination is identified.

**1.    PasTime Anticipates Claims 1 And 24**

HyperPhrase's main response to PasTime is that it is not prior art to claims 1 and 24.  (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 49-50.)  HyperPhrase does not dispute that PasTime was published by March of 1997.  (*See* Google Reply to Its PFOF (Dkt. No. 137) No. 75.)  As noted above, the '321 patent application was filed on August 13, 1999, and so if HyperPhrase is unable to meet its burden of showing entitlement to a priority date before that date, PasTime is statutory bar prior art to these claims under § 102(b).

HyperPhrase contends that claims 1 and 24 were fully disclosed in the provisional patent application 60/023,126 filed on July 30, 1996.  (de la Huerga Decl. (Dkt. No. 130) Appendix A-2, at 3-15.)  The disclosure on which HyperPhrase relies concerns the use of patient identification number and record date in combination with a keyword phrase in the record (*id*. at 3):

> In the '126 Application maturing into the '461 patent, Figs. 7 and 8 show a referencing record that references several referenced records, for example, the "admission ecg", the "current ecg", the "previous discharge ecg", and the "admission CK enzyme". Each of these is referenced by a combination of a data reference (the text shown in the record) and a modifier reference (the patient identification number (987654321) in the report text and record date (14_May_1996).

This feature does not disclose the salient aspects of claims 1 and 24.  There is no disclosure in the '126 application of searching the record first for a DR, and then using a rule set to search for a MR.  To the contrary, the application is absolutely clear that the patient identification number and record date (the alleged MRs) are keyed in ***manually*** by the user when the record was initially created ('126 application, at 14-15):

14

A.    Creating Data Records

FIGS. 2A-2D describe the operation of the present invention with particular reference to the operation of the functions of a specialized word processor for accepting and recognizing keywords input by the creator of a data record and storing the record at a predetermined location which will be referenced by a hypertext link associated with the keywords.  For clarity but by way of example only, the discussion is placed in the context of a hospital "intranet" wherein the computer system of the present invention comprises multiple databases containing disparate types of patient medical records.

Commencing with FIG. 2A, in step **100** a user working from user interface **8** or user interface/processor **12** (FIG. 1) begins the creation of a new data record, which shall also be referred to as a "report" in the hospital context.  The user is prompted by word processor **14** to enter certain information which will serve to identify the precise nature of the report.  A patient identification (ID) number is requested in step **102**.  In response to an ID number entered by the user in step **104**, word processor **14** checks the format of the ID number for the proper length and correct characters in step **106**.  If the format is improper, an error is indicated to the user in step **108**.  Otherwise, in step **110** the user is requested to enter the type of report being created.  Preferably, a list of options of the various permissible types of reports is presented to the user, and the well-known "typedown" capability is provided by word processor **14**, wherein each letter entered by the user causes to be displayed only those options corresponding to that letter or series of letters.

Other key information identifying a report in a hospital environment is the identity of the physician, nurse or technician creating the report, the type of report (e.g., nurse's report, discharge report, etc.), and the date and time the report was made.  Steps **112**, **114**, **116** and **118** establish the identity of the physician or clinical staff member, and include name requesting step **112**, name validation step **114**, name suggestion step **116** and name selection step **118**.  If no valid name is entered by the user, word processor **14** displays a list of suggested names which correlate in spelling with the name attempted to be input by the user (step **116**).  Thereafter, only if the user selects a name from the displayed list is the user permitted to continue creating the report.

If a keyword phrase such as "admission ecg" is later identified in the record, there is no need to look further in the record for MRs such as patent identification number and/or record date that are used to specify the particular "admission ecg," *since the system already knows them* (*id.* at 17-18):

15

In addition to creating links based on the filling of a "report type" field, the invention includes the capability to create hypertext links to other data records, including data records which have not yet been created or published for viewing by all users. When a data record (report) is being created, it is desirable to refer to other reports concerning the same patient, requiring that word processor 14 recognize keywords referencing these other reports "on the fly" as the keywords are entered by the user. For example, a physician creating a report may desire to refer to another report without reciting the actual data from that other report. Word processor 14 must therefore monitor the text entered as part of the data record to match text with predetermined keywords. In general, keywords for each type of report to be created can be developed. For example, in a hospital environment, word processor 14 can be programmed to scan for keywords such as "admission ecg," "cath report," "discharge report," etc.

FIGS. 2C and 2D detail the monitoring function of word processor 14 whereby text being input or edited by the user is scanned to determine if the user is entering a keyword for which a hyperlink is to be created or has already been created. In step 134 and 136, the user begins typing a newly-created report or begins editing a previously published report. Until such time as the user indicates that he is finished editing the report (step 138), word processor 14 will monitor data input by the user to determine whether the user is modifying existing text (step 142). For a new report which contains no text to modify, word processor 14 proceeds to check whether each new word input by the user starts a defined keyword indicating a particular test or report type (step 146). So long as words being entered are not predetermined keywords or keyword phrases, word processor 14 returns to step 136 and continues monitoring. But if step 146 detects the beginning of a keyword, word processor 14 proceeds to determine whether a completed keyword or keyword phrase is entered (steps 148 and 150). If a keyword from a multi-word keyword phrase is correctly entered by the user, steps 152 and 148 scan successive words to determine if a keyword phrase is being entered, such as "admission ecg." If at any time a completed keyword or keyword phrase is entered by the user, step 154 declares that a match has been found and creates a hyperlink between that keyword (or keyword phrase) and the report to which it refers. A sample address for an admission electrocardiogram report created prior to May 19, 1996 for patient ID number 987654321 would be:

hww.st_mary.springfield/ecg/report/987654321/19_May_1996/13:42/admission.

In short, not only has HyperPhrase failed to identify any disclosure in the '126 application of a method that scans a record first for a DR and then for a MR (using an MRRS), but such an approach would be a waste of time for the particular system disclosed in that application, since it knows the MR information needed to form the hyperlink *a priori* from the initial form data entry. Since HyperPhrase has failed in its burden to show any entitlement to a

16

priority date before August 13, 1999, PasTime is § 102(b) prior art, and HyperPhrase's alleged prior invention evidence is irrelevant.[6]  *PowerOasis, Inc.*, 522 F.3d at 1305-06.

Apart from priority, most of HyperPhrase's efforts to distinguish the PasTime prior art center on the issues of databases and addresses, two concepts that are absent from claims 1 and 24 (but that are relevant to claims 1 and 7 of the '889 patent, discussed below).

With regard to claims 1 and 24, HyperPhrase offers only two alleged distinctions—both unsupportable—one based on the disclosure of PasTime, and the other based on claim construction.

As to the disclosure of PasTime, HyperPhrase disputes that the reference teaches the concept of looking in the record for an MR after first locating a DR.  (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 53-55.)  This dispute is not genuine.  One illustration of this is where PasTime first looks for the keyword "Bill," and then searches the document further for a year, so that the particular bill can be identified (Kirk Decl. (Dkt. No. 32) Ex. B at GOOG074992) [PasTime at 170]:

> For example, the first equivalence operation may involve the case of the expression—e.g. those sentences (noun phrases) containing "Bill" or "BILL" as opposed to "bill".  Later functions could involve checking for the presence of a year designator (e.g., "… Bill ... 1993") and so on.

HyperPhrase contends that "[w]hat is missing from this passage … is a discussion of where the date comes from."   (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 53.)  That is incorrect.  The above-quoted passage from PasTime expressly discloses that the year information would appear in the text in the vicinity of the keyword Bill:  "(e.g., "… Bill ... 1993")".  That is what the ellipses mean, and no reasonable jury could conclude otherwise.  The quoted passage from PasTime discloses a method of looking first for the DR keyword "Bill," and then for the

---

[6] Although entitlement to claim priority from an earlier-filed application is clearly a distinct concept than prior invention, HyperPhrase frequently conflates and confuses the two.  A patent owner cannot "swear behind" a §102(b) prior art reference by relying on prior invention evidence.

MR year, in this example 1993. This is all that claims 1 and 24 require, and it is anticipated by PasTime.

With regard to claim construction, HyperPhrase rehashes its argument that a DR must refer to multiple other records (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 55), even though the Federal Circuit's claim construction is clear that a DR can refer to one or plural other records. (Niro Decl., Ex. A (Dkt. No. 125-2) Federal Circuit Opinion at 10.)

### 2. Graham Anticipates Claims 1 And 24

Graham is a simple reference. It discloses that if a browser[7] encounters a partial URL in a HTML page, it then looks for a BASE element. If it finds it, then the browser combines the partial URL with the BASE, and the resultant complete URL is a link to another record. In the nomenclature of claims 1 and 24, the partial URL is the DR. Looking for a BASE element is the application of a rule. The BASE element itself is a MR. The combination is a reference to another data record. It is a perfect fit with claims 1 and 24.

HyperPhrase does not dispute that Graham is prior art to claims 1 and 24. (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 60.) HyperPhrase's lengthy discussion of HTML and its "hidden codes" boils down to three alleged distinctions over Graham, one semantic and the others based on claim construction. None has merit.

HyperPhrase first protests that "Graham is a series of definitions and grammatical structures for a programming language called HTML." (*Id.*) This is semantics. Continuing, HyperPhrase states that "As such, Graham does not describe parsing a first data record to identify a reference to a second data record." (*Id.*) This is a *non sequitur*. Regardless of the labels that HyperPhrase applies to Graham's disclosure, in substance there is absolutely nothing distinguishing Graham from claims 1 and 24. The '321 patent looks for one set of characters in a

---

[7] HyperPhrase's assertion that Google is combining Graham and Netscape Navigator (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 65) completely misstates Google's position. Graham describes the operation of browsers such as Netscape Navigator. Google's use of Navigator is simply to illustrate the principles disclosed in Graham.

record (a DR), then looks for another set of characters in that record (a MR), and then puts them together to identify another data record.  Graham does exactly the same thing.[8]

HyperPhrase's first claim construction issue concerns the ubiquitous term Data Reference.  The crux of HyperPhrase's response to the Graham prior art turns on HyperPhrase's bald assertion that "[t]he Federal Circuit did not construe a 'data reference' to encompass hidden codes."  (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 63.)  Not so.  There is nothing in the Federal Circuit's construction that excludes "hidden codes."  Again, that construction is simply: "a unique phrase or word which may be used in a record to refer to another record or record segment."  (Niro Decl., (Dkt. No. 125) Ex. A (Fed. Cir. Opinion) at 10.)  The construction draws no distinction between words that are visible to a reader on the display of an internet browser program (such as Microsoft Explorer), and the words found in the HTML file that are used to create that display, which are equally visible to a reader through the use of, e.g., a standard text editor program—or by simply going to the "View" menu item in the Explorer browser, and selecting the "Source" option. The bulk of HyperPhrase's opposition is an attempt to reconstrue the term as limited to the portions of records viewed on a browser screen.  It is too late in the day to reargue the construction of this term, which is now settled law, in an effort to save the claim from invalidity.  Moreover, on HyperPhrase's narrow view of this term, it should dismiss most if not all of its infringement case, given the extent to which it then turns around and relies on hidden information to support its affirmative claims.  (*See* Google Noninf. Reply Br. (Dkt. No. 136) at § II.)

---

[8] HyperPhrase inexplicably states that "neither Graham nor Google disclose how hidden programming codes are to be modified to create an address."  (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 69.)  First of all, it is not Google's position that the partial and BASE URLs are "modified to create an address."  As to HyperPhrase's unsupported attorney argument that Graham does not disclose how to create an address, as Google has noted repeatedly, it creates a complete URL by simply concatenating the partial URL on the end of the BASE URL—i.e., address = BASE URL + partial URL.  There is no mystery here.  As to HyperPhrase's further suggestion (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 69-71) that Graham is inapplicable because it does not modify the underlying record (the HTML file), as with so many other of HyperPhrase's attempted distinctions over the prior art, that is not a feature of either claim 1 or claim 24, and so is wholly irrelevant.

19

The second claim construction issue raised by HyperPhrase concerns the rule set (MRRS). HyperPhrase attempts to limit this term to the exact embodiments disclosed in the specification (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 66), a position of course that HyperPhrase does not take regarding infringement, in clear contravention of the blackletter law of claim construction. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004). HyperPhrase offers no cogent argument as to why the rule disclosed in Graham—if you encounter a partial URL, look for a BASE element—does not fully anticipate this feature of claims 1 and 24.

### C.    Claim 27 Of The '321 Patent Is Invalid As Anticipated By MUC-6 And Aberdeen

Given that HyperPhrase has dropped its allegation of infringement of claim 27, and given the number of other issues presented by Google's motion, Google will rest its position that claim 27 is invalid on the arguments set forth in its moving papers. However, this is not to suggest that the invalidity of this claim has been mooted or otherwise rendered irrelevant by HyperPhrase's long-overdue decision to drop this claim. Google asked HyperPhrase to stipulate to the dismissal with prejudice of claim 27, and for its agreement not to assert this claim against Google or its products in the future. HyperPhrase refused. Given this, the invalidity of this claim remains justiciable, and there also is a public interest in expunging clearly invalid claims such as this one.

### 1.    Claims 1 And 7 Of The '889 Patent Are Invalid As Anticipated By PasTime

#### a.    PasTime Is Prior Art To Claims 1 And 7

PasTime was a publicly available printed publication as of March 22, 1997. (Kirk Decl. (Dkt. No. 32) Ex. B at GOOG074992.) The '889 patent application was filed on June 9, 1997, and does not claim priority to any earlier-filed application. (*See* Google Reply to Its PFOF (Dkt. No. 137) No. 25.) Although HyperPhrase alleges that Mr. de la Huerga conceived and reduced to practice the subject matter of claims 1 and 7 "by no later than September 30, 1996" (de la Huerga Decl. (Dkt. No. 130) at para. 5), that alleged date of prior invention is based entirely on evidence from Mr. de la Huerga. As noted in Google's moving papers, an alleged prior

invention date must be corroborated by someone other than the inventor.  *See, e.g., Refac Electronics Corp. v. R.H. Macy & Co., Inc.*, 1988 WL 93835, 5 (D.N.J., 1988) (a patent holder is not entitled to earlier than filing date priority on a motion for summary judgment where the patentee offered only unsubstantiated declarations of the inventors in support of priority to parent patent).  Mr. de la Huerga simply cannot corroborate his own date of invention.

Moreover, although HyperPhrase alleges an actual reduction to practice before the filing date, its sole evidence consists of alleged prior draft patent applications.  (*See generally*, (de la Huerga Decl. (Dkt. No. 130) Appendix A-1.)  A reduction to practice requires a making of the invention, not simply writing ideas down on a piece of paper.  *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998).  Thus, even if there were credible and competent corroborating evidence showing Mr. de la Huerga's draft applications to be *bona fide*, these would at most amount to evidence of conception, not actual reduction to practice.  *Hahn v. Wong*, 892 F.2d 1028, 1033 (Fed. Cir. 1989); *see also Mahurkar v. CR Bard, Inc.*, 79 F.3d 1572, 1577-78 (Fed.Cir.1996).  Such evidence is insufficient to establish prior conception.  *See Stern v. Trustees of Columbia Univ.*, 434 F.3d 1375, 1378 (Fed. Cir. 2006) ("[R]egardless of the contents of the notebooks, unwitnessed laboratory notebooks on their own are insufficient to support his claim [of conception, and therefore] co-inventorship").  In order for conception evidence to amount to evidence of prior invention, the burden is on HyperPhrase to then show continuous diligence from the alleged conception to an actual or constructive reduction to practice, which here is the June 9, 1997, filing date of the '889 patent application.  *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1365 (Fed. Cir. 2001).  Like conception, the only evidence of alleged diligence is the uncorroborated—and thus ineffective—testimony from Mr. de la Huerga.  *See Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1170-72 (Fed. Cir. 2006) (an inventor's "unwitnessed notebook is insufficient on its own to support a claim for reduction to practice" as an "inventor's notebooks … do not provide an 'independent' source of authority on the issue of reduction to practice.").  Tacitly acknowledging the inadequacy of this, HyperPhrase offers the bald assertion that Mr. de la Huerga's "patent attorney was also working on the '889 patent

21

application consistently and at a reasonable pace during the Sept. 1996 through June 1997 timeframe." (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 8-9.) Where is the evidence of this? There is none. There is no declaration from Mr. de la Huerga's patent attorney, let alone time records to substantiate this alleged continuous activity. HyperPhrase has thus failed in its burden to adduce evidence sufficient to show a date of invention before the March 22, 1997, publication date of PasTime.

### b. PasTime Anticipates Claims 1 And 7

HyperPhrase offers two alleged distinctions over PasTime, both pertaining to the scope and content of this prior art reference.

HyperPhrase's position that PasTime does not disclose "a plurality of databases" is form over substance. PasTime discloses something that the authors call a "hyperbase." Rather than address the details of the hyperbase actually described in PasTime, HyperPhrase inexplicably scours a number of extrinsic references that have nothing do with the PasTime system, and then declares that the word is not a term of art. (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 50-51.)

The proper, and far simpler, approach is to read PasTime. The reference discloses that the hyperbase is composed of numerous different discrete sources of data, such as (1) Hansards, (2) transcripts, (3) explanatory memoranda, (4) meeting minutes, (5) standing orders, (6) rules, and (7) biographies (Kirk Decl. (Dkt. No. 32), Ex. B at GOOG074992) [PasTime at 170]:

> The approaches advocated in this paper have been used to build a hyperbase of the complete electronic document holdings of the Australian Parliament—in all, about 2 gigabytes of text. Those holdings include the Hansards for the House of Representatives and the Senate from 1981 onwards, Committee Transcripts and Reports, and Explanatory Memoranda for Bills. There is a range of other material: the agenda for Parliamentary meetings is provided by the Notice Papers, while the formal minutes of meetings are provided by the Votes and Proceedings (for the House of Representatives) and the Journals (for the Senate); the Standing Orders (for each House) provide the rules by which these meetings are conducted; the House Practice and Senate Practice books describe the formal and conventional rules and practices within the Parliament, and the Parliamentary Handbook provides other information, including biographical details of past and present Members and Senators..... In all, there are approximately 250,000 separate atomic documents in the hyperbase[.]

22

The parties   previously agreed that  a "database" means "a group of related data records." *See* HyperPhrase's Response to Google's Proposed Finding of Fact (Dkt. No. 131) No. 147.  Thus, each sub-collection in the hyperbase constitutes a separate database, each of which has plural documents.  The hyperbase is therefore a plurality of databases.

Also without merit is HyperPhrase's contention that PasTime does not employ "a standardized format for addressing said data records."  (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 52-53.)  This too is explicit in the reference.  Each file is addressed by listing the byte location where the file begins in the hyperbase, and the total length of the file, in bytes [PasTime at 171; emphasis added]:

> 5.1 Data Capture
>
> As new files become available, Parliament uses the FTP protocol to transfer the file into a special directory on our server, which is automatically monitored.  When a new file is detected the following automatic processes are applied:
>
> 1. the file is examined to determine which sub-collection it belongs to (e.g. Senate Hansard, Standing Orders, etc.)
> 2. *a document identifier index is generated listing the start byte location and byte extent of each atomic component document in the file* together with canonical identifier for that component, such as "Hasnard/Senate/1996/May/22/article_10" (but the file is not physically partitioned into separate smaller files.)

While HyperPhrase posits that this is not a standardized addressing format (HyperPhrase Invalidity Opp. (Dkt. No. 128) at 52-53), it offers no cogent explanation why.  HyperPhrase has not identified anything in the intrinsic record that would in any way limit the scope of "a standardized format for addressing said data records" to exclude the addressing scheme disclosed in PasTime.  The documents that make up the hyperbase are all stored in sequence, one after the other.  Every single document in the hyperbase is identified using the same two pieces of information:  (1) the start byte of the file, and (2) the length of the document, also in bytes.  So, for example, if the hyperbase included only two documents, and document 1 consisted of the single word "Google" and document 2 consisted of the single word "Autolink," then the hyperbase would be:  "GoogleAutolink".  The address of document 1 in this hypothetical hyperbase would be 1 [starting byte of "Google"] and 6 ["Google" is six bytes long], and the

23

address of document 2 would be 7 [starting byte of "Autolink"] and 8 ["Autolink" is eight bytes long].  Thus, the addressing scheme disclosed in PasTime uses just two numbers to reference and locate any document in the hyperbase, no matter how long or when added.  It is hard to imagine a simpler or more standardized addressing format, and the '321 patent requires nothing more.

## III.     CONCLUSION

WHEREFORE, for the foregoing reasons and those set forth in its moving papers, Google respectfully requests that this Court grant Google's motion for summary judgment of invalidity as a matter of law on the following issues:

1.     Claims 1 and 7 of United States Patent 5,903,889 patent are invalid; and

2.     Claims 1, 24, 27, and 86 of United States Patent 6,516,321 patent are invalid.

//

//

//

//

//

//

//

//

//

//

Respectfully submitted,

Dated:  May 19, 2008

/s/ Jason W. Wolff

Jason W. Wolff (wolff@fr.com)
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA  92130
Telephone:  (858) 678-5070
Facsimile:  (858) 678-5099

Frank E. Scherkenbach
FISH & RICHARDSON P.C.
225 Franklin Street
Boston, MA  02110

James A. Friedman
James D. Peterson
GODFREY & KAHN, S.C.
One East Main Street, Suite 500
P.O. Box 2719
Madison, WI 53701-2719
Telephone: (608) 257-3911
Facsimile: (608) 257-0609

*Of Counsel:*

Kurt L. Glitzenstein
Christoper Dillon
FISH & RICHARDSON P.C.
225 Franklin Street
Boston, MA  02110

Attorneys for Defendant GOOGLE INC.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the May 19, 2008, a true and correct copy of the following

document: **REPLY IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY**

**JUDGMENT OF INVALIDITY REGARDING U.S. PATENT NOS. 5,903,899 AND**

**6,516,321 (along with Exhibit 1)** was filed with the Clerk of the Court using the ECF filing

system which will send notification of such filing to counsel of record for HyperPhrase

Technologies, LLC and HyperPhrase, Inc., including Raymond P. Niro, Kim Grimmer, Jennifer

L. Amundsen.


/s/ Jason W. Wolff