IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HYPERPHRASE TECHNOLOGIES, LLC and
HYPERPHRASE, INC.,                                OPINION AND  ORDER

                        Plaintiffs,

                                                              06-cv-199-bbc

            v.

GOOGLE, INC.,

                        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiffs Hyperphrase Technologies, LLC and Hyperphrase, Inc. brought this patent
infringement action alleging that defendant Google Inc.'s AutoLink and AdSense products
infringe plaintiffs' United States Patents Nos. 5,903,889, ('889 patent) 6,434,567 ('567
patent), 6,526,321 ('321 patent) and 7,013,298 ('298 patent).   On December 20, 2006,
Judge Shabaz granted summary judgment to defendant, finding that neither product
infringed any claim of the patents-in-suit, in light of his construction of the term "data
reference."  On December 26, 2007, the Court of Appeals for the Federal Circuit held that
Judge Shabaz's construction of data reference was erroneous, but it affirmed the decision
with respect to the claims of infringement against AdSense that Judge Shabaz had dismissed,
reversed the judgment that  AutoLink did not infringe the '889 and '321 patents and

1

remanded the case with the following instructions:

> It is unclear from the record on appeal whether AutoLink meets all of the remaining elements of any of the asserted claims of [the '889 and '321] patents because the "data reference" limitation was the only limitation the district court discussed in its infringement analysis and the only limitation discussed in detail in the parties' briefing on appeal. We thus cannot determine if AutoLink does not infringe because it does not meet other limitations of the claims. Therefore, we must remand so the district court can evaluate whether AutoLink infringes the asserted claims of the '889 and '321 patents under the correct construction of "data reference."

Hyperphrase Technologies,, Inc. v. Google, Inc., 260 Fed. Appx. 274, 282 (Fed. Cir. 2007) The remaining asserted claims are claims 1 and 7 of the '889 patent and claims 1, 24 and 86 of the '321 patent.

Defendant now renews its motions for summary judgment, arguing that AutoLink does not infringe any of the asserted claims, that the asserted claims are invalid as a matter of law, and that, if there is infringement, it is not willful. With Judge Shabaz out on medical leave, I am handling his cases, including this one. I conclude that AutoLink lacks at least one element of each of the remaining asserted claims. Therefore, defendant is entitled to summary judgment of non-infringement. Because I find no infringement, the issue of willful infringement is moot. Furthermore, because the parties do not suggest any ongoing controversy apart from the AutoLink product, I decline to address defendant's counterclaims for a declaration of invalidity.

2

FACTS

The patents in suit are related to one another as continuations-in-part of prior applications and all are the inventions of Carlos de la Huerga.  The preferred embodiments of the patented  inventions involve storage and retrieval of electronic medical records.

A. The '889 patent

The '889 patent claims a system for retrieving, modifying and collecting data records on a computer network.  The invention detects types, relationships and classification of data records and modifies them to support interactive hypertext-linked display and organized access to the records.  Plaintiffs assert infringement of the following claims:

Claim 1:

> A computer system with a plurality of data records on a plurality of databases, and a standardized format for addressing said data records, said computer system comprising:
>> (a) a user interface having an interactive display program for requesting one of said data records and displaying a plurality of interface supported data formats;
>> (b) means for receiving a reference to a first data record from said interactive display program;
>> (c) means for retrieving said first data record;
>> (d) means for parsing said first data record to identify a reference to a second data record;

(e) means for modifying said reference to said second data record to create an address, said address being operable to retrieve said second data record; and

(f) means for sending said modified first data record to said interactive display program.

\*   \*   \*

Claim 7:

The computer system of claim 1, wherein said reference to said second data record comprises a keyword phrase.

The '889 specification, col. 2, ln. 65 to col. 3, ln. 9, provides the following summary of the invention:

It is an object of this invention to provide a means of processing and converting existing data records formatted, structured, and accessed according to a multitude of disparate standards to common standards by which they may be accessed, controlled, and/or displayed through a single interactive display program.  It is another object of this invention to provide conventions for exploring data records for references to contextually related records and modifying, generating, embedding and appending links and data-retrieving codes in and to said related data records, whereby to organize said related data records in a hypertext tree structure.

Figures 12A-12C of the '889 specification graphically depict the operation of the claimed system:

4



Figure 12A

5



Figure 12B



Figure 12C

B. The '321 Patent

The '321 patent claims a method for automatically creating hyperlinks between records in a record set that both eliminates ambiguity when record references overlap and inserts tags to identify specific information within the records. Plaintiffs assert infringement of the following claims:

7

Claim 1:

    A method for identifying a referenced record referenced in a referencing record wherein the referenced record is referenced in the referencing record by at least a combination including a data reference (DR) and a modifier reference (MR), the method comprising the steps of:

        (i) receiving the referencing record;

        (ii) analyzing the referencing record to identify a DR, when a DR is identified:

            (a) identifying an MR rule set (MRRS) specifying the relationship between an MR and the DR;

            (b) analyzing the referencing record in accordance with the MRRS to identify the existence of the MR and, when the MR is identified;

            (c) identifying the referenced record associated with the DR/MR combination.

*  *  *

Claim 24:

    The method of claim 1 further including the step of linking the record reference to the referenced record.

*  *  *

Claim 86:

    A method for use with an application wherein specifying references (SRs) in one record to other records which are selectable to access the other records are visually distinguished from other record information so as to indicate selectability, the method also for use with a system which enables a user to designate and also select SRs where designation comprises pointing to an SR without selection and, wherein a seemingly general SR is modified by other record information which renders the SR relatively specific, the method for indicating the specific nature of an SR prior to selection and comprising the steps of:

        when an SR is designated, indicating the specific nature of the SR.

8

C. <u>AutoLink</u>

Defendant sells a toolbar program which can be added to an internet browser. AutoLink is a toolbar feature that is used to identify additional sources of information for certain types of information in a pre-existing web page. Among the various types of information that the AutoLink feature tries to recognize are International Standard Book Numbers (ISBNs), vehicle identification numbers, package tracking numbers, such as FedEx or UPS, and postal addresses. If one of the information types is found in the document, AutoLink creates an anchor tag containing a computer generated Uniform Resource Locator (URL) that points to the path of a Google server. AutoLink then inserts the anchor tag into a memory representation of the original web page (a document object model or DOM) and displays the DOM to the user. When the anchor tag (which appears in blue and underlined on the web page representation) is selected by the browser user, the Google server generates a second URL that points to a second server and retrieves information that is presented to the user.

AutoLink software scans the web page for patterns of consecutive strings of characters (for example, a 10-digit string, a 19-digit string, etc.) referred to as tokens. AutoLink also scans the page for key words known as triggers. If a trigger is found, the token is assumed to be of the type of information associated with its format. For example, a 10-digit number is assumed to be an ISBN, and a 19-digit string is assumed to be a UPS tracking number. A

9

heuristic is applied on the token to verify that the token conforms with the known format (for example, the last digit in an ISBN number is called a "check digit," which is used to mathematically compute whether the ISBN number itself is properly formatted).  The token is not tested to confirm whether it corresponds in fact to additional information stored somewhere else.

The presence of a trigger and a properly formatted token causes the AutoLink button on the toolbar to become selectable. If the user selects the AutoLink button, then the AutoLink software converts the token into a URL and formats it for the browser as a blue highlighted and underlined text supported by the underlying anchor tag that has the format: <A HREF="[URL]">[token]</A>.  If the user selects the blue text, defendant's server generates and directs a second URL to either a third party server such as amazon.com, fedex.com, carfax.com, or in the case of a street address, initiates a process to retrieve a map from one of several possible providers.

OPINION

Defendant contends that AutoLink lacks at least three elements of independent claim 1 of the '889 patent and at least two elements of each of claims 1 and 86 of the '321 patent. Because construction of patent claims is an issue of law and there is no factual dispute concerning the operation of AutoLink, the infringement issues presented may be resolved on

10

summary judgment.

As a procedural matter, plaintiffs object to defendant's non- infringement arguments as beyond the scope of the remand order because they raise arguments not presented in the previous summary judgment motion.  This position is meritless.  Defendant was under no obligation to bring all of its non-infringement arguments in its initial summary judgment motion and was in no way restricted from bringing additional arguments either on summary judgment or at trial.  Indeed, the federal circuit remanded expressly because it could not "determine if AutoLink does not infringe because it does not meet other limitations of the claims."  Accordingly, I will address all of defendant's non-infringement arguments on their merits.

Patent infringement analysis consists of two steps.  First, the patent claims must be interpreted or construed to determine their meaning and scope.  Second, the properly construed claims are compared to the process or product accused of infringing.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995).  The first step of this analysis, claim construction, is a matter of law exclusively for the court.  Id. at 970-71.  To establish infringement, plaintiffs must prove that each claim element is present in the accused product, either literally or by equivalence.  Dawn Equipment Co. v. Kentucky Farms Inc., 140 F.3d 1009, 1015 (Fed. Cir. 1998).  Conversely, defendant can prevail by demonstrating that at least one element of the asserted claim is absent from its product or process.

11

The well established process for claim construction begins with examination of the claims language. The language is given its ordinary meaning as it would be understood by one of ordinary skill in the relevant art, in light of its context and the other patent claims. Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001). This initial construction is then considered in light of the specification to determine whether the inventor expressed a different meaning for the language, whether the preferred embodiment is consistent with the initial interpretation and whether the inventor disclaimed certain subject matter specifically. Id. at 1342-43. The specification takes on a more important role if the claims language is particularly ambiguous, id., or if the inventor invoked the means plus function language of 35 U.S.C. § 112, ¶ 6, thereby incorporating the specification's embodiment into the claims by reference. Finally, the interpretation is examined for consistency with the patent's prosecution history and any disclaimers made therein. Id. at 1343.

Assuming one or more elements is literally absent from the accused device, the court must determine whether the device infringes under the doctrine of equivalents. The Supreme Court has offered the following guidance for assessing whether an element is present by equivalents:

> Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention? . . . A focus on individual elements and a special vigilance against allowing the concept of equivalence to eliminate

> completely any such elements should reduce considerably the imprecision of whatever language is used. An analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element.

Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co., 520 U.S. 17, 40 (1997).

## A. '889 Patent

Defendant first contends that AutoLink necessarily lacks "a standardized format for addressing the records," as required by the claim 1 preamble because AutoLink accesses records in third-party databases that defendant does not control. Second, defendant argues that AutoLink neither modifies the reference to a second record nor modifies the first record, as required by subparagraphs (e) and (f) of claim 1. Plaintiffs argue that AutoLink's use of the URL addressing convention is a "standardized format" that satisfies the first claim element and that AutoLink modifies the reference and also modifies the first data record, at least under the doctrine of equivalents. I conclude that AutoLink lacks a standardized format for addressing records and means to modify the first data record to create an address operable to retrieve a second data record, either literally or by equivalence.

### 1. "Standardized format for addressing"

Given its ordinary meaning in the context of the claim 1 preamble, the phrase "standardized format for addressing" data records means that data records on the computer system are stored so that any record can be addressed using a common addressing format. Plaintiffs do not dispute that the claim 1 preamble is intended to include limitations of the claim. Bell Communications Research, Inc. v. Vitalink Communications Corp., 55 F.3d 615, 620 (Fed. Cir. 1995). Plaintiffs argue that only the addressing convention need be standardized, not the addresses to records themselves. So, for example, plaintiffs suggest that use of a URL, which is a prescribed convention for addressing records stored in many different ways, is sufficient to meet the element. However, dependent claims 4 and 9, referring back to claim 1, use the phrase "said standardized addresses," making it clear that plaintiffs' construction is incorrect and that the addresses themselves are standardized, not merely the convention for forming URLs.

The '889 specification leaves no doubt that a proper construction requires a standardized addressing format, not merely the use of URL convention. The summary of the invention describes a primary objective as converting records "accessed according to a multitude of disparate standards to common standards by which they may be accessed," an apparent reference to addressing and retrieving. In support of their unrealistically broad construction of the claim limitation plaintiffs assert that "[t]here is not one mention of translating, converting or changing the address of data records to conform to a standard

14

format . . . ." in the specification.  Plt's. Opp. Br., dkt # 127, at 23.   This assertion is wrong.

The specification provides, for example:

> Col. 3, lns. 34-39:
>
>> The present invention utilizes specification tables identifying each of the information processors or databases used by the hospital, the types of data records stored by the databases, and instructions and algorithms for accessing, *modifying* and processing *data records and their addresses*, . . .
>
> Col. 7, lns. 15-17:
>
>> Further corresponding to each data type **136** is a *URL cipher **140** used to generate an address* to store the designated type of data.
>
> Co. 8, lns. 41-43:
>
>> If there are data references, they may in steps **580** through **596** be *reformatted so that the URL addresses are compatible* with addressing protocols used by the hospital.

(Emphasis added.)

The reconfiguration of data record addresses to comport with a standardized addressing scheme is pervasive in the specification, as reflected in Figures 3B (step 140), 4A, 5C (step 268), 5E (step 316)12B, (step 596), 13C, 14A and 14B.  As defendant notes, these address modifications involve changing from one URL form to another URL form, thereby foreclosing the construction that simply forming a URL constitutes the "standardized format" of the claims.

As the court of appeals recognized, AutoLink does not use a standardized format for

15

addressing the data records it retrieves:

> After identifying tokens, the processing device (i.e., the user's computer) does not convert them into the same address format as that used by the database holding the contextually related record (e.g., UPS's database). Instead AutoLink sends the token to Google's servers which, like the intermediate computers of the prior art systems, conduct the necessary translation into the address format used by each database. As the district court astutely noted, this translation is necessary because Google does not control the databases and thus cannot dictate (to UPS or CarFax.com, for example) what address formats they must use.

Hyperphrase Technologies,, Inc. v. Google, Inc., 260 Fed. Appx. 274, 282 (Fed. Cir. 2007).

Thus, the AutoLink system is inherently incapable of using a "standardized format for addressing" the records in the system, an element that is at the heart of the '889 invention.

2.  "Means for modifying said reference to said second data record to create an address"

The parties' dispute on this term is whether, as defendant contends, it requires an actual modification to the reference within the first data record, resulting in a modified first data record or whether the element requires only a modification to the reference extracted from the record.  Plaintiffs add that, in any event, AutoLink's modification of a document object model of the record is equivalent to modification of the data record itself.  I conclude that modification of the reference, and consequently the first data record itself, is an element of the claim and that modifying a representation of the record is not its equivalent.

Beginning with the claim language, the phrase "modifying said reference" is ambiguous

16

with respect to whether it requires a modification to the first data record or merely modification of the reference apart from the record.   The next element in the claim eliminates the ambiguity.   The requirement in element (f) of a "means for sending said modified first data record" is a plain reference to the modification of the first data reference in element (e), making it clear that the claim requires actual modification of the record.

The claim element under construction is in classic means-plus-function format, invoking 35 U.S.C. § 112 ¶ 6:

> an element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

The specification and all its embodiments include actual modification of the first record.   A stated purpose of the invention is "to provide conventions for exploring data records for references to contextually related records and *modifying, generating, embedding and appending links and data-retrieving codes in and to said related data records*, whereby to organize said related data records in a hypertext tree structure."   The claims of the '889 patent involve not only providing the immediate user with access to related records, but also altering the records for the benefit of future users.   Whether those records are modified one by one as a user requests them (see figs. 12A-C) or in a separate process that systematically amends them (see figs. 13A-C), one of the core inventive elements is the permanent modification of the records:

17

> FIGS. 13A-13C set forth an alternate embodiment of the operation of the translation and collection system 110 (FIG. 1) with particular reference to receiving, translating, and formatting data records to facilitate access through browsers and hypertext links for future users. This embodiment is similar to that set forth in FIGS. 12A-12C but may proceed independently of and prior to a request for such data.

'889 pat., col. 9, lns. 19-27.

Once a reader understands the meaning of the claim and the purpose of the invention as set forth in the specification and illustrated by the embodiments incorporated under § 112 ¶ 6, it is apparent that AutoLink does not infringe literally or by equivalence. Just as it cannot alter the addressing standard of its third party providers, AutoLink cannot modify the web pages it parses. Rather, it modifies a memory representation of the web page solely for the potential benefit of the particular user. This modification of a DOM is not literally a modification of the data record and does not perform the role of creating a hypertext tree structure by the modification of actual records. Therefore, it cannot satisfy the requirements of the doctrine of equivalents. <u>Warner-Jenkinson</u>, 520 U.S. at 40.

3. <u>"Said address being operable to retrieve said second data record"</u>

AutoLink creates a URL address, addressed to the AutoLink server, using the token it identifies in the web page representation. Although that address is not the address of a second record, it begins a process that includes at least the creation of a second URL address

18

by the google server and culminates in retrieval of a second data record.  The issue presented is whether the phrase "address being operable to retrieve" requires that the address directly accesses the record, as defendant contends, or whether it need only set in motion a process that leads ultimately to retrieval, as plaintiffs contend.  Consideration of the claims language, specification and prosecution history leads to the inescapable conclusion that defendant's construction is correct.

The claim language requires the address to be operable to retrieve the second data record, implying that no additional steps are required.  Such an interpretation is consistent with the preamble, which speaks of a standardized format for addresses.  Thus, in its most ordinary sense and in the context of the entire claim, the address must be that of the second record.

Because the element is in means-plus-function form, the preferred embodiments also impart meaning.  Each preferred embodiment employs the URL cipher 140, configured to produce an address to the second record pursuant to the standardized addressing format.  See, e.g., Fig. 12B, step 596, Fig. 13B, step 680.  No preferred embodiment employs additional operations to retrieve the record.  In each embodiment, the address formed is the address of the second record.  Contrary to plaintiffs' contention, figures 14A and B and the related text do not show a contrary embodiment.

19



Figure 14A



Figure 14B

FIGS. 14A-D set forth an example of the hypertext and URL processing performed by the data translation and collection system **110 (FIG.1)** in response to a request for a data record. FIG. 14A proffers, by way of example, a URL address **700** that may be compatible with a standard hospital format. . . . The data translation and collection system (**110**) reformats the data request into a new data request **720 (FIG. 14B)** which is compatible with the data base system **106 (FIG. 1**) holding this data.

Col. 10, lns. 43-59.

20

This portion of the specification explains the invention operation to convert an initial data request into a request that conforms to the standardized addressing system. See generally FIG. 12A. This process is unrelated to the process of parsing the first record to produce an address operable to retrieve the second record. The specification does not suggest that the initial, improperly formatted document request of FIG. 14A, is "operable to retrieve" the requested record, as that phrase is used in the claims. Rather, FIG. 14A depicts the "means for receiving a reference" of claim 1, step (b), while FIG. 14B depicts the "means for retrieving said first data record." In this context, the address of FIG. 14B is "operable to retrieve the record" while the address of FIG. 14A is not. The reformatted address is in accord with the standardized addressing format for the storage system.

Finally, during the patent prosecution, the applicant confirmed his intent that the address created by modifying the first reference would be the actual address of the second record. In response to the examiner's rejection based in part on U.S. Patent No. 5,530,852 to Meske, the applicant argued:

> Parsing the references (keywords, hyperlinks and the like) and modifying the parsed reference to create an address of the referenced data record is not taught by the cited references. In Meske, HTML versions of articles (files, or data records) are parsed for the presence of specified search terms. The parsing, however, only leads to the creation of additional files such as a brief file describing the contents of the article, a profile list, and story files; there is no modification of the parsed file to refer to

21

> another file by its address . . . .  There is simply no teaching of linking records by <u>modifying</u> the parsed record to create the address of the referenced record.

Dkt. #26, Exh B at GOOG05699-700 (emphasis in original).  In distinguishing the prior art, the patentee notes in three separate places that the address created in step (e) of claim 1 *is the address of the referenced record,* not some other address that might lead to the development of an address to the referenced record through further processing.

From this analysis, I conclude that AutoLink lacks at least these three elements of claim 1 of the '889 and therefore does not infringe as a matter of law.  It follows that AutoLink does not infringe claim 7, which depends from claim 1.

## B.  '321 Patent

Defendant seeks summary judgment of non-infringement of claim 1 of the '321 patent on the ground that AutoLink does not employ a "modifier reference," as that term is properly construed.  Defendant argues that the AutoLink "trigger" cannot be a modifier reference because it does not change the token in a way that makes its reference more specific.  Concerning claim 86, defendant makes two related arguments.  First, a "specifying reference" necessarily includes a modifier reference.  Alternatively, the phrase "modified by other information which renders the SR relatively specific" has the same meaning as modifier reference.  Because I agree that the AutoLink trigger does not act as a modifier of the token

22

as required by both asserted independent claims of the '321 patent, I conclude that AutoLink does not infringe either asserted independent claim

1. Claim 1 – "modifier reference"

_____ Neither the claims nor the specification expressly define the term "modifier reference." However, the '321 specification expressly defines two related terms that inform the meaning of modifier reference: "data reference" and "specifying reference."

> A DR [data reference] is a unique phrase or word which may be used in a record to refer to another record or record segment. In the context of a medical facility an exemplary DR may be as simple as "medication given", or "ECG report", or "Admission NMR heartbeat". As explained in more detail below, when a processor linking feature is selected, processor **14** searches for DRs in a specified record and, when a DR is identified, links the DR to a record or record segment associated with the DR via hyperlink or other mechanism.

'321 pat., col. 8, lns. 30-32. The term "specifying reference" is "used to refer generically to each of a DR and a DR/MR combination or a DR/MR/MR combination." Col. 4, lns. 34-36.

The ordinary meaning of the term "modifier" suggests that a modifier reference alters or changes a data reference in some way. In all of the embodiments disclosed in the specification, the modifier reference changes the data reference in the sense that the combination of the modifier and data references creates an association with a more specific record or record segment than the data reference alone.

23

The role of a modifier reference, and the nature of the way it modifies the data reference, is explained in general at col. 3, lines 20-28:

> A wrinkle of complexity is added to the referencing scheme whereby modifier references (MRs) may be used to further specify a specific record when a DR is identified. In this case, when a DR is identified, the record is further examined to identify modifier references (MRs) which identify a specific segment of a record which is associated with the data reference.

The following example from the '321 specification illustrates how a modifier reference is used to specify more precisely a portion of the broader record associated with the data reference:

> [A] single DR may be modified by any of several different modifier references (MRs) such that each DR/MR combination refers to a specific and distinct record or record segment and is correlated with a specific record or segment address. For example, a DR may comprise the term "ECG" while one MR may be "previous" and another MR may be "admission" so that DR/MR combinations include each of "admission ECG" and "previous ECG".

Col. 12, lns. 1-8.

I conclude that the AutoLink trigger is not a modifier reference because it does nothing to designate the referenced record more specifically. When AutoLink identifies a token it associates the token with a single referenced record. For example, if the AutoLink software identifies a 19-digit string, it associates the number with a UPS web page for a 19-digit UPS tracking number. Although a trigger must also be present in the first record before AutoLink will create a selectable link for the user, in all cases, the address for the second record is based

24

exclusively on the content of the token.  The trigger has no effect on the formation of the address to the second record.  The trigger does not specify a different or more specific portion of the identified web page.  Stated differently, the record referenced by the token alone is always identical to the record referenced by the token/trigger combination.  The trigger does not provide any greater specificity in the designation of the second record. Therefore, the trigger is not a modifier reference as that term is used in the '321 patent.

The trigger makes it more likely that the record associated with the token will be relevant to the user.  For example, a 19-digit string might appear in the first record even though it does not represent a UPS tracking number.  In that instance, linking to the UPS web page for that tracking number will likely produce a result that is irrelevant and confusing to a user, if it produces a result at all.  The probability of this result is reduced by searching for a token/trigger combination.  However, searching for a combination of terms before linking to a record does not necessarily render any single term in the combination a "modifier reference."  In fact, the '321 specification is replete with examples of relatively complex data references including several terms.  See, e.g., Fig. 28 of the '321 specification:



Fig. 28

It would be consistent with the patent teachings to characterize the token/trigger combination as data reference.  But the trigger cannot properly be characterized as a modifier reference because it does not perform the unique function of a modifier reference, which is specifying a more specific component of the record or records associated with the data reference.

Because AutoLink does not infringe claim 1, it follows that it does not infringe dependent claim 24.

2.  <u>Claim 86  – "seemingly general SR is modified by other record information which renders the SR relatively specific"</u>

Defendant first argues that a specifying reference necessarily includes a modifier reference and, because AutoLink does not use a modifier reference, it cannot infringe.   The first premise of this argument is erroneous.  A data reference alone can constitute a specifying reference in accordance with the patent's definition.  The phrase "each of a DR and a DR/MR combination or a DR/MR/MR combination" is grammatically ambiguous and might mean, as defendant suggests at page 28 of its opposition brief, dkt # 103, that it could be either (1) a combination of a first DR, a second DR, and an MR or (2) a DR/MR/MR combination.  Alternatively, the phrase might mean either (1) a DR; (2) a DR/MR combination; or (3) a DR/MR/MR combination.   Examination of the specification reveals that the second construction is correct.  At column 13, lines 33-34, a similar phrase is repeated with the ambiguity removed: "the term 'specifying reference' (SR) is used to refer generically to each

27

of a DR and a DR/MR combination." This formulation leaves no doubt that a data reference alone can be a specifying reference. Therefore, a modifier reference is not necessarily an element of a specifying reference.

However, I agree with defendant that the claim language "seemingly general SR is modified by other record information which renders the SR relatively specific" includes elements identical to the limitation of a modifier reference and that AutoLink lacks those elements for the same reasons. Plaintiffs assert that AutoLink tokens are "seemingly general" and that AutoLink triggers modify the tokens to render them "relatively specific." But in any ordinary sense of the term, AutoLink tokens are not seemingly general. In fact, the tokens are seemingly very specific; pointing to a single book, tracking number, etc. The triggers do not render tokens relatively more specific because the token/trigger combination is always associated with an identical record associated with the token alone. Consideration of the applicable portion of the specification confirms that the phrase is intended to have the same meaning as a modifier reference and that AutoLink lacks the element. Figure 27a and the accompanying text at col. 16, lns. 1-10 is an embodiment of claim 86:



**Fig. 27a**

Here, when a mouse controlled cursor **551** is used to designate a DR which is separated from an associated MR, processor **14** provides an SR description box **552** to help the user navigate system records. For example, referring still to FIG. 27a, when phrase "ECG image" is pointed to prior to selection thereof, processor **14** provides description box **552** adjacent phrase "ECG image" showing the SR (i.e. "ECG image of Jan. 16, 1996"). Thereafter, selection via a mouse or the like links the user to the corresponding ECG image of Jan. 16, 1996.

In the embodiment, "ECG Image" represents the "seemingly general SR," which "is modified by other record information "of January 16, 1996" rendering the SR relatively specific. Thus, the embodiment makes clear that the modification accomplished in this element of claim 86 is identical to the increased specificity inherent in the modifier reference

29

element of claim 1.  AutoLink lacks this element for the same reason it lacks a modifier

reference.  The AutoLink token is always the most specific reference employed to identify and

link to the second record.  The trigger does not modify it to make it more specific.  Lacking

this element, AutoLink does not infringe claim 86.


## C. Other Pending Motions

It is not necessary to take up defendant's related motion to determine that any

infringement is not willful in light of the determination that there is no infringement.  As to

defendant's motions relating to the asserted invalidity of various claims of the patents-in-suit,

I decline to take them up.  It appears that final resolution of all infringement claims prior to

trial eliminates any case or controversy, particularly when defendant has produced no

evidence of other, different products.  Benitec Australia, Ltd. v. Nucleonics, Inc., 495 F.3d

1340, 1347-49 (Fed. Cir. 2007).  Given the doubtfulness of continuing jurisdiction and the

relative clarity of the infringement issues, I will exercise my discretion not to address the

invalidity counterclaims.  I will dismiss those counterclaims as moot.  Phonometrics, Inc. v.

Northern Telecom Inc., 133 F.3d 1459, 1468 (Fed. Cir. 1998).


## ORDER

IT IS ORDERED that defendant Google Inc.'s motion for summary judgment, dkt.

#100, is GRANTED insofar as it seeks a determination that its AutoLink product does not

infringe United States Patents Nos. 5,903,889 and 6,526,321 and is in all other respects DENIED AS MOOT.  The clerk of court is directed to enter judgment dismissing plaintiffs Hyperphrase Technologies, LLC and Hyperphrase Inc.'s complaint with prejudice.

Entered this 30th day of September, 2008.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge